# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FIREMAN'S FUND INSURANCE COMPANY<br>777 San Marin Drive<br>Novato, CA 94998<br><br>Plaintiff,<br><br>v.<br><br>CELLULAR TELECOMMUNICATIONS AND INTERNET ASSOCIATION<br>1400 16th Street, N.W.<br>Ste. 600<br>Washington, D.C. 20036<br><br>AND<br><br>THE HARTFORD CASUALTY INSURANCE COMPANY<br>Hartford Plaza<br>Hartford, CT 06115<br><br>AND<br><br>TWIN CITY FIRE INSURANCE COMPANY<br>Hartford Plaza<br>Hartford, CT 06115<br><br>Defendants. | CIV. ACTION NO. |

## COMPLAINT FOR DECLARATORY AND OTHER RELIEF

Plaintiff, Fireman's Fund Insurance Company ("Fireman's Fund"), for its

Complaint against Defendants, alleges as follows:

## NATURE OF THE ACTION

1.     This is an action by Fireman's Fund pursuant to 28 U.S.C. §§ 2201 and

2202 for a declaratory judgment regarding its rights and obligations under certain

insurance policies issued to the Cellular Telecommunications and Internet Association

("CTIA"), as described more fully below, with respect to claims asserted against CTIA in

various lawsuits commonly referred to as the Wireless Telephone Litigation.  In this

action, Fireman's Fund seeks a judgment declaring that coverage for the Wireless

Telephone Litigation is excluded by a Prior and/or Pending Litigation Exclusion in the

referenced policies.  That exclusion is triggered because the Wireless Telephone

Litigation involves or is based upon or arises out of facts and circumstances that were at

issue in litigation against CTIA filed prior to, or pending as of, the inception of the

Fireman's Fund policies.

2.     In addition, Fireman's Fund seeks relief as against Defendants Hartford

Casualty Insurance Company and its subsidiary, Twin City Fire Insurance Company

(collectively, "Hartford") with respect to the approximately $1 million in attorneys' fees

and costs that Fireman's Fund has advanced to CTIA, and continues to advance to CTIA,

under a reservation of rights, in connection with its defense of the Wireless Telephone

Litigation.  Hartford has issued comprehensive general liability policies that provide

coverage to CTIA on a primary basis for the Wireless Telephone Litigation, however

Hartford has failed to provide CTIA with a full defense to CTIA under those policies in

connection with the Wirelesss Telephone Litigation.  Upon receiving the requested

declaration that the Wireless Telephone Litigation is not covered under the Fireman's

Fund policies, Fireman's Fund will be entitled to recover from Hartford, as CTIA's

subrogee or otherwise, the attorneys' fees and costs Fireman's Fund has advanced or will advance on behalf of CTIA. Alternatively, *even if* the Wireless Telephone Litigation is found to be potentially covered under the Fireman's Fund policies issued to CTIA, any coverage obligation Fireman's Fund may have under those policies, including any defense obligation, is excess to the Hartford GL Policies and would not attach until the Hartford GL Policies have been fully exhausted. Accordingly, Fireman's Fund seeks, in the alternative, a declaration that the indemnification and defense obligations under its policies are not triggered until the exhaustion of the underlying Hartford GL Policies and an award against Hartford, as CTIA's subrogee or otherwise, in the amount of the defense fees and costs Fireman's Fund has advanced and is continuing to advance in defense of CTIA that properly should have been borne by Hartford.

### JURISDICTION AND VENUE

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. section 1332(a)(1). Based on information and belief, there is complete diversity of citizenship between Plaintiff and Defendants. The amount in controversy exceeds the sum of $75,000, exclusive of interest and costs. An actual controversy within the meaning of 28 U.S.C. § 2201 exists between the parties.

4.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 in that a substantial part of the events giving rise to the claims at issue in this action occurred in this district.

## PARTIES

5.      Plaintiff Fireman's Fund is a corporation organized and existing under the laws of the State of California with its principal place of business in the State of California.

6.      Upon information and belief, defendant CTIA is a corporation organized and existing under the laws of the District of Columbia with its principal place of business in the District of Columbia.

7.      Upon information and belief, defendant Hartford Insurance Company is a corporation organized and existing under the laws of the State of Indiana with its principal place of business in Hartford, Connecticut.

8.      Upon information and belief, defendant Twin City Fire Insurance Company is a subsidiary of Hartford Insurance Company, and is a corporation organized and existing under the laws of the State of Indiana with its principal place of business in Hartford, Connecticut.

9.      Defendants Hartford Insurance Company and Twin City Fire Insurance Company are collectively referred to herein as "Hartford."

## FACTUAL ALLEGATIONS

### The Fireman's Fund Policies

10.      First Specialty Insurance Company, issued NonProfit Organization Liability Insurance Policy No. NPA-000122-3 to CTIA for the policy period June 1, 2000 to June 1, 2001 (the "2000 – 2001 Policy") and Nonprofit Organization Liability Insurance Policy No. NPA-000122-4 to CTIA for the policy period June 1, 2001 to June 1, 2002 (the "2001 – 2002 Policy).  Effective November 16, 2000, Fireman's Fund

acquired First Specialty's rights and obligations under the 2000-2001 Policy and the 2001-2002 Policy and is the real party in interest with respect to those policies. Collectively, the 2000-2001 and 2001-2002 Policies are referred to herein as the "Fireman's Fund Policies." The Fireman's Fund Policies, excluding application materials, are attached hereto as Exhibits 1 and 2 respectively.

11.    Subject to all of their terms, conditions and exclusions, the Fireman's Fund Policies provide coverage, in pertinent part, to the "Insureds" for all "Loss" in excess of the applicable retention amount which the "Insureds" "shall be legally obligated to pay as a result of any 'claim' or 'claim(s)' that is made against the 'insured' due to a 'wrongful act,' provided that the 'claim' is first made during the 'policy period' and written notice of the 'claim' is received during the 'policy period.'" See 2000 – 2001 Policy, Section I; 2001 – 2002 Policy, Section I.

12.    The term "Claim" is defined under the Fireman's Fund Policies to mean "any demand made upon the 'insured' for monetary damages, whether formal or informal, written or oral, as a result of a 'wrongful act.'" See 2000 – 2001 Policy, Section II.A; Definitions, "Claim;" 2001 – 2002 Policy, Section II.A, Definitions, "Claim."

13.    The term "Wrongful Act" is defined under the Fireman's Fund Policies to mean "any actual or alleged error or omission, misstatement, misleading statement, discrimination, harassment, civil rights violations, breach of duty, or negligent act committed by an 'insured,' 'employment practice claim,' or 'personal injury' based upon or arising out of the (non)performance of 'professional services' on behalf of the

'entity.'" See 2000 – 2001 Policy, Section II.K; Definitions, "Wrongful Act;" 2001 –

2002 Policy, Section II.K, Definitions, "Wrongful Act."

14.    The term "Loss" is defined under the Fireman's Fund Policies in relevant

part, and subject to certain exceptions, to mean "any amount which the 'insured(s)' are

legally obligated to pay, or which the 'entity' shall be required or permitted by law to

pay, as indemnity to the 'insured(s)' for any 'claim' or 'claim(s)' made against them for

'wrongful act(s)' and shall include, but not be limited to monetary damages, judgments,

settlements, and 'claims expenses.'" See 2000 – 2001 Policy, Section II.F; Definitions,

"Loss;" 2001 – 2002 Policy, Section II.F, Definitions, "Loss."

15.    The term "Insured" and "Insureds" is defined under the Fireman's Fund

Policies to include the "entity" (defined in the policies as CTIA) and any current or

former director, officer, employee or volunteer of CTIA.  See 2000 – 2001 Policy,

Declarations Page and Section II.E; Definitions, "Insured(s);" 2001 – 2002 Policy,

Declarations Page and Section II.E, Definitions, "Insured(s)."

16.    The Fireman's Fund Policies each contain an exclusion for prior and/or

pending litigation which provides as follows:

> This Policy does not apply to any "claim" made against any
> "insured" based upon, "arising out of," in consequence of, or in
> any way involving:
>
> 1.  Any litigation brought prior to or pending at the inception of
>     this insurance; or
>
> 2.  Any fact, circumstance or situation underlying or alleged in
>     such litigation.

See 2000-2001 Policy, Prior/Pending Litigation Exclusion; 2001 – 2002 Policy,

Prior/Pending Litigation Exclusion.

17.    The Fireman's Fund Policies each contain an "other insurance" provision which provides that: "If the 'entity' or any 'insured' has other insurance insuring a 'loss' covered by this policy, the insurance provided by this policy shall apply in excess of such other insurance." See 2000 – 2001 Policy, Section XV, "Other Insurance;" 2001 – 2002 Policy, Section XV, "Other Insurance."

18.    The Fireman's Fund Policies each contain a subrogation provision that provides in relevant part that: "In the event of any payment under this policy, we shall be subrogated to all the 'insured's' rights of recovery therefore against any person or organization." See 2000 – 2001 Policy, Section XVII, "Subrogation;" 2001 – 2002 Policy, Section XVII, "Subrogation."

### The Hartford Policies

19.    Upon information and belief, from July 29, 1991 until June 1, 2002, Hartford issued comprehensive general liability and umbrella liability insurance policies on an annual basis to CTIA (hereinafter, the "Hartford GL Policies " and the "Hartford Umbrella Policies" respectively). Upon information and belief, the Hartford GL Policies are so-called "occurrence" policies, covering "those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage'" caused by an "occurrence" during the applicable policy period.

20.    For instance, the Hartford GL Policy for the period June 1, 1996 to June 1, 1997, attached hereto in relevant part as Exhibit 3, contains an Insuring Agreement that provides, in relevant part, that Hartford "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies." The policy further provides that "[t]his insurance applies

to 'bodily injury' and 'property damage' only if (1) [t]he 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory' and (2) [t]he 'bodily injury' or 'property damage' occurs during the policy period." Upon information and belief, a similar Insuring Agreement is contained in the other Hartford GL Policies.

21.    Upon information and belief, the Hartford GL Policies provide an annual aggregate limit of liability between $1 million and $2 million, and the corresponding Hartford Umbrella Policies provide an annual aggregate limit of liability between $2 million to $5 million.

22.    Upon information and belief, the Hartford GL Policies are written on a duty to defend basis, and provide that the duty to defend does not terminate under the Hartford GL Policies until the applicable limit of insurance afforded under the Hartford GL Policies is exhausted in the payment of judgments or settlements. For instance, the Hartford GL Policy for the period June 1, 1996 to June 1, 1997 provides that "[w]e will have the right and duty to defend the insured" and that "[o]ur right and duty to defend end when we have used up the applicable limit of insurance in the payment of judgments or settlements." Upon information and belief, similar provisions are contained in the other Hartford GL Policies.

23.    Upon information and belief, the Hartford GL Policies contain an "other insurance" clause that provides that the insurance afforded under the Hartford GL Policies is primary to other valid and collectible insurance, such as the FFI Policies, except under certain circumstances not present here. For instance, the Hartford GL Policy for the period June 1, 1996 to June 1, 1997 provides that:

If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage part, our obligations are limited as follows:

**a.    Primary Insurance**

This insurance is primary except when **b.** below applies.  If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary.  Then, we will share with all that other insurance by the method described in **c.** below.

**b.    Excess Insurance**

This insurance is excess over any other insurance, whether primary, excess, contingent or on any other basis:

(1)    That is Fire, Extended Coverage, Builders Risk, Installation Risk or similar coverage for "your work;"

(2)    That is Fire, lightning or explosion insurance for premises rented to you;

(3)    It the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion **g.** of **Coverage A** (Section I); or

(4)    When any of the Named Insureds, under this Coverage Part, are additional insureds under a commercial general liability policy or similar insurance of another party.

When this insurance is excess, we will have no duty under Coverage A or B to defend any claim or "suit" that any other insurer has a duty to defend.  If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insureds.

When this insurance is excess over other insurance, we will pay only our share of the amount of the loss, if any, that exceeds the sum of:

(1)    The total amount that all such other insurance would pay for the loss in the absence of this insurance; and

(2)    The total of all deductible and self-insured amounts under all that other insurance.

We will share the remaining loss, if any, with any other insurance that is not described in this Excess Insurance provision and was not bought

specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.

**c.    Method of Sharing**

If all of the other insurance permits contribution by equal shares, we will follow this method also.  Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.

If any of the other insurance does not permit contribution by equal shares, we will contribute by limits.  Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

Upon information and belief, similar provisions are contained in the other Hartford GL Policies.

24.    CTIA has requested coverage for the Wireless Telephone Litigation under the Hartford GL Policies.

<u>**The Wireless Telephone Litigation**</u>

25.    CTIA is a trade association and the international organization that represents the interests of the wireless communications industry, including service providers and manufacturers of wireless telephones.

26.    CTIA is a defendant in several lawsuits that arise out of the alleged continuous practice of the cellular telephone industry, beginning at least in the 1980s and continuing through the 1990s and beyond, of negligently and/or fraudulently misrepresenting to the public the safety of cellular telephones marketed and purchased during that period.[1]  Among other things, the defendants, including CTIA, allegedly concealed from the public the status of research into potential adverse health effects associated with cell phone usage, discouraged or delayed the conducting of such research,

---

[1] Nothing in this complaint is intended to imply or suggest that Fireman's Fund credits the allegations that have been made against CTIA.

selectively reported research results to the public that were favorable to the cell phone

industry, supported studies designed to produce results favorable to the cell phone

industry, concealed or delayed the disclosure of allegedly independent research results

that were not favorable to the cell phone industry in that they identified adverse health

effects associated with cell phone usage, and otherwise mischaracterized the medical and

scientific data known to CTIA about the alleged adverse health effects of cell phone

usage.

27.    The gravamen of the Wireless Telephone Litigation, as it pertains to

CTIA, is the allegation that CTIA, as the trade association for the cell phone industry,

was at the forefront of the cell phone industry's alleged negligent and/or fraudulent

misrepresentations to the public of the safety of cellular telephones.

28.    CTIA has requested coverage under the Fireman's Fund Policies for the

following lawsuits which make these and similar allegations:  (a) Christopher Newman,

et al. v. Motorola, Inc., et al., filed in or about August 2000, in the Circuit Court for

Baltimore City, Maryland; (b) Gibb Brower, et al. v. Motorola, Inc., et al., filed in or

about April 2001 in the Superior Court of the State of California, County of San Diego;

(c) Michael Patrick Murray, et al. v. Motorola, Inc., et al., filed in or about November

2001 in the Superior Court of the District of Columbia; (d) David C. Keller, et al. v.

Nokia, Inc., et al., filed in or about February 2002 in the Superior Court of the District of

Columbia; (e) Baldassare S. Agro, et al. v. Motorola, Inc., et al., filed in or about

February 2002 in the Superior Court of the District of Columbia; (f) Richard Schwamb,

et al. v. Qualcomm, Inc., et al., filed in or about February 2002 in the Superior Court for

the District of Columbia; (g) Dino Shofield v. Matsushita, Inc., et al., filed in or about

February 2002 in the Superior Court of the District of Columbia; (h) Pamela Cochran, et al. v. Audiovox Corp., et al., filed in or about February 2002 in the Superior Court of the District of Columbia; (i) Sarah Dahlgren, et al. v. Audiovox Communications Corp., et al., filed in or about May 2002 in the United States District Court for the District of Maryland, and re-filed after voluntary dismissal in the Superior Court of the District of Columbia in or about September 2002; (j) J. Douglas Pinney, et al. v. Nokia, et al., filed in or about May 2001 in the Circuit Court for Baltimore City, Maryland, and subsequently amended in or about September 2002 to name CTIA as a defendant; (k) Francis Farina, et al. v. Nokia, et al., filed in or about April 2001 in the Court of Common Pleas, Philadelphia, Pennsylvania, and subsequently amended in or about September 2002 to name CTIA as a defendant; (l) Crystal Gilliam, et al. v. Nokia, et al, filed in or about April 2001 in the Supreme Court of New York, Bronx County, and subsequently amended in or about September 2002 to name CTIA as a defendant; and (m) Riedy Gimpelson, et al. v. Nokia, Inc., et al., filed in or about June 2001 in the Superior Court of Georgia, and subsequently amended in or about September 2002 to name CTIA as a defendant.

29.    The above-referenced lawsuits, Newman, Agro, Schofield, Schwamb, Keller, Cochran, Murray, Brower, Dahlgren, Farina, Gilliam, Gimpelson, and Pinney are collectively referred to herein as the "Wireless Telephone Litigation."

30.    Collectively, the lawsuits assert causes of action for: (1) intentional fraud and misrepresentation; (2) negligent misrepresentation; (3) strict products liability; (4) negligence; (5) failure to warn and defective manufacture and design; (6) breach of

express and implied warranties; (7) civil conspiracy; (8) violations of consumer

protection statutes; and (9) civil battery.

31.    The <u>Newman</u>, <u>Agro</u>, <u>Schofield</u>, <u>Schwamb</u>, <u>Keller</u>, <u>Cochran</u>, <u>Murray</u>, and

<u>Brower</u> matters involve plaintiffs who allegedly have been diagnosed with brain cancer

or related injuries which they attribute to the radiation emitted from their cellular

telephones, and are commonly referred to as the "brain cancer cases." Attached hereto as

Exhibits 4-6 are copies of the original complaints in the <u>Newman</u>, <u>Agro</u>, and <u>Brower</u>

matters, which are representative of the allegations asserted in the so-called "brain cancer

cases." The <u>Pinney</u>, <u>Gilliam</u>, <u>Farina</u>, <u>Gimpelson</u>, and <u>Dahlgren</u> matters involve plaintiffs

who have not been diagnosed with a cellular telephone related injury, but who contend

that the radiation emitted by cellular telephones causes biological injury and otherwise

creates an unacceptable health risk to users that has caused them damage by making their

cellular telephones effectively unusable. These cases are commonly referred to as the

"headset cases" because they seek as partial relief an order requiring the defendants to

supply cellular telephones with accompanying headsets. Attached hereto as Exhibits 7-8

are copies of the original complaints in the <u>Pinney</u> and <u>Dahlgren</u> matters asserting claims

against CTIA, which are representative of the allegations asserted in the so-called

"headset cases."

32.    The referenced lawsuits were removed by the defendants to federal court

and, due to their factual similarity, generally were consolidated into a single proceeding

styled, <u>In re Wireless Telephone Radio Frequency Emissions Product Liability Litigation</u>

(01-MDL-1421), before the United States District Court for the District of Maryland.

The lawsuits were recently remanded to their respective state courts following extensive

litigation over jurisdictional issues, but still have not moved beyond the preliminary motions stage. Upon information and belief, the complaints in <u>Gilliam</u> and <u>Gimpelson</u> have been voluntarily dismissed, and the first-filed of the Wireless Telephone Litigation, <u>Newman</u>, was dismissed on summary judgment in or about November 2002.

### **The Earlier Wright and Busse Matters**

33.    The Wireless Telephone Litigation involves, is based upon, or arises out of, facts, circumstances and situations, underlying or alleged in two lawsuits previously filed against CTIA in 1995.

34.    The first of these lawsuits, <u>Wright v. Motorola, Inc.</u>, was filed on March 2, 1995 against CTIA and others, and involved a plaintiff who allegedly developed brain cancer from the radiation emitted by her cellular telephone. A copy of the original complaint, without exhibits, is attached hereto as Exhibit 9.

35.    In <u>Wright</u>, the plaintiff contended that her injury resulted in part from "misrepresentations and omissions . . . by both Motorola and CTIA" in furtherance of a "conspiracy against the public . . . into believing that the scientific database with respect to the potential and adverse short-term and long-term consequences of using cellular portable telephones is broad and conclusive as to safety when in fact it is not." (<u>Wright</u> Compl. ¶ 125). The plaintiff referred to CTIA specifically as "the front organization that performs as a propaganda machine which produces and circulates public relations pronouncements that are meant to conceal or blunt the truth pertaining to known dangerous factors surrounding the current generation of cellular portable telephones and the absence of any research on the effect of usage to human beings." (<u>Wright</u> Compl. ¶ 37).

36.    The other case, <u>Busse v. Motorola, Inc., et al.</u>, was filed on October 26, 1995 against CTIA and others, and involved a plaintiff who asserted causes of action on behalf of himself and a putative class of consumers who allegedly were being misinformed about the health effects of radiation from cellular telephones.  A copy of the original complaint in <u>Busse</u> is attached hereto as Exhibit 10.

37.    The plaintiff in <u>Busse</u> alleged that "purchasers have not been informed and are not being informed at the time of purchase . . . that cellular portable telephones are, in fact, under research to determine whether they foster or contribute to the development of tumorous conditions" and that "[d]efendants . . . have advanced purported findings of research regarding the safety of cellular portable telephones and failed to publicize research which puts in question the safety of cellular portable telephones and makes irrefutable their unproven safety."  (<u>Busse</u> Compl. ¶¶ 16 and 19)

38.    <u>Wright</u> and <u>Busse</u> cite, as examples of this alleged misconduct, many of the same examples cited in the Wireless Telephone Litigation to support similar allegations.  For instance, the lawsuits feature prominently allegations regarding alleged false statements made by CTIA at a press conference on July 16, 1993, which prompted a response by Elizabeth Jacobson of the FDA.  The lawsuits also cite many of the same studies, which allegedly showed biological damage from cell phone radiation, as evidence of defendants' prior knowledge of the inaccuracy of their public statements.  The lawsuits also juxtapose these allegedly independent studies against the contrary results of studies that allegedly were improperly influenced by the cellular telephone industry.  These allegations are cited as evidence of defendants' alleged continuous practice of negligently and/or fraudulently manipulating science and misinforming the

consuming public.  (E.g., Wright Compl. ¶¶ 37, 42-49; Busse Compl. ¶¶ 19-20 and Exh.

B; Brower Compl. ¶¶ 28 and 29 (kk, ll, pp, vv); Pinney Amended Compl. ¶¶ 78, 80, 84-

85; Dahlgren Compl. ¶¶ 40, 41, 44-45, 47; Newman First Amended Compl. ¶¶ 24-30, 37;

Agro Compl. ¶¶ 47mm, 49(b), 50(a), 64-65).

39.        Collectively, Wright and Busse asserted causes of actions of civil

conspiracy, violation of consumer protection acts, products liability, breach of warranty,

negligence, and civil battery.  Upon information and belief, the causes of action asserted

against CTIA in Wright were dismissed in or about May 1997.  Upon information and

belief, the causes of action against CTIA in Busse were dismissed in or about October

2002.

40.        Wright and Busse were brought prior to, and/or were pending, as of the

inception of the insurance provided in the Fireman's Fund Policies.

### Fireman's Fund's Advancement of Defense Fees and Costs

41.        Fireman's Fund has advanced, and continues to advance, reasonable

attorneys' fees and costs incurred by or on behalf of CTIA in defense of the Wireless

Telephone Litigation.  To date, Fireman's Fund has advanced approximately $1 million

in such fees and costs, which represents approximately one-half of the reasonable

attorneys' fees and costs incurred to date.  On information and belief, approximately the

remaining one-half has been advanced by Hartford pursuant to the Hartford GL Policies.

42.        Fireman's Fund's advancements have been made subject to a reservation

of rights, including a reservation of Fireman's Fund's right to seek recoupment of any

monies so advanced upon a determination of its legal rights.

43.     Fireman's Fund has been advised by CTIA that Hartford recently has refused to continue to advance attorneys' fees and costs related to certain headset litigation matters based on the position that that litigation does not involve "bodily injury."  Subject to a full reservation of rights, Fireman's Fund has agreed to advance 100 percent of the reasonable defense fees and costs in that litigation, and has agreed to continue to advance 50 percent of the reasonable defense fees and costs incurred in connection with the remaining lawsuits.

44.     Fireman's Fund brings this action for a judicial determination of its obligations under the Fireman's Fund Policy.

## CONTROVERSY AND RIPENESS

45.     There is an actual, ripe and live controversy between the parties regarding their respective rights and obligations under the Fireman's Fund Policies for "Loss" incurred in connection with the Wireless Telephone Litigation.  As more fully described throughout this Complaint, CTIA has requested coverage under the Fireman's Fund Policies, including the provision of a defense, in connection with the Wireless Telephone Litigation.  Fireman's Fund has reserved its right to deny coverage in connection with that claim based on a number of potentially applicable Policy provisions.

## COUNT I

**(Declaratory Relief:  Prior/Pending Litigation Exclusion)**

46.     Fireman's Fund repeats and incorporates by reference the allegations in paragraphs 1 through 45 of this Complaint.

47.    As set forth above, the Policy excludes from coverage any "claim made against any "insured" based upon, 'arising out of,' in consequence of, or in any way involving:

1. Any litigation brought prior to or pending at the inception of this insurance; or

2. Any fact, circumstance or situation underlying or alleged in such litigation."

See 2000-2001 Policy, Prior/Pending Litigation Exclusion; 2001 – 2002 Policy, Prior/Pending Litigation Exclusion.

48.    The Wireless Telephone Litigation is based upon, arises out of, is in consequence of, or in any way involves, a fact, circumstance, or situation underlying or alleged in the Wright and Busse actions.

49.    The Wright and Busse actions were filed against CTIA prior to the inception date of the Fireman's Fund Policies and/or were pending as of the inception date of the Fireman's Fund Policies.

50.    As a result of the foregoing, Fireman's Fund is entitled to a judgment declaring that coverage is not available under the Fireman's Fund Policies for the Wireless Telephone Litigation by operation of the Prior/Pending Litigation Exclusion.

## <u>COUNT II</u>

### (Declaratory Relief: "Other Insurance" Clause)

51.    Fireman's Fund repeats and incorporates by reference the allegations in paragraphs 1 through 50 of this Complaint.

52.    The Fireman's Fund Policies each contain an "other insurance" provision which provides that: "If the 'entity' or any 'insured' has other insurance insuring a 'loss'

covered by this policy, the insurance provided by this policy shall apply in excess of such other insurance." See 2000 – 2001 Policy, Section XV, Other Insurance; 2001 – 2002 Policy, Declarations Page and Section XV, Other Insurance.

53.    As a result of these provisions, the Fireman's Fund Policies are excess of the coverage afforded by the Hartford GL Policies and, accordingly, Fireman's Fund has no obligation to indemnify or defend CTIA until the limits of the Hartford GL Policies have been fully exhausted.

54.    Upon information and belief, Hartford does not dispute that its defense obligations are triggered with respect to the so-called brain cancer cases, Newman, Murray, Agro, Schofield, Schwamb, Keller, Cochran, and Brower matters. Upon information and belief, at least for the period prior to June 2005, Hartford did not dispute that the so-called headset cases, Pinney, Gilliam, Farina, Gimpelson, and Dahlgren, were sufficiently related to the brain cancer cases, both procedurally and substantively, as to make it appropriate for Hartford to treat all of the Wireless Telephone Litigation as part of its defense obligation.

55.    Fireman's Fund is entitled to a judgment declaring that, even if there were coverage under the Fireman's Fund Policies for the Wireless Telephone Litigation, that coverage would be excess to the Hartford GL Policies.

## **COUNT III**

### **(Recoupment)**

56.    Fireman's Fund repeats and incorporates by reference the allegations in paragraphs 1 through 55 of this Complaint.

57.    To the extent Fireman's Fund has paid or will pay any attorneys' fees and costs incurred by CTIA in connection with the Wireless Telephone Litigation that should have been paid by Hartford, Fireman's Fund, as subrogee or otherwise, is entitled to recover all such amounts from Hartford.  To the extent Fireman's Fund is found not to be entitled to recover any such amounts from Hartford, Fireman's Fund is entitled to recover some or all of such amounts, as appropriate, from CTIA.

WHEREFORE, plaintiff Fireman's Fund requests that the Court enter judgment in its favor as follows:

A.    On Count I, a judicial declaration that Fireman's Fund has no obligation under the Fireman's Fund Policies to defend or indemnify CTIA with respect to the Wireless Telephone Litigation as a result of the Prior and/or Pending Litigation Exclusion in the Fireman's Fund Policies.

B.    On Count II, a judicial declaration that Fireman's Fund has no obligation under the Fireman's Fund Policies to defend or indemnify CTIA with respect to the Wireless Telephone Litigation until the applicable coverage afforded by the Hartford GL Policies has been fully exhausted.

C.    On Count III, awarding judgment against Hartford and in favor of Fireman's Fund, to the extent Fireman's Fund has paid or will pay any attorneys' fees and costs incurred by CTIA in connection with the Wireless Telephone Litigation that should have been paid by Hartford, or to the extent Fireman's Fund is found not to be entitled to recover any such amounts from Hartford, awarding judgment for some or all such amounts, as appropriate, from CTIA.

D.    Awarding Fireman's Fund such additional declaratory and other relief as

shall be found to be appropriate in the circumstances.


Dated: May 8, 2006                        Respectfully submitted,

                                          _____
                                          Lewis K. Loss, D.C. Bar No. 375793
                                          Jeremy S. Simon, D.C. Bar No. 447956
                                          THOMPSON, LOSS & JUDGE LLP
                                          1919 Pennsylvania Ave., N.W.
                                          Suite M-200
                                          Washington, D.C. 20006
                                          (202) 772-5170 (phone)
                                          (202) 772-5180 (fax)