1   Carl Hilliard (034270)
    1246 Stratford
2   Del Mar, CA 92014
    Telephone 858/509-2938
3   Fax 858/509-2937

4

5           SUPERIOR COURT OF THE STATE OF CALIFORNIA

6                   COUNTY OF SAN DIEGO

7

8   Gibb Brower and Kim Brower,       ) Case No.: No.
                                      )
9           Plaintiffs,               ) COMPLAINT GIC  765987
        vs.                           )
10                                    )
    Motorola, Inc., a Delaware        )
11  corporation; U.S. West            )
    Wireless, LLC, a Colorado         )
12  Corporation; U.S. West            )
    Communications, Inc., a           )
13  Colorado corporation; Verizon     )
    Communications, Inc., a New       )
14  York corporation; GTE Mobilnet    )
    of San Diego Incorporated, a      )
15  Delaware corporation; GTE         )
    Wireless San Diego LLC, a         )
16  California Limited Liability       )
    Corporation; Sony Electronics     )
17  Inc., a Delaware corporation;     )
    Cellular Telecommunications and   )
18  Internet Association, a           )
    District of Columbia              )
19  corporation; and DOES 1 through   )
    100, inclusive,                   )
20                                    )
            Defendants.               )
21                                    )

22

23  Plaintiffs allege as follows:

24      1. Defendants Motorola, Inc. ("Motorola") and Sony

25  ///

                    Complaint - 1

1  Electronics Inc. ("Sony") manufacture portable handheld cellular
2  telephones ("PCT") for sale to the public.

3     2. Defendant U.S. Wireless, LLC, ("U.S. Wireless") provided
4  cellular telephone service to Plaintiff, Gibb Brower, in San
5  Diego County from 1994 up until approximately September of 1995,
6  when it transferred the cellular system to GTE Mobilnet of San
7  Diego Incorporated.  ("GTE Mobilnet").

8     3. GTE Mobilnet thereafter provided cellular telephone service
9  over said system to Plaintiff, Gibb Brower, until its assets
10 were sold to GTE Wireless San Diego, LLC in approximately
11 October, 2000.

12    4. Defendant Cellular Telecommunications and Internet
13 Association ("CTIA") is a trade association of cellular
14 telephone equipment manufacturers and service providers.

15    5. Plaintiff, Gibb Brower, purchased a new Motorola PCT from
16 U.S. Wireless on or about August 8, 1994 for use on its cellular
17 system in San Diego, California.  He continued to use the same
18 PCT after the transfer of the cellular system to GTE Wireless.
19 In approximately March of 1999, Mr. Bower purchased a new PCT
20 manufactured by Sony from GTE Wireless, which he then used over
21 the cellular system.  Mr. Brower now suffers from multiple
22 symptoms as a result of a brain tumor discovered on April 21,
23 2000, which was caused, directly related to, promoted by and
24 aggravated by the use of Defendants' PCTs and service.
25 ///

1    6. This Complaint alleges twelve causes of action against all

2  Defendants:

3       (a)  Intentional misrepresentation for falsely stating

4  that PCTs are absolutely safe and unconditionally pose no risk

5  of harm to the health of the user;

6       (b)  Negligent misrepresentation for failure to tell the

7  public that numerous studies show PCT use can cause genetic

8  damage, damage to the cells in the brain, interference with the

9  brain's blood barrier, dysfunction of the cellular structure of

10  the brain and cancer.

11      (c)  Strict liability for the manufacture and selling of

12  PCTs, with knowledge that such equipment was defective and

13  dangerous.

14      (d)  Product liability for failure to warn consumers of

15  the health risks associated with the use of PCTs, and failure to

16  equip PCTs with the proper and necessary safeguards to protect

17  the user against such health risk.

18      (e)  Negligence by failing to exercise ordinary care in

19  the manufacture, sale, testing, quality assurance, quality

20  control, distribution, advertising and warnings concerning PCTs.

21      (f)  Breach of Express Warranty that PCTs were safe for

22  use and posed no risk of harm to users.

23      (g)  Breach of Implied Warranty that PCTs were fit for

24  their intended purpose and posed no risk of harm to users.

25  ///

1    (h)   Conspiracy to suppress, manipulate, conceal, cover-
2 up, distort and discredit research and studies showing a risk of
3 harm to PCT users and to purchase, ghostwrite, create, bribe,
4 and co-opt researchers to reach inconclusive results to be
5 released to the public under the guise that such studies show
6 that PCTs are safe.

7    (i)   Fraud by misleading users of PCTs to believe that
8 such equipment was safe and poses no risk of harm at all to the
9 user.

10    (j)   Battery by exposing Plaintiff, Gibb Brower. to
11 harmful radiation, which they knew, or should have known, posed
12 a risk of harm to his person.

13    (k)   Loss of Consortium which has deprived Plaintiff Kim
14 Brower of her husband's comfort, society and companionship.

15    (l) Punitive damages for wanton and willful misconduct
16 by acting in reckless disregard of the consequences by placing
17 PCTs in general use without any prior testing to determine the
18 possible adverse health risk to users.

19                    **JURISDICTION AND VENUE**

20 7. The allegations and claims for relief in this Complaint
21 arise from acts committed in this state, which violate
22 California's laws.

23 8. The Federal Communications Commission ("FCC") has adopted
24 a limit, based on engineering standards, of the specific
25 absorption rate ("SAR") from radio frequency radiation

1  ("RFR")that PCTs must not exceed.  The Defendants self-certify
2  the SAR test numbers for their PCTs. Such testing is subject to
3  manipulation and error because there are so many variables and
4  subjective criteria so as to make the SAR results of no value.
5  The FCC has publicly stated that it is not the "expert agency"
6  for evaluating the health effects of PCTs.  The FCC has not
7  preempted state action in this matter.

8      9.  The U.S. Food and Drug Administration ("FDA") has
9  recently announced that it has been unable to test PCTs to see
10  if they pose a risk of harm from RFR, for the past two decades.
11  The FDA has not preempted state action in this matter.

12     10.  Venue is proper in this Court as Plaintiffs entered
13  into contracts, purchased PCTs and used such equipment in San
14  Diego, California and a substantial number of the acts
15  complained of herein took place in San Diego County.

16                            **PARTIES**

17     11.  Plaintiffs are residents of the City of San Diego,
18  State of California.  From approximately August 8, 1994 to
19  September 7, 1995, Plaintiff, Gibb Brower, subscribed to
20  cellular telephone service from Defendant U.S. Wireless.  He
21  purchased a new Motorola PCT from U.S. Wireless in August of
22  1994, which he used in connection with their cellular service.
23  After the cellular system was transferred to GTE Wireless, Mr.
24  Brower continued to use the same PCT, on said system, up until
25  approximately March 1999 when he purchased a PCT manufactured by

1   Sony from GTE Wireless for use on its cellular system.  On April
2   21, 2000, Mr. Brower was informed that a massive tumor had been
3   discovered in his brain.  This tumor was surgically removed on
4   April 27, 2000 and found to be malignant.

5       12.Defendant Motorola is a Delaware corporation,
6   headquartered at 1303 E. Algonquin Road, Schaumburg, Illinois
7   and doing business in California.

8       13.Defendant U.S. West Wireless, LLC, is a Colorado
9   corporation that is wholly owned by U.S. West Communications,
10  Inc., a Colorado corporation ("US West").  Plaintiffs are
11  informed and believe and thereon allege that U.S. Wireless has
12  no assets, and if it still exists, is merely a shell
13  corporation.

14      14.Defendant GTE Wireless is a Delaware corporation that
15  was the owner and operator of the cellular telephone system
16  serving San Diego County from approximately September of 1995.
17  On or about October 2000, all of the assets of GTE Wireless were
18  transferred to GTE Wireless San Diego LLC, a California limited
19  liability company which is now wholly owned at AT&T Wireless
20  Services, Inc., a Delaware corporation. Plaintiffs are informed
21  and believe and thereon allege that GTE Wireless has been merged
22  into to Verizon Communications Inc., a New York corporation,
23  which has its principal place of business at 1095 Avenue of the
24  Americas, New York, New York.  Plaintiffs are further informed
25  ///

1   and believe and thereon allege that GTE Wireless, if it still

2   exists, is a shell corporation.

3       16.   Defendant Sony Electronics Inc. is a Delaware

4   corporation which has its principal place of business at 1 Sony

5   Drive, Park Ridge, New Jersey.

6       17. Defendant CTIA is a trade association incorporated

7   under the laws of the District of Columbia, having its principal

8   place of business at 1250 Connecticut Avenue, N.W., in

9   Washington, D.C.  CTIA tests PCTs and certifies such equipment

10  as proper for operation with cellular systems.

11      18.   The true names and identities of the defendants sued

12  herein under California Code of Civil Procedure § 474 as Does 1

13  through 100, inclusive, are currently not known to Plaintiffs,

14  who therefore sues these defendants by such fictitious names.

15  Plaintiffs will seek to amend this Complaint and include these

16  Doe defendants' true names and capacities when they are

17  ascertained.  Each of the fictitiously named defendants is

18  responsible in some manner for the conduct alleged herein and

19  for the damages suffered by Plaintiffs.

20      19.   At all times herein mentioned in the causes of action

21  alleged herein, each and every Defendant was an agent and/or

22  general partner of each and every other defendant.   In

23  committing the acts complained of herein, each and every

24  Defendant acted within the scope of its agency and/or

25  partnership agreement and was action with the consent,

1  permission, authorization and knowledge of each of the remaining

2  defendants, and perpetrated and/or aided and abetted the

3  violations of law described herein.  All actions of each

4  Defendant as alleged herein were ratified and approved by every

5  other defendant or their officers, directors, controlling

6  persons, agents, partners, or joint venturers.

7  <u>**FACTUAL BACKGROUND**</u>

8  20.  Cellular markets are divided into standard geographical

9  areas by the FCC for administrative convenience in the licensing

10  of cellular systems.  Defendants U.S. West and then GTE Wireless

11  were one of two entities licensed by the FCC to provide cellular

12  radio telephone service in San Diego County.

13  21.  In order to provide cellular service, Defendants U.S.

14  West and GTE Wireless installed radio transmitters and receivers

15  at various locations ("cell sites")in San Diego County.  To

16  prevent interference to and from other users of the cellular

17  system, a control unit at the cell site instructs the cellular

18  radio telephones (including PCTs) within its range to increase

19  or decrease transmitting power when making or receiving a call.

20  Cellular telephones were originally installed in automobiles,

21  used external antennas and operated at 3 watts of power.  The

22  U.S. West/GTE Wireless system was designed and installed to

23  serve these units.  Defendants introduced PCTs into the market

24  in the United States without any prior environmental or testing

25  for health consequences from RFRs.  Because they are handheld,

1  the power output of PCTs is lower, 600 milliwatts, than vehicle

2  installed units.  Because the PCT antenna is located next to the

3  head, the RFR penetrates 2 ½ inches or more ("the plume") into

4  the brain.  Because the U.S. West/GTE Wireless system was

5  designed for more powerful units, the PCT is often instructed by

6  the cell site to operate at maximum power.  Some cell sites have

7  been redesigned to be "portable compatible" but Plaintiffs are

8  informed and believe and thereon allege that many of the U.S.

9  West/GTE Wireless's San Diego cell sites were not upgraded so

10 that PCTs using their cellular system usually were and are

11 operated at near maximum power.

12    22.   On or about the year 1994, Plaintiff Gibb Brower

13 purchased a new PCT, manufactured by Motorola, from U.S.

14 Wireless and commenced using, and continued to use said PCT,

15 until approximately March of 1999 on the Defendants' cellular

16 system in San Diego.  In March of 1999 he purchased a new PCT,

17 manufactured by Sony, from GTE Wireless and used that PCT in

18 place of the Motorola PCT up until April, 2000

19    23.   Generally speaking, all PCTs are purchased directly

20 from cellular telephone companies or through one of their

21 agents, who often purchase PCTs from the cellular telephone

22 company rather than from the manufacturer.  As a result,

23 cellular telephone companies and CTIA have de facto control of

24 the PCT market and accept or reject PCTs that do not meet their

25 specifications. This control is further enforced by CTIA's

1   testing program that grants the manufacturer the right to

2   advertise CTIA's approval of the approved PCT.  Finally,

3   cellular service and PCT are sold as a package and in the

4   package, the price of the PCT is fixed below cost in order to

5   discourage any PCT manufacturers from trying to sell directly to

6   consumers.  In sum, Defendants were, at all times mentioned

7   herein, in control of the design, assembly, platform for usage,

8   manufacture, marketing and sale of PCTs, which have been widely

9   advertised by the Defendants as safe.

10      24. Plaintiff Gibb Brower's brain tumor was discovered on

11  April 21, 2000.  A craniotomy was performed on April 27, 2000.

12  A mass lesion was removed, which was diagnosed as a cancerous

13  brain tumor.  This tumor was located directly in the plume where

14  the RFR from the antenna of his PCT penetrated into his brain.

15  He has undergone radiation therapy, chemotherapy and other

16  therapies.

17      25. Prior to his craniotomy, Mr. Brower had been the sole

18  proprietor of a thriving landscape business.  He used his PCT on

19  Defendants' cellular system on a more or less continuous basis

20  in his daily business.  Defendants U.S. Wireless and GTE

21  Wireless were aware of the large number of minutes of airtime

22  used for long periods, by Mr. Brower.  No one ever told him that

23  there was a risk of harm associated with this use.  No one ever

24  suggested that he use a headset or take other precautionary

25  measures to reduce his radiation exposure from PCTs.

26. Plaintiff Gibb Brower is now permanently disabled as a result of his brain tumor. Although he has continued light supervision of his business, Mr. Brower suffers from excessive fatigue, visual impairment, memory problems, psychological and emotional stress, brain cancer and trauma associated with brain surgery, and is otherwise injured. As a result, his business has declined.

27. Mr. Brower is 41 years old. He and his wife's life has been adversely affected and injured by his brain cancer and as a result of the removal and treatment of his brain tumor.

28. Since at least 1984, the Defendants have been well aware of the indicators that PCTs were harmful to the health of cellular telephone subscribers, especially heavy users of the service, and have acted to conceal and suppress such information from the public. Researchers who discovered adverse effects associated with PCT use, lost their funding, were fired, found their reputation damaged, and had their work denigrated. During a massive six-year study funded by CTIA, the epidemiologist in charge of the study concluded that there was significant evidence that PCT use is a cause of brain cancer. He was then fired by CTIA, funding for the ongoing studies was cut off, his research data was "reevaluated" and the results changed.

29. At all times herein mentioned, Defendants' were aware of numerous studies and experiments that demonstrated the health hazards of radiation from RFR dating back to the late 1940s.

1  Defendants' prior knowledge of these studies and conduct to

2  suppress adverse findings included, but was not limited to, the

3  following:

4   (a) During World War II intensive research and

5  engineering work led to the development of devices capable of

6  producing electromagnetic energy at the radio frequency band.

7   (b) In 1928, Helen Hosner, a researcher at the Albany

8  Medical College, showed that radio waves were capable of heating

9  body tissue in a study investigating the effects of experimental

10  short wave radio transmitters on workers at a General Electric

11  research facility.  Her work was entitled "Heating Effects

12  Observed in a High Frequency Static Field," was published in

13  Science.

14  (c) In a 1948 article published in the archives of Physical

15  Medicine, it was reported that electromagnetic radiation at

16  2,450 MHz was "highly productive in producing lenticular

17  opacities."

18

19  (d) In 1952, researchers noted that "experiments in which the

20  head area alone was directly irradiated suggests that the fatal

21  outcome was the result of an excessive rise in brain

22  temperature.  The lethal effects of irradiation to a limited

23  area of the body are different from those in which the entire

24  animal is exposed."  That warning was published after

25  researchers had exposed laboratory rats to a few seconds of

1  intense exposure of radio frequency radiation.  The warning was
2  published in Microwave Radiation: Biophysical Considerations and
3  Standards Criteria, IEEE Transactions on Biomedical Engineering.

4     (e)  In 1955, researchers Schwan and Piersol published
5  their work that radio frequency energy, in a broad range from
6  500 MHz to 1000 MHz, is preferentially deposited beyond the
7  skull and absorbed into the brain.

8     (f)  In its initial form, during the 1960s the IEEE/ANSI
9  safety standard, known as ANSIC95.1, established a maximum safe
10  exposure level for radio frequency radiation at 10.0m W/em2.
11  The modified standard, ANSCI95.1-1982 set the maximum level for
12  radio frequency exposure on a sliding scale by dividing the
13  frequency by a multiple of three hundred.  At 845 MHz, the
14  safety standard would be 2.8m W/cm2; at 1900 MHz the safety
15  standard would be 6.33m W/cm2.

16     (g)  In 1962, it was known in the scientific community that
17  radio frequency energy is most efficiently absorbed into human
18  tissue and is capable of producing undesirable effects.

19     (h)  It was well known in the scientific and medical
20  communities in the 1970s that an antenna is the most efficient
21  means of depositing energy into the human body and penetrating
22  human tissue.

23     (i)  In 1971, A.W. Guy published in IEEE Transaction in
24  Microwave Theory and Techniques that in order to obtain
25  selective heating, "hot spot" heating, it is necessary to expose

1  the tissue to the near zone fields of the energy source, namely

2  the antenna.  From this experimental data at 433 MHz, 750 MHz,

3  and 918 MHz the research confirmed that energy is readily

4  absorbed from the induction fields in the near zone.  The

5  absorption within the brain was found to be about 20 times

6  greater than that of the skull and subcutaneous fat.

7      (j) In 1972, in a study by I.J. Bahl, it was demonstrated

8  that frequencies between 700 megahertz and 1000 megahertz

9  interact most efficiently with human tissue to yield the

10  greatest energy absorption and that the temporal lobe of the

11  brain is the most sensitive area of the body to this type of

12  radiation.  The work performed by Bahl was published in IEEE

13  Transactions on Microwave Theory and Techniques, a publication

14  accepted as authoritative in the medical and scientific

15  communities.

16      (k)  In 1977, J.C. Lin published the results of his

17  research in IEEE Transaction on Microwave Theory and Techniques.

18  Results revealed that because microwave absorption occurs in a

19  very short time there is little chance for heat conduction to

20  take place; the conduction of heat takes much longer.  At "hot

21  spots" the inability of biological tissue to get rid of excess

22  heat quickly and efficiently may be yet another mechanism

23  leading to destructive exposure.

24      (l) Research confirmed that "hot spot" absorption is

25  dependent on the diameter of the head model which was used.  As

1   the diameter decreased the absorption effect became more

2   pronounced.   Most notably, the greatest absorption enhancement

3   occurs at frequencies between 800 MHz to 1000 MHz, effectively

4   covering the portable cellular telephone transmit band.

5       (m)  In 1977, O.P. Gandhi published a study in Radio Science

6   which confirmed that radiation absorption enhancement occurs

7   when subjects are close to reflecting surfaces.   Gandhi reported

8   a measured energy absorption enhancement factor of as much as 27

9   in close proximity to corner shaped reflectors and about 4.7 for

10  flat reflectors.

11      (n)  In 1978, Motorola studied the efficiency of the antenna

12  and learned that the maximum Specific Absorption Rate exists at

13  the antenna "feed point."

14      (o)   Long before the introduction of cellular telephones,

15  researchers provided data indicating that children absorb

16  approximately 50% more radiation within their heads than do

17  adults.   The research performed by C.H. Durney, reported in IEEE

18  Transactions on Microwave Theory and Techniques in 1979, only

19  took into consideration the plain wave far field exposures and

20  did not include any of the enhancement effects that are

21  introduced by the near zone operation of cellular telephones.

22      (p) In 1979, researchers Sheppard, Bawin and Adey confirmed

23  in a published article that low intensity modulated (16 Hz) 450

24  MHz fields produced modified calcium efflux through brain cell

25  membranes.   The researchers observed the effect for power

1    density levels lower than 2.0m W/cm2.  The work was published in

2    Radio Science in December 1979.

3         (q) In 1979, in an experiment by J.L. Meyerhoff,

4    laboratory rats were killed quickly to prevent unwanted changes

5    in brain structure.  It was reported that "it is preferable to

6    focus the microwave energy into the head of the animal, thereby

7    increasing the efficiency of the energy delivered to the brain."

8    The experiment was published in IEEE Transactions on Microwave

9    Theory and Techniques in January, 1980.

10        (r) The cellular phone industry conducted extensive

11   research in the early 1980s on the effects of antennas and

12   discovered that there is a large amount of stored energy that is

13   disposed immediately around the antenna of a cell phone.

14        (s) In follow up research, Adey published in 1980 research

15   demonstrating modifications in brain cells at low level

16   radiation exposure.  Adey also reported that weak modulated

17   frequency radiation results in major physiological changes.  The

18   work was published in Proceedings of the IEEE, January 1980.

19        (t)      In 1981, a Motorola researcher was quoted in IEEE

20   Transactions on Vehicular Technology (November) "the proposed

21   standard recognizes the possibility of encountering fields

22   higher than the maximum of the protection guides in the close

23   vicinity of low power radiators, like portable communication

24   equipment.  For this reason, an exclusion clause for devices

25   ///

1  operating at 1 GHz or less end with less than 7 watts output
2  power has been proposed.

3     (u)  At the same time, Motorola researchers publicly stated
4  "the Radio Frequency Protection Guides of the American National
5  Standards Institute at 750 MHz would be violated at .03
6  centimeters distance by a resident dipole radiating about 1mW
7  and at .5 centimeters distance by a radiated power of 4mW."  "A
8  resident dipole provides the most favorable condition of minimum
9  stored energy around the antenna."  The researchers conceded
10 that "a rigorous enforcement without exclusion of the radio
11 frequency protection guides would render portable radios
12 practically useless."

13    (v)  Motorola researchers concealed from the public the
14 enhancement effects of antennas and the efficiency that antennas
15 deposit energy into brain tissue.  In an article published in
16 1981 in IEEE Transactions of Vehicular Technology, a prominent
17 Motorola employee stated, "this paper addresses the question of
18 how long the power radiated by a dipole has to be so that the
19 field near the antenna never exceeds ANSI-Proposed Protection
20 Guides for distances greater than .3 centimeters, which is the
21 spacing which at times separates the antenna from the head of
22 the portable radio user.  Radiated power of a few milliwatts is
23 enough to exceed the proposed radiation protection guides at 750
24 MHz.  Such reticence in accepting the clause probably resides in
25 the fact that the near field of antennas is largely un-

1   investigated."  At the same time, a prominent Motorola

2   researcher stated, "the study of the near field has been

3   substantially neglected."  The same prominent Motorola

4   researcher stated, "dipole antennas, although extensively used

5   in portable and mobile communications, have not been carefully

6   investigated in the near field."

7       (w)  In 1981, during the time that the exclusion of

8   portable cellular phones was debated within the ANSI Committee,

9   a Motorola researcher was quoted as stating, "strict enforcement

10  .. technically forbids the exposure to a resident dipole about

11  19 centimeters long, radiating 1mW."

12      (x)  In 1982, Motorola researchers found that as little as

13  250 micro Watts radiated power would be enough to exceed the

14  safety standards established by the American National Standards

15  Institute when using the helix antenna as the radiator for near

16  zone exposure.  The study was published in IEEE Transactions on

17  Vehicular Technology in November, 1982.

18      (y)      The Motorola researchers found that the exposure

19  to the helical antennas yields a power density of as much as

20  127mW.cm2 when the antenna is placed about 1 centimeter distant.

21  The radiated power was only .02 Watts, which is thirty times

22  less than what is radiated from a portable cellular phone.

23      (z) In 1984, in an article published by Microwave News,

24  there was a report of a 1984 study by the United States Air

25  Force in which it was found by Dr, Vernor of the University of

California "findings of excess malignancies in the exposed animals is provocative" after being exposed to radio frequency radiation.

(aa) In 1986, the United States Air Force sponsored a study by A.W. Guy in which 100 rats were irradiated over a three year period and compared to 100 rats that were not exposed to radiation but were otherwise treated identically.  After the experiments were completed the researchers reported that 19 malignant tumors developed in the exposed rats as compared to 5 in the control group rats.  The researchers claimed that such a difference was "statistically highly significant."  They also stated, "at face value this last finding suggests that low levels of microwave radiation can cause cancer in mice." Remarkably, the Environmental Protection Agency accepted a report by the same researchers who suddenly "corrected" their conclusions.  The EPA in 1986 stated that evidence of carcinogenicity must be confirmed to a specific tumor type.. Defendants knew or should have known these PCTs to be defective, unreasonably dangerous and hazardous, foreseeably causing injury to the Plaintiffs as described herein, and committed and continue to commit tortuous and other conduct.

(bb)  In 1989, Stephen Cleary presented a review of the state of research related to non-thermal interactions and effects of radio frequency radiation.  He concluded, "cellular studies provide convincing evidence that RF radiation, and other

1  types of electric or magnetic fields, can alter living systems

2  via direct non-thermal mechanisms, as well as via heating."

3     (cc) During a 1989 meeting of the ANSI Committee, held in

4  Tucson, Arizona, industry representatives dominated the

5  membership of the standard setting committee.  After a heated

6  discussion and debate over the exclusion clause it was decided

7  upon a vote by the committee that portable cellular telephones

8  would not be excluded from regulation or compliance under the

9  ANSI Safety Standard.  A short time after the meeting, at

10  another quietly held committee meeting attended by a select,

11  smaller group of members, the exclusion clause passed, and as a

12  result, cell phones would be excluded from any testing,

13  compliance, or monitoring by any safety standard, government

14  agency, or regulatory body.

15     (dd) The American National Standards Institute "ANSI" has

16  adopted a set of electromagnetic energy exposure levels that the

17  Institute of Electrical and Electronic Engineers ("IEEE") has

18  determined to be safe for humans.  The ANSI safety standard was

19  initially developed during the 1960s, modified during the early

20  1980s, and modified again, most recently, during the early

21  1990s.

22     (ee) The cellular phone industry manipulated the

23  research and pressured members of the Safety Standard Committee

24  to exempt portable cellular telephones from regulation and

25  ///

1 compliance under the ANSI standards. Cellular telephones, then
2 and now, would not meet the standard established in 1982.

3    (ff) In 1992, a project performed by A. Maes confirmed a
4 marked increase in the frequency chromosomal aberrations and the
5 presence of micro nuclei in peripheral blood after exposed to
6 2,450 MHz radiation.

7    (gg) In 1992, F. Montecchia published an article in IEEE
8 Transactions on Biomedical Engineering that some antennas are
9 specifically designed to use the non radiating induction energy
10 (around the antenna) for penetration into humans.  One such
11 antenna was specifically developed to provide an improved method
12 for depositing energy into tissue for hyperthermia treatment.

13    (hh)  In 1992, it was reported in Microwave News, a news
14 publication widely circulated and read by the scientific and
15 medical community, that Keith Angstadr, an antenna technician,
16 was treated at Johns Hopkins University for exposure to radio
17 frequency radiation which led to his loss of night vision and
18 color blindness.  The retinas of his eyes had sustained 5 mW/cm2
19 of continuous wave radiation.

20    (ii)  The medical and scientific communities were well
21 aware of the extensive research published and reported
22 throughout the 1950s and 1960s of the dangers of causing burns
23 when RFR is applied over a bony prominence.  It was revealed
24 that non-uniformities such as bone ridges and irregular fat
25 ///

1  layers caused the energy to be absorbed non-uniformly within the

2  body or head.

3     (jj) On January 26, 1993, Motorola, through one of its

4  senior executives announced to the news media, and subsequently

5  reported by the news media to the public, that "thousands of

6  studies" had already shown cellular phones were safe.  Such

7  statement was fraudulent, deceitful, and misleading.

8     (kk) On July 16, 1993, the CTIA, representing many of the

9  other named Defendants, issued a report entitled "Safety Update

10 - Fast Facts; Portable Cell Phone Safety," in which it was

11 fraudulently and deceptively stated, in bold print, the

12 following:  "Rest assured.  Cellular telephones are safe!"  The

13 report further stated that cell phones fall within the safety

14 standards of the FCC.  However, the Defendants fraudulently and

15 deceitfully omitted the fact that the FCC had also declared that

16 it does not consider itself the "expert agency" for evaluating

17 health effects.

18    (ll) On July 19, 1993, Elizabeth Jacobson, Deputy Director

19 for Science at the Center for Devices and Radiological Health,

20 Food and Drug Administration, sent a correspondence to CTIA

21 president Thomas Wheeler, which clearly identified certain

22 fraudulent and deceitful statements made by the Defendants to

23 the public regarding the "safety" of PCTs.  In pertinent part,

24 this letter states:

25         I am writing to let you know that we were concerned
           about two important aspects of your press conference

on July 16 concerning the safety of cellular phones, and to ask that you carefully consider the following comments when you make future statements to the press.

First, both the written press statements and your verbal comments during the conference seemed to display an unwarranted confidence that these products will be found to be absolutely safe.  In fact, the unremittingly upbeat tone of the press packet strongly implies that there can be no hazard, leading the reader to wonder why any further research would be needed at all. (Some readers might also wonder how impartial the research can be when its stated goal is "a determination to reassure consumers."  And when the research sponsors predict in advance that "we expect the new research to reach the same conclusions, that the cellular phones are safe.") …

We are even more concerned that your press statements did not accurately characterize the relationship between CTIA and the FDA ….[S]ince it is not yet clear whether we will help to direct the research program, it is premature to state that we will credential the research.

To sum up, Mr. Wheeler, our role as a public health agency is to protect health and safety, not to "reassure consumers."  I think it is very important that the public understand where we stand in evaluating the possibility that cellular phones might pose a health risk ….

(mm) In 1993, N. Kuster published an article in IEEE Transactions on Biomedical Engineering which demonstrated the very high level of energy absorbed into the head and brain in the area close to the location of the antenna.  Kuster reported that the maximum SAR measured in models of human heads exposed to 1 Watt of energy was 5 mW/g.  The antenna employed was approximately one inch from the head of the model.

1     (nn)  In December 1993, Chergrinets reported that pulsed

2  150 to 300 MHz at 5 mW/cm2 caused chromosomal changes in human

3  peripheral lymphocytes and whole blood cells.

4     (oo) On or about late 1993/early 1994, the cell phone

5  industry, including the named Defendants, through CTIA, organized

6  a committee which was to draft a manual to discuss "responsible"

7  PCT use.  After receiving a draft of the manual, Thomas Wheeler,

8  president of CTIA, sent out a memorandum expressing his concerns

9  over certain language used in the manual which acknowledged

10  and/or implied that the use of PCTs could pose health risks.  An

11  example of such substantive changes follows, with the suggested

12  deletions put forth in bold typeface:

> Do not operate your transportable cellular telephone when holding the antenna, or when any person is within 4 inches (10 centimeters) of the antenna.  **Otherwise you may impair call quality, may cause your phone to operate at a higher power level than is necessary, and may expose that person to RF energy in excess of the levels established by the updated ANSI Standard.**
>
> **If you want to limit RF exposure even further, you may choose to control the duration of your calls or maintain a distances from the antenna of more than 4 inches (10 centimeters).**
>
> For best call quality, keep the antenna free from obstructions and point it straight up."

22  (pp) Gandhi published findings of his research that were

23  contradictory to Kuster's.  Gandhi reported that the maximum

24  SARs within the human brain would be about 30 times lower than

25  what Kuster had reported.  But by March of 1994, the word in the

1  research community had spread that the Gandhi team had, in fact,
2  misstated SAR figures.  During the 1994 Bioelectromagnetics
3  Society 16th Annual Conference, Gandhi produced findings of still
4  higher maximum SARs for the same research.  During his
5  presentation, SARs corresponded, at times, to levels as much as
6  ten times higher that were previously reported.  The conference
7  results, presented in Copenhagen, Denmark, never reached the
8  U.S. audience.  In a letter to the Federal Communications
9  Commission, August 1994, Gandhi explained the nature of the
10 errors and revised his experimental results upward.  That is,
11 nearly a full year after the initial false claims of safety -
12 and almost six months after his revisions first became known,
13 the Gandhi team provided an official correction.

14     (qq) The Defendants knew that early in 1994 research
15 performed in India by Sarkar, et al. confirmed that DNA
16 modifications result from low-level exposure to radio frequency
17 radiation.  Clearly, if radio frequency radiation can rearrange
18 the DNA in tissue then it can initiate cancer.

19     (rr) In 1994, Henry Kues, a Johns Hopkins researcher,
20 reported cell destruction and cell death comparable to that
21 which would be expected from ultraviolet radiation was reported
22 from exposure of rhesus monkeys to 1,250, 2,450 and 2,850 MHz
23 radio frequency radiation.  In a 1980 addition of IEEE
24 Proceedings, it was reported that radio frequency radiation may
25 inactivate enzymes or proteins that are involved in the repair

1 processes.  In 1984, two researchers, Dr. Chang and Dr. Milham,

2 made a presentation to the Annual Bioelectromagnetic's Society

3 Conference in which they revealed an increase in malignant

4 tumors in rats after long term exposure to radio frequency

5 radiation in experiments they conducted.

6      (ss) In 1994, L. Verschaeve documented evidence that human

7 and rat blood samples exposed to 450 and 954 MHz radiation

8 provided induced DNA breaks.  The cellular phone industry has

9 insisted for fifteen years that no such effect could be obtained

10 from radio frequency radiation.  The research by Verschaeve is

11 but one of many similar reports that became known during 1994

12 and which support the earlier findings of Cleary.

13      (tt) In an alarming report, D.C. Cain disclosed in 1994

14 that 837 MHz radiation at a power density exposure level of 3.7

15 mW/cm2 produced a 40% increase in what researchers refer to as

16 "focus Formation."  These researchers explained at the 16th

17 annual Bioelectromagnetics Society that the radio frequency

18 radiation was acting as a co promoter for cancer formation.

19      (uu) The Defendants knew, on or about June 12, 1994, that

20 the notable researcher Henry Lai, (and others) presented a

21 report that indicated low-level (0.6 mW/g SAR) radio frequency

22 radiation exposure at 2450 MHz resulted in memory deficits for

23 experiments conducted with rats.  This was a follow-up

24 presentation of an article by Lai, Horita & Guy published only a

25 few months earlier that provided substantially the same

1   information. The memory deficits were observed as an inability
2   of the rats to perform in a maze experiment.  In effect, the
3   rats forgot their way around a familiar area.  The researchers
4   explain the effect as being caused by a decrease in brain
5   activity.  The low-level radiation exposure is extremely
6   significant.  Virtually all operators of Cell phones subject
7   themselves to such exposure and energy absorption while
8   operating the phone.  Further, the memory deficits do not stop
9   when the exposure ends.  Researchers have learned that the
10  effect persists for five days or more.

11      (vv) Late in 1994 Lai and Singh make known the results of
12  their research which should have been received as conclusive
13  proof that cellular phone radiation is capable of causing
14  harmful biological effects.  The researchers reported in the
15  International Journal of Radiation Biology that low level
16  exposure to radio frequency radiation causes an increase in
17  single and double strand breaks in DNA.

18      (ww) Lai and Singh repeated their earlier experiment with
19  similar results in 1996.  In 1997, Repacholi published the
20  results of his work that demonstrated that mice exposed to low
21  levels of 900 MHz radiation exhibited a higher incidence of
22  cancers than did their non exposed laboratory counterparts.

23      (xx) The Defendants acted in a fraudulent, deceitful,
24  intimidating, illegal, and harassing manner to a researcher by
25  the name of Dr. Jerry L. Phillips, who essentially replicated

1  the DNA damage studies of Lai and Singh and reached the same

2  conclusions, i.e. exposure to low levels of radio frequency

3  radiation causes DNA damage which can develop into cancer.

4      (yy) Motorola willfully and wantonly attempted to suppress

5  information from Plaintiffs, its other customers, the public,

6  and government regulatory agencies by making illegal threats and

7  illegal acts of intimidation upon Dr. Phillips.

8      (zz) After completion of his research, Dr. Phillips

9  expressed his desire to publish said research.  Initially,

10  Motorola told Dr. Phillips that it was too early to publish his

11  results and that he needed to do more research.  When Dr.

12  Phillips refused to "spin" his research, as demanded by

13  Motorola, Motorola cut off Dr. Phillips' funding.  Additionally,

14  Motorola threatened to discredit Dr. Phillips in the scientific

15  community, as well as to ruin his career.

16      (aaa)  Motorola willfully and wantonly attempted to

17  suppress information from Plaintiffs, its other customers, the

18  public, and government regulatory agencies, by illegal threats

19  and illegal acts of intimation made upon Dr. George Carlo, a

20  notable public health scientist, epidemiologist,  founder of

21  Health Risk Management Group, and the individual appointed by

22  the cell phone industry to study the health hazards associated

23  with PCT use.

24      (bbb) After leading the research effort regarding the

25  health hazards associated with PCT use for a period of six

1   years, Dr. Carlo indicated that PCTs may very well pose health

2   risks to its user.  In a response similar to that received by

3   Dr. Phillips, the cell phone industry cut off Dr. Carlo's

4   funding, attempted to discredit him within the scientific

5   community, and attempted to ruin his career.

6      30.  The Defendants, aware of these conclusions, along with

7   a myriad of other scientific studies, clinical observations, and

8   hypotheses by noted scientists and engineers, misled both public

9   officials and the public into believing that PCTs could in no

10   way cause biological harm to the user, and further, that there

11   should be no alarm.

12      31. The Defendants have and continue to manipulate science

13   to the detriment of consumers by failing to reveal all relevant

14   findings and by selectively withholding important public health

15   information from the public and Plaintiffs.  Such information

16   would have caused Plaintiff Gibb Brower and other prudent

17   consumers to cease using their PCTs.

18      32.  The Defendants have actively encouraged the increased

19   use of PCTs, while knowing the potential biological risks

20   associated with their use.

21      33. At all times relevant, Defendants, themselves, or by

22   use of others, did manufacture, create, design, test, label,

23   package, distribute, supply, market, sell, advertise, and/or

24   otherwise distribute products and services related to PCTs in

25   San Diego, the State of California, and elsewhere in the United

1  States, as well as to, PCT owners and users throughout its

2  service areas, nationally, and internationally.

3     34. The product warnings in effect during the period

4  relevant to this Complaint were both substantively and

5  graphically wholly inadequate to alert Plaintiffs and other

6  consumers of the risks associated with PCT use.

7     35. As a result, Plaintiffs and the public have been

8  grossly misled and misinformed regarding the biological risks

9  associated with PCT use.  Specifically, Defendants have never

10  warned the public about the risk of biological damage arising

11  out of the use of PCTs, such as, but not limited to, brain

12  tumors, cancer, or genetic damage in human blood, and/or that

13  the risk of injury can differ with the amount of use and the

14  sensitivity of the user.

15     36. Defendants' strategy has been to aggressively market

16  and sell these products and its related service by misleading

17  and misinforming potential users about the products and by

18  failing to protect users from serious dangers, which Defendants

19  knew or should have known to result from use of these products.

20     37. Defendants widely and successfully marketed PCTs in

21  San Diego County, the State of California, other states, and as

22  to some Defendants, nationally and internationally.  Defendants

23  undertook an advertising blitz extolling the virtues of PCTs in

24  order to induce widespread use of the product.  The Defendants'

25  marketing campaign consisted of advertisements on television,

1  radio, and the Internet, promotional-literature to be placed in

2  the printed media, and in other advertising media, and other

3  promotional materials to be provided to potential users of PCTs.

4      38. The Defendants' advertising program, as a whole, by

5  affirmative misrepresentations and omissions, falsely and

6  fraudently sought to create the image and impression that the

7  use of PCTs was safe with no potential for biological harm to

8  the user.

9      39. Defendants purposefully downplayed, understated,

10 and/or did not state the health hazards and risks associated

11 with PCTs.  These Defendants, through promotional literature,

12 deceived potential users of PCTs by relaying positive

13 information, including testimonials from satisfied users, and by

14 manipulating statistics to suggest widespread acceptability,

15 while downplaying, understating, and/or not stating the known

16 adverse and serious health effects.  Defendants falsely and

17 fraudently kept relevant information from potential and actual

18 PCT users and minimized user concern regarding the safety of

19 these products and services.

20     40. In particular, in the materials produced by Defendants,

21 they falsely and fraudently misrepresented a number of facts

22 regarding PCTs, including the following:

23 The presence of adequate testing of RFR and potential biological

24 effects on PCT users.

25 ///

1  The adverse potential health effects that may be caused by their

2  products.

3      41. Upon information and belief, there are over 90 million

4  PCT users in the United States, and over 400 million PCT users

5  worldwide.

6      42. Defendants failed to publish adequate precautionary

7  statements warning consumers as more information about possible

8  adverse effects became available.

9              **FIRST CAUSE OF ACTION**

10             (Intentional Misrepresentation)

11     43. Plaintiffs hereby incorporates by reference the

12  allegations contained in all proceeding paragraphs of this

13  Complaint.

14     44.  In order to maintain and/or increase its sales

15  and profits, Defendants, through their advertising, promotional

16  campaigns and marketing, have, by the use of false statements

17  and/or material omissions of fact, intentionally misrepresented

18  the following to Plaintiffs:

19       (a) PCTs are safe to use and that there is no danger from

20       high levels of RFR emitted from PCTs.

21       (b) Health care standards have been adopted by the Federal

22       Government to assure the public that PCTs are safe and have

23       been approved for use by the public.

24       (c) Research has shown that there is absolutely no risk of

25       harm associated with the use of PCTs.

1     SAR testing of PCTs is a guarantee that PCTs emit no

2   harmful RFR radiation.

3     45.  In making these misrepresentations of fact to

4 prospective and current subscribers while knowing such

5 representations to be false, Defendants have intentionally

6 misrepresented material facts and breached their duty not to do

7 so.

8     46. Plaintiff Gibb Brower relied upon these

9 misrepresentations and has contracted brain cancer as result of

10 harmful RFR radiation to his brain from use of his PCT.

                  **SECOND CAUSE OF ACTION**

11

12         (Negligent Misrepresentation)

13     47. Plaintiffs hereby incorporates by reference the

14 allegations contained in all proceeding paragraphs of this

15 Complaint.

16     48.  In making the misrepresentations of fact to

17 Plaintiffs, Defendants failed to fulfill their duty to disclose

18 all the material facts as set forth above.  As an actual and

19 proximate result of Defendants' negligence, Plaintiff Gibb

20 Brower was deceived and misled as to the risk of harm associated

21 with the use of PCTs, and were damaged thereby.

22     49.  Plaintiffs were unaware of the Defendants'

23 affirmative misrepresentations and failure to disclose the fact

24 ///

25 ///

1  that there was a risk of great harm associated with the use of

2  PCTs.  Plaintiffs reasonably relied on Defendants'

3  representations concerning the safety of PCTs to their

4  detriment, and as a direct result, suffered damages, in an

5  amount according to proof at the time of trial.

6              **THIRD CAUSE OF ACTION**

7              (Strict Product Liability)

8      50.  Plaintiffs hereby incorporates by reference the

9  allegations contained in all proceeding paragraphs of this

10 Complaint.

11

12     51. Defendants are manufacturers and/or suppliers of PCTs

13 and cellular services and are engaged in the design,

14 manufacturer, and sale of PCTs.

15     52. Plaintiff, Gibb Brower, purchased such goods and

16 services from Defendants, without knowledge that the same were

17 defective and dangerous.

18     53. At all times, Plaintiff Gibb Brower, used defendants'

19 goods and services in the manner for which they were intended.

20     54. Plaintiff, Gibb Brower, contracted brain cancer as a

21 result of the defective condition of defendants' goods and

22 services, said defect having existed at the time of manufacture

23 of the products and continuing to exist through and including

24 the time of injury to plaintiff, Gibb Brower.  As a result

25 thereof, defendants are strictly liable to plaintiffs for the

1 injuries sustained by plaintiffs and the damages they have

2 incurred thereby.

3 **FOURTH CAUSE OF ACTION**

4 (STRICT PRODUCT LIABILITY - FAILURE TO WARN AND
DEFECTIVE MANUFACTURE AND DESIGN)

5

6 55.  Plaintiffs hereby incorporates by reference the

7 allegations contained in all proceeding paragraphs of this

8 Complaint.

9 56. Defendants were manufacturers, suppliers and

10 promoters of PCTs and related services.

11 57. PCTs and related services which were manufactured,

12 supplied and promoted by Defendants and were placed in the

13 stream of commerce, sold and promoted by Defendants were

14 defective and unreasonably dangerous in that the design and use

15 of PCTs and their related services failed to include proper and

16 necessary warnings regarding the potential health effects

17 associated with the use of PCTs.

18 58. The PCTs and related services were defective in

19 that they were marketed and sold without adequate testing and/or

20 a prior analysis of rest information which would have shown that

21 PCTs and related services possessed and created serious

22 potential harmful health effects.  Full and proper warnings

23 accurately and fully reflecting the scope and severity of such

24 side effects should have been, but were not provided.

25 59. Defendants also failed to equip their PCTs with

1    proper and necessary safeguards and protections which were

2    available, such as, but not limited to, a headset or speaker

3    phone adapter which should have been furnished as a part of the

4    PCT.

5        60. Defendants also failed to provide adequate warnings or

6    instructions of the dangers associated with such use as they

7    knew, or should have known, of the risk of injury from PCTs.

8    Moreover, despite such knowledge, defendants continued to

9    promote the PCTs and related services as safe, free of defects

10   and free from dangers.

11       61.  The PCTs and services as designed, manufactured,

12   provided and supplied by the Defendants were placed in the

13   stream of commerce in a defective and unreasonably dangerous

14   condition.

15       62. As a direct result of the defective and

16   unreasonably dangerous conditions of the PCTs and related

17   services, and due to the defendants' failure to warn, plaintiff,

18   Gibb Brower, has developed cancer in his brain, has developed

19   complications related to the cancer, has undergone surgery,

20   radiation and therapy, and suffers from numerous impairments and

21   disabilities, along with severe emotional distress and anxiety.

22                        **FIFTH CAUSE OF ACTION**

23                            (Negligence)

24       63. Plaintiffs hereby incorporates by reference the

25   ///

1  allegations contained in all proceeding paragraphs of this

2  Complaint.

3      64. Defendants owed the plaintiffs the duty of ordinary and

4  appropriate care in the testing, manufacture, sale and promotion

5  of the PCTs and related transmission services. Defendants failed

6  to fulfill that duty in numerous respects including, but not

7  limited to, the following:

8      a.  Not adequately or properly testing PCTs and the

9  related services for health hazards associated with exposure to

10  RFR emitted by said phones;

11      b.  By failing to analyze the significance of RFR studies

12  and information already known at the time of marketing the

13  products and/or services;

14      c.  By selling PCTs which emit harmful RFR without

15  adequate protection to protect the user; and

16      d.  By failing to provide adequate warning to the public,

17  purchasers or users of the dangerous potential hazardous RFR

18  emitted by the PCTs.

19      65.  As a direct and proximate result of the Defendants'

20  conduct as alleged herein, Plaintiff, Gibb Brower, has suffered

21  permanent and total disability, has a terminal illness and has

22  undergone multiple cancer therapies. Furthermore, Plaintiff,

23  Gibb Brower, has sustained economic loss, emotional and

24  psychological stress, including loss of earnings and diminution

25  or loss of earning capacity, in an amount to be determined,

1  requires reasonable and necessary health care, attention and

2  service and has incurred and will incur medical, health,

3  incidental and related expenses, and/or has been otherwise

4  injured.

5  ### SIXTH CAUSE OF ACTION

6  (Breach of Express Warranty)

7  66.  Plaintiffs hereby incorporates by reference the

8  allegations contained in all proceeding paragraphs of this

9  Complaint.

10  67. Defendants expressly warranted that PCTs and related

11  services were safe for human usage.

12  68. Defendants' warranties constitute affirmations of

13  fact, promises and descriptions regarding the quality and safety

14  of their products and services.

15  69. Defendants breached these warranties in that they

16  failed to eliminate or minimize health hazards or possible

17  health hazards for the RFR by designing PCTs and/or adequately

18  training users as to the appropriate method of using a PCT.

19  70. PCTs do not conform to express representations because

20  they are not safe and have high potential for serious biological

21  and health effects, including life threatening diseases.

22  ### SEVENTH CAUSE OF ACTION

23  (Breach of Implied Warranty)

24  71. Plaintiffs hereby incorporates by reference the

25  ///

1  allegations contained in all proceeding paragraphs of this

2  Complaint.

3      72. At the time Defendants marketed, sold, distributed

4  and/or promoted PCTs and related services for use by Plaintiff

5  Gibb Brower, Defendants know of the use for which PCTs and their

6  related services were intended and impliedly warranted the

7  product and services to be of merchantable quality and safe and

8  fit for such use.

9      73. Plaintiffs relied upon the skill and judgment of

10  defendants as to whether the PCTs and related services were of

11  merchantable quality and safe and fit for their intended us.

12      74. Plaintiff, Gibb Brower, used the PCTs and related

13  services as intended and foreseen by defendants.

14      75. Defendants breached said warranty as such PCTs and

15  related services were not fit for their intended purpose and are

16  unreasonably dangerous and unfit for that purpose.

17              **EIGHTH CAUSE OF ACTION**

18                  (Conspiracy)

19      76. Plaintiffs hereby incorporates by reference the

20  allegations contained in all proceeding paragraphs of this

21  Complaint.

22      77.  At all times relevant to this Complaint, the

23  Defendants, formed confederacies and entered into agreements

24  and/or tacit understandings to individually, jointly, and in

25  conspiracy with each other, market unreasonably dangerous and

1   defective PCTs by collective means, including their collective
2   conduct of suppressing their knowledge of the hazards of RFR
3   emissions from PCTs, and of placing into the stream of commerce
4   dangerously defective PCTs which caused an intentional,
5   unpermitted touching of Plaintiff, Gibb Brower; an intent to
6   defraud Plaintiff, Gibb Brower; and failed to warn Plaintiff,
7   Gibb Brower, and the public of hazardous RFR emissions.

8        78. The Defendants, acting collectively, reached a common
9   agreement or understanding to market their defective PCTs by:
10  marketing, producing and promoting the use of PCTs
11  without proper tests or warnings and without regard to the
12  dangerous RFR emitted therefrom and the effects that the RFR
13  would cause to Plaintiff, Gibb Brower, and other users;
14  suppressing, discouraging and/or retarding appropriate research,
15  testing, regulation and public dissemination of information
16  concerning RFR emissions and the effects those emissions would
17  have on the public and Plaintiff, Gibb Brower; and
18  ignoring, disparaging, or misleading the public about medical
19  and scientific data available to them which clearly indicated
20  that RFR emissions from PCTs are potentially hazardous to the
21  health and safety of the public and Plaintiff, Gibb Brower.

22       79. Defendants, jointly and in conspiracy with each
23  other, knowingly committed the acts described herein, as well as
24  other similar acts, in furtherance of their agreement or
25  understanding to promote and market PCTs.

1    80. Defendants were aware of the dangers to those exposed
2    to RFR emissions from PCTs prior to the use of same by
3    plaintiff, Gibb Brower.

4    81.  At all times relevant, notwithstanding their
5    knowledge of the hazards of RFR emissions for PCTs, defendants
6    collectively lobbied various government officials and standard
7    setting bodies to prevent regulation and control of PCTs.
8    At all times relevant, Defendants collectively spent
9    millions of dollars per year to finance selective research and
10   to rebut growing evidence that RFR form PCTs are hazardous to
11   users.

12   82. Notwithstanding their extensive knowledge of the
13   hazards of RFR emissions from PCTs, defendants continued to
14   promote and advertise PCTs as appropriate for use and plaintiffs
15   were mislead and deceived by the defendants into believing that
16   PCTs operated at power levels too low to cause adverse health
17   effects and/or are safe for public use.

18   83. Defendants, acting collectively, reached a common
19   understanding or agreement so that to this very day, Defendants
20   have failed to instruct and warn consumers about the hazards
21   associated with RFR emissions from PCTs notwithstanding their
22   knowledge of such hazards.

23   84. Defendants collective, conspiratorial and tortuous
24   activities were knowingly and purposefully designed for their
25   ///

1  own economic and pecuniary benefit and were performed in

2  furtherance of Defendants' respective joint business interests.

3     85. At all times relevant, notwithstanding their knowledge

4  of the hazards of RFR emissions from PCTs, Defendants continued,

5  and continue to this very day, to place into the stream of

6  commerce dangerous and defective PCTs.

7     86. As a direct and proximate result of Defendants'

8  conduct as alleged herein, Plaintiff, Gibb Brower, has suffered

9  permanent and total disability and has undergone multiple cancer

10  therapies. Furthermore, Plaintiff, Gibb Brower, has sustained

11  economic loss, emotional and psychological stress, including

12  loss of earnings and diminution or loss of earning capacity, in

13  an amount to be determined, requires reasonable and necessary

14  health care, attention and services and has incurred and will

15  incur medical, health, incidental and related expenses and/or

16  has been otherwise injured.

17     87. At all times relevant hereto, the Defendants actually

18  knew of the defective nature of their products as herein set

19  forth and continued to design, manufacture, market and sell

20  their products so as to maximize sales and profits at the

21  expense of public health and safety. Defendants' conduct

22  exhibits such an entire want of care as to establish that their

23  actions were a result of fraud, evil motive, actual malice, and

24  the conscious and deliberate disregard of foreseeable harm to

25  ///

1  Plaintiff, Gibb Brower.  Plaintiff, Gibb Brower, is therefore

2  entitled to punitive damages.

### NINTH CAUSE OF ACTION

#### (Fraud)

5  88. Plaintiffs hereby incorporates by reference the

6  allegations contained in all proceeding paragraphs of this

7  Complaint.

8  89.  Defendants made false representations of material

9  facts to the public and the Plaintiffs.  The Defendants led the

10  public and the Plaintiffs to believe under false pretenses that

11  the PCTs were safe and did not emit an unsafe level of RFR.

12  90. Defendants knew these representations were false or

13  they made these representations with such reckless disregard for

14  the truth that the falsity can be imputed to them.

15  91. Defendants were acting at all times relevant within the

16  scope of their business for profit.

17  92. Defendants deceived the public and the plaintiffs for

18  their own benefit.  This conduct by the Defendants as described

19  above was intentional, malicious, evil, extreme and outrageous

20  conduct, and was designated and calculated to cause Plaintiff

21  harm. As a direct and proximate result of Defendants' conduct,

22  Plaintiffs were caused to suffer and will continue to suffer

23  severe financial, emotional, psychological, and medical injury

24  as set forth above.

25  ///

1    93. Defendants made these false misrepresentations in order

2    to defraud the public and therefore the Plaintiffs.

3    94. Particularly, Defendants committed fraud by:

4         (a)    concealing evidence, as alleged in this

5                 Complaint, that would have demonstrated to the

6                 public and Plaintiff, Gibb Brower, that PCTs

7                 are not safe for use;

8         (b)    failing to adequately test PCTs and inform the

9                 public that such PCTs did not meet safety

10                standards;

11        (c)    misstating to the public and the Plaintiff,

12                Gibb Brower, through advertising and

13                testimonials that PCTs are safe;

14        (d)    failing to warn the public and Plaintiff, Gibb

15                Brower, of research, as alleged throughout this

16                Complaint, that indicated an association

17                between RFR and PCTs and cancer; failing to

18                validate such research; and failing to

19                replicate such research; and otherwise

20                committing fraud which upon information and

21                belief will be proven through documentary

22                evidence, which is in the possession of the

23                Defendants.

24   95. Plaintiffs justifiably relied on the false

25   ///

1  representations made by the Defendants, were defrauded by

2  Defendants' concealment and failure to conduct proper research,

3  and as a direct result suffered damages.

4      96. As a direct and proximate result of the

5  Defendants' fraudulent conduct, Plaintiff, Gibb Brower, has

6  suffered permanent and total disability, has undergone surgery

7  and has undergone cancer treatments.  Furthermore, Plaintiff,

8  Gibb Brower, sustained economic loss, emotional and

9  psychological stress, including loss of earnings and diminution

10 or loss of earning capacity, in an amount to be determined.

11 Plaintiff, Gibb Brower, requires reasonable and necessary health

12 care, attention and services and has incurred and will incur

13 medical, health, incidental and related expenses, and/or has

14 been otherwise injured.

15     97. At all times relevant hereto, the Defendants

16 actually knew of the defective nature of their products as

17 herein set forth and continued to design, manufacture, market

18 and sell their products so as to maximize sales and profits at

19 the expense of public health and safety.  Defendants' conduct

20 exhibits such an entire want of care as to establish that their

21 actions were a result of fraud, evil motive, actual malice, and

22 the conscious and deliberate disregard of the foreseeable harm

23 to Plaintiff, Gibb Brower.  Plaintiff, Gibb Brower, is therefore

24 entitled to punitive damages.

25 ///

1

## TENTH CAUSE OF ACTION

2

### (Civil Battery)

3      98. Plaintiffs hereby incorporates by reference the

4  allegations contained in all proceeding paragraphs of this

5  Complaint.

6      99. The Defendants, through their conduct and

7  omissions, acting by and through their respective agents,

8  servants, and/or employees, inflicted harmful or offensive

9  contact to Plaintiff, Gibb Brower, by exposing him to RFR which

10  they knew would cause biological changes and had the potential

11  to cause permanent and significant health risks and effects.

12      100. Based upon their conduct, Defendants intended to

13  and did bring about and inflict this specific harm upon

14  Plaintiff, Gibb Brower, which gave rise to injuries including

15  his current medical condition and development of the tumor in

16  his brain.

17

## ELEVENTH CAUSE OF ACTION

18

### (Loss of Consortium)

19      101. Plaintiffs hereby incorporates by reference the

20  allegations contained in all proceeding paragraphs of this

21  Complaint.

22      102. Plaintiff, Kim Brower, is the spouse of Plaintiff,

23  Gibb Brower, was his spouse at the time he first began

24  exhibiting symptoms and was diagnosed with a brain tumor, and

25  she continues to be his spouse to the present.

1    103. By reason of the injuries and medical condition

2    suffered and sustained by Plaintiff, Gibb Brower, and as a

3    direct and proximate result thereof, Plaintiff, Kim Brower, has

4    been deprived of her husband's comfort, society and

5    companionship, and such deprivation will continue into the

6    future, to the general damage of Plaintiff, Kim Brower.

7    104. Defendants are therefore jointly and severally liable

8    to Plaintiff, Kim Brower, for general damages in an amount to be

9    proven by the evidence at trial.

10                    **TWEVELTH CAUSE OF ACTION**

11                       (Punitive Damages)

12    105. Plaintiffs hereby incorporates by reference the

13    allegations contained in all proceeding paragraphs of this

14    complaint.

15    106. All of the Defendants' conduct was willful, wanton

16    and Defendants acted with reckless and conscious disregard for

17    the consequences of their actions.

18    107.  As a result, each and all of the Defendants herein

19    are liable for punitive and exemplary damages in such amount as

20    a jury deems just and proper under the circumstances.

21          WHEREFORE, Plaintiffs pray as follows:

22          a.    That they have judgment against Defendants,

23                jointly and severally for all special and

24                general damages in an amount to be determined at

25                trial;

b.  That they recover punitive and exemplary damages of the Defendants in an amount to be determined at trial;

c.  That they recover costs of this action; and

d.  That this Court afford such other relief that it deems just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Dated: April 19, 2001

*[signature]*

Carl Hilliard
1246 Stratford Court
Del Mar, CA 92104
Telephone: 858/509-2938

Attorney for Plaintiffs

Complaint - 48