## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION



------------------------------------------------------------ X

SARAH DAHLGREN,
2437 Tunlaw Road, NW
Washington, DC 20007,
On behalf of herself and
all others similarly situated

                             Plaintiff,

           v.

AUDIOVOX COMMUNICATIONS
CORPORATION,
150 Marcus Blvd.
Hauppauge, NY 11788

MOTOROLA, INC.
1303 E. Algonquin Road,
Schaumburg, IL 60196

NOKIA INC.
A/K/A Nokia Mobile Phones, Inc.
6000 Connection Drive
Irving, TX 75039

ERICSSON WIRELESS
COMMUNICATIONS, INC.
A/K/A Ericsson, Inc.
740 East Campbell Road
Richardson, TX 75081

QUALCOMM, INC.
5775 Morehouse Drive
San Diego, CA 92121

KYOCERA WIRELESS CORP.
10300 Campus Point Drive
Sand Diego, CA 92121-1522

SAMSUNG TELECOMMUNICATIONS

**02-0007881**

**CLASS ACTION COMPLAINT**

FILED
CIVIL ACTIONS BRANCH
2002

1



AMERICA, LLP                              :
1130 E. Arapaho                           :
Richardson, TX 75081                      :
                                          :
                                          :
CELLULAR TELECOMMUNICATION &              :
INTERNET ASSOCIATION                      :
1250 Connecticut Ave, NW                  :
Suite 800                                 :
Washington, DC 20036,                     :
                                          :
                             Defendants.  :
                                          :
----------------------------------------------------------- X

Plaintiff, Sarah Dahlgren, by her undersigned attorneys, brings this class action on behalf

of herself and all others similarly situated, and alleges the following:

## INTRODUCTION

1.       This class action seeks damages and declaratory and injunctive relief on behalf of

Plaintiff and a class of persons who purchased wireless handheld telephones ("WHHPs") in

Maryland and the District of Columbia manufactured by any of the above-captioned defendants

("Manufacturing Defendants").

2.       Through a common and uniform course of conduct, the Manufacturing

Defendants have manufactured, supplied, promoted, sold and/or leased WHHPs - which generate

and emit radiofrequency radiation ("RFR") - without informing consumers that important issues

and debate exists as to the safety risks associated with WHHP use, and to the safety

representations implied by the reference to a numerical information measured and collected by

the Manufacturing Defendants and, until recently, withheld from consumers.

3.       In particular, the Manufacturing Defendants, in cooperation with the Cellular

Telecommunication & Internet Association,  ("CTIA") (collectively, "Defendants"), have failed

2

to disclose to consumers that: (a) industry experts and scientific study results differ as to the risks and "biological effects"[1] that might arise from WHHP use; (b) for each WHHP model, the Manufacturing Defendants measure and collect the Specific Absorption Rate ("SAR"), a measurement of how much radiation passes through tissue during a specified time period; and (c) that the measurements of the SAR is not the product of standardized testing protocols approved by an federal or scientific authority.

4.      The purpose of this action is neither to challenge the process by which the Manufacturing Defendants design, manufacture and/or test their WHHPs nor to question the federal standards for measurement of RFR. The action is not meant to conclusively demonstrate the existence of safety risks posed by WHHPs or the level of any such safety risks.

5.      Rather, this action concentrates on Defendants' decision whether or not to communicate to the consumer information regarding the important safety debate raging within the industry, (many details of which are known only to industry insiders), and/or the true meaning (or lack thereof) of their disclosed SAR levels for each model WHHP. Such disclosures would allow consumers to decide for themselves whether the safety debate warrants purchasing a WHHP, or refraining from purchasing and/or using any WHHP.

6.      This action asserts that Defendants have decided against revealing such industry-known information to consumers in order to garner higher profits from the sale of WHHPs and to

---

1 "Biological effects," as that term is used herein, refers to the adverse effects that RFR exposure may have on calcium and iron distribution; melatonin production; neurological function; DNA single and double strand breaks and chromosomes; enzyme activities; cell stress and gene transcription; and the function of the blood brain barrier. According to the United States General Accounting Office, the radio waves used by WHHPs are a form of electromagnetic radiation. The frequency used by WHHPs is part of the "radiofrequency spectrum" and is used by other applications such as microwave ovens and radar. Radiofrequency energy has been known to produce biological effects, namely the heating of biological tissue. This thermal effect can cause harm by increasing body temperature, disrupting behavior, and damaging biological tissue.

3

maintain the health and welfare of their industry. That decision constitutes deceptive and unlawful conduct under the laws of Maryland and the District of Columbia, and has resulted in harm to Plaintiff and the Class. Plaintiff therefore seeks restitution and injunctive relief on behalf of herself and the Class, as articulated below.

## PARTIES

7.    Plaintiff Sarah Dahlgren ("Plaintiff" or "Ms. Dahlgren"), is an adult individual who resides at 2437 Tunlaw Road, N.W., Washington, D.C., and who has purchased WHHPs in the District of Columbia and the State of Maryland manufactured by one or more of the Defendants.

8.    Defendant Audiovox Communications Corporation ("Audiovox") is incorporated in Delaware and has its principal place of business in Hauppague, New York. At all relevant times, Audiovox was engaged in the business of manufacturing, promoting, marketing, and distributing WHHPs throughout the country and in this District.

9.    Defendant Motorola, Inc. ("Motorola") is incorporated in Delaware and has its principal place of business in Schaumburg, Illinois. At all relevant times, Motorola was engaged in the business of manufacturing, promoting, marketing, and distributing WHHPs throughout the country and in this District.

10.    Defendant Nokia, Inc. ("Nokia") is incorporated in Delaware and has its principal place of business in Irving, TX. At all relevant times, Nokia was engaged in the business of manufacturing, promoting, marketing, and distributing WHHPs throughout the country and in this District.

4

11.     Defendant Ericsson, Inc. ("Ericsson") is incorporated in Delaware and has its principal place of business in Richardson, Texas.  At all relevant times, Ericsson was engaged in the business of manufacturing, promoting, marketing, and distributing WHHPs throughout the country and in this District.

12.     Defendant Kyocera Wireless Corp. ("Kyocera") is incorporated in Delaware and has its principal place of business in San Diego, CA.  It is the successor in interest to Defendant Qualcomm, Inc., which has acquired by Kyocera International, Inc. in February, 2000.  Since that acquisition, Kyocera has been engaged in the business of manufacturing, promoting, marketing, and distributing WHHPs throughout the country and in this District.

13.     Defendant Qualcomm, Inc. ("Qualcomm") is incorporated in Delaware and has its principal place of business in San Diego, CA.  Kyocera International, Inc. acquired Qualcomm's consumer wireless phone business in February 2000 and formed Defendant Kyocera Wireless Corp.  Until that acquisition, Qualcomm was engaged in the business of manufacturing, promoting, marketing, and distributing WHHPs throughout the country and in this District.

14.     Defendant Samsung Telecommunications America ("Samsung") is incorporated in Delaware and has its principal place of business in Richardson, TX.  At all relevant times, Samsung was engaged in the business of manufacturing, promoting, marketing, and distributing WHHPs throughout the country and in this District.

15.     Defendant Cellular Telecommunications & Internet Association ("CTIA") is a non-profit industry association founded in 1984 and located in the District of Columbia.  At all relevant times, the CTIA has represented the cellular phone industry.  CTIA's members include the Manufacturing Defendants.

5

## JURISDICTION & VENUE

16.    Jurisdiction of this Court is founded on D.C. Code (1967 Edition, Supplement IV) § 11-921.

17.    Venue is proper in this District. The claims asserted in this complaint arise, in part, within this District. Plaintiff and the class members have purchased one or more WHHPs within this District. Defendants transact business in this District and have caused injury in the form of loss of monies to class members within the District. The Manufacturing Defendants are all members of Defendant CTIA, which is a non-government trade association located in this District.

## CLASS ACTION ALLEGATIONS

18.    The Class consists of all persons who purchased a WHHP in Maryland or the District of Columbia between January 1, 1989 through the present (the "Class Period") that was manufactured by one of the Manufacturing Defendants, and who have suffered damages as a result of such purchase (the "Class"). This action does not assert personal injury claims, such as claims related to the harmful physical effects that result from any class member's *use* of WHHPs. Rather, this action asserts claims stemming from class members' purchase of WHHPs from the Manufacturing Defendants, and Defendants' deceptive acts and practices in conjunction with the marketing, sale and/or lease of their WHHPs. Plaintiff and the Class seek economic and related equitable relief. Plaintiff is a member of this Class.

19.    Although the exact number of Class members is presently unknown to Plaintiff, it is estimated that the Class consists of at least thousands of persons in Maryland, the District of Columbia, and elsewhere. Joinder of all members is therefore impracticable.

6

20.    There are questions of law or fact common to the members of the Class which predominate over any questions affecting only individual members and which make class certification appropriate in this case, including:

(a)    whether Defendants, acting individually or collectively, falsely and deceptively misrepresented, omitted to adequately disclose, affirmatively concealed or otherwise failed to warn or inform Plaintiff and other members of the Class in advertisements, promotional materials, and other materials, among other things, material information regarding the varying positions within the cell phone industry and the scientific and research community on the safety risks associated with the use of their WHHPs;

(b)    whether Defendants, acting individually or collectively, falsely and deceptively misrepresented, omitted to adequately disclose, affirmatively concealed or otherwise failed to warn or inform Plaintiff and other members of the Class in advertisements, promotional materials, and other materials, among other things, that the Specific Absorption Rates associated with their WHHPs are based on non-standardized and non-approved testing protocols;

(c)    whether Defendants, acting individually or collectively, falsely and deceptively misrepresented, omitted to adequately disclose, affirmatively concealed or otherwise failed to warn or inform Plaintiff and other members of the Class in advertisements, promotional materials, and other materials, among other things, that reference to accurate and meaningful or

7

objective Specific Absorption Rates associated with their WHHPs could assist consumers in purchasing a WHHP with a decreased emission of radiation; and

(d)     whether Defendants' conduct violated the laws of the District of Columbia and/or the State of Maryland, including Consumer Protection Act, MD. Comm. Law Code Ann. §13-101 et seq. and the District of Columbia Consumer Fraud and Procedures Act, D.C. Code § 28-3901 et seq.

21.     The claims asserted by Plaintiff are typical of the claims of the members of the Class.

22.     Plaintiff is a member of the Class and will fairly and adequately protect the interests of the members of the Class; her interests are not antagonistic to those of the Class; and she has retained attorneys experienced in class and complex litigation as her counsel.

23.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

(a)     It is economically impractical for most members of the Class to prosecute separate, individual actions, and

(b)     After the liability of Defendants has been adjudicated, damages to members of the Class can be determined by the Court.

24.     Litigation of separate actions by individual Class members would create the risk of inconsistent or varying adjudications with respect to the individual Class members which would substantially impair or impede the ability of other Class members to protect their interests.

8

25.    Class certification is also appropriate because Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate declaratory and/or injunctive relief with respect to the claims of plaintiff and the Class members.

## INDUSTRY BACKGROUND

26.    WHHPs are sold in the United States and throughout the world. According to the United States General Accounting Office, there are an estimated 110 million Americans who use WHPPs and an estimated 1.2 billion will be in use internationally by 2005.

27.    WHHPs cannot be used without service providers ("Cell Phone Carriers"), who are granted licenses by the Federal Communication Commission ("FCC") to broadcast wireless signals on specific frequency bands to provide cellular telephone service to consumers.

28.    Each cell phone manufacturer designs and manufactures its WHHP to fit the specifications of the Cell Phone Carriers.

29.    Defendant CTIA is the industry association representing WHHP manufacturers and service providers.[2]

30.    Each Cell Phone Carrier provides manufacturers and/or sellers of WHHPs with specifications based on its specific frequency band. The specifications of the battery and circuitry for all WHHPs in a Cell Phone Carrier's network are determined by the Cell Phone Carrier's license and frequency granted by the FCC.

31.    Cell Phone Carriers own, lease and/or operate land-based lines that connect cellular telephone calls from the radio equipment base station to a mobile switch, which is also

---

[2] In October, 2000, the CTIA changed its name from the Cellular Telecommunications Industry Association to the Cellular Telecommunications & Internet Association, and retained the acronym CTIA.

owned by the Cell Phone Carriers. Based upon the license granted by the FCC, and the frequency specifications provided to sellers and/or manufacturers of WHHPs, Cell Phone Carriers create a network by which the wireless signal is transferred to land lines and the call is sent to a receiver or sent to the cell phone customer.

32.    Each WHHP has a Specific Absorption Rate ("SAR"). The SAR is a measurement of how much radiation passes through tissue during a specified time period.

33.    The WHHPs purchased by Plaintiff were sold without a meaningful and objective disclosure of SAR measurement.

## HISTORY OF MEDICAL AND SCIENTIFIC RESEARCH

34.    Scientific and medical research, published in peer-reviewed literature, has demonstrated a correlation between biological effects and the exposure to RFR within the radio frequency band of 300 megahertz to 2.4 gigahertz. As industry members, Defendants were aware or should have been aware of numerous studies and experiments that demonstrated the health risks and biological effects of RFR dating back to the late 1920's.

35.    As research and studies, including animal research, evolved over the ensuing decades, it was found that, among other things, adverse biological effects resulted from exposure to varying levels of RFR. By the early 1960's, it was believed in the scientific and medical communities that RFR is absorbed into human tissue and is capable of producing biological effects.

36.    It was believed in the scientific and medical community by the early 1960's that an antenna is the most efficient means of depositing RFR into the human body and penetrating

human tissue, and that the temporal lobe of the brain was the most sensitive area of the body to this type of radiation.

37.    Medical and scientific inquiry and research into the harmful biological effects of RFR has continued from the 1960's to the present day. Throughout this period, dozens of peer-reviewed research papers were published which, individually and collectively, raised serious and credible questions regarding whether the RFR, to which WHHP users were and are exposed, posed a risk to their health.

38.    Throughout this entire period, Defendants, individually and collectively through their trade associations, acted affirmatively to suppress and/or minimize this emerging science in the eyes of their consumers.

39.    In the early 1990's, consumers began inquiring into the connection between cell phone use and brain tumors. Despite repeated statements by the cell phone industry that thousands of studies had proven cell phones safe, no such studies existed. For example, Defendant Motorola disingenuously cited to studies showing no correlation between adverse health effects and the use of radios and microwave ovens. Based on these radio and microwave oven studies, Motorola stated that any allegations of a connection between cell phones and adverse health effects were mere speculation.

40.    In the early 1990's, as credible concerns continued to surface regarding the safety of WHHPs, Defendants, individually and through their trade association, undertook with great public fanfare to fund scientific studies to prove the safety of WHHPs. This resulted in the formation of the Science Advisory Group ("SAG") in 1993.

11

41.    With a $25 million budget contributed by the members of the CTIA, Dr. George Carlo was appointed by the CTIA to direct the workings of SAG.  When this industry-funded research failed to corroborate the industry's claims of safety - and, in fact, presented new evidence of potential health concerns - the industry responded by terminating the research funding and publicly disparaging, suppressing and minimizing Dr. Carlo's results, as well as Dr. Carlo himself.

42.    Despite their knowledge of the relevant literature and research – including industry-funded studies - Defendants continued to maintain that WHHPs posed no threat to human health despite mounting abundant evidence to the contrary.

43.    At all relevant times, the debate regarding the biological effects caused by the low-level RFR emitted by Defendants' WHHPs was fully known and appreciated by Defendants. At all relevant times, Defendants should have, and easily could have disclosed to Plaintiff and the Class the existence and implications of this debate, and the potential health risks at issue. Defendants failed and/or refused to take this simple step of disclosure to consumers for fear that such action would inhibit their ability to mass market WHHPs to the consuming public, including Plaintiff and other members of the Class.

44.    On July 16, 1993, in furtherance of its campaign to assure the consuming public of the purported safety of WHHPs, the CTIA held a press conference and issued a report entitled "Safety Update-Fast Facts: Portable Cell Phone Safety", which, in bold print, stated: **"Rest assured.  Cellular telephones are safe!"**

45.    This industry deception prompted Elizabeth Jacobson, Deputy Director for Science at the Center for Devices and Radiological Health of the U.S. Food and Drug

12

Administration ("FDA"), to send a letter on July 19, 1993, to CTIA president Thomas Wheeler,

which clearly questioned and challenged the false and misleading statements made by

Defendants to the public regarding the "safety" of WHHPs.  In pertinent part, that letter stated:

> I am writing to let you know that we were concerned about two important aspects of your press conference on July 16 concerning the safety of cellular phones, and to ask that you carefully consider the following comments when you make future statements to the press.
>
> First, both the written press statements and your verbal comments during the conference seemed to display an unwarranted confidence that these products will be found to be absolutely safe. In fact, the unremittingly upbeat tone of the press packet strongly implies that there can be no hazard, leading the reader to wonder why any further research would be needed at all.  (Some readers might also wonder how impartial the research can be when its stated goal is "a determination to reassure consumers," and when the research sponsors predict in advance that "we expect the new research to reach the same conclusion, that the cellular phones are safe.")
>
> ***
>
> We are even more concerned that your press statements did not accurately characterize the relationship between CTIA and the FDA. . . . [S]ince it is not yet clear whether we will help to direct the research program, it is premature to state that we will credential the research.
>
> To sum up, Mr. Wheeler, our role as a public health agency is to protect health and safety, not to "reassure consumers".  I think it is very important that the public understand where we stand in evaluating the possibility that cellular phones might pose a health risk. . . .

46.    In or about late 1993 or early 1994, the cell phone industry - including Defendant

manufacturers, through Defendant CTIA - organized a committee to prepare a manual for public

consumption discussing "responsible" WHHP use.  After receiving a draft of the manual,

13

Wheeler sent a memorandum to the drafting committee expressing his concerns over certain

language in the draft which acknowledged and/or implied that the use of WHHPs could pose

health risks.  Mr.  Wheeler's memorandum suggested significant substantive deletions from the

draft.  The committee thereafter deleted the offending material, set forth below in strikeout font:

> Do not operate your transportable cellular telephone when holding
> the antenna, or when any person is within 4 inches (10 centimeters)
> of the antenna. ~~Otherwise, you may impair call quality, may cause
> your phone to operate at a higher power level than is necessary, and
> may expose that person to RF energy in excess of the levels
> established by the updated ASNI Standard.~~
>
> ~~If you want to limit RF exposure even further, you may choose to
> control the duration of your calls or maintain a distance from the
> antenna of more than 4 inches (10 centimeters).~~
>
> For best call quality, keep the antenna free from obstructions and
> point it straight up.

47.    In June 1994, Dr. Henry Lai of the University of Washington contacted Dr. Carlo

at a Bioelectromagnetics Society conference in Copenhagen, Denmark.  Dr. Lai wanted to show

some important data to SAG.  Dr. Lai and his colleague, Dr. Narendrah Singh, had conducted a

series of experiments on rats that had been exposed to radiation similar to the type of radiation

that comes from the antenna of a cellular phone.  According to Lai, these tests showed that cell

phone radiation causes damage to DNA in human blood cells.  Specifically, the radiation causes

both single- and double-stranded DNA breaks.  The representatives at the meeting from

Motorola, Chuck Eger and Dr. Quirno Balzano, questioned the testing protocols as well as the

tests' relevancy to humans, and dismissed and discredited the research and results.  The CTIA,

SAG, and Defendants made no disclosure to the public or to the FDA of any type about the Lai

study.

48.     A 1994 Canadian study of electric utilities workers showed a statistically significant increase in lung cancer in those workers who had jobs that put them in proximity with mobile radio communications equipment and with possible exposure to radiation from the equipment. The risk was as much as 3.11 times higher than for those workers not exposed.

49.     Three studies conducted in 1996 were relevant to the cell phone industry and the disclosures it should have made to the public. First, a study of Air Force personnel exposed to RFR in their jobs revealed an increased risk of developing brain tumors. This risk was 1.39 times higher in those exposed to RFR as compared to those not exposed. Second, a study of Polish military workers exposed to radio waves in their work revealed a statistically significant increase in brain and blood cancers. The risk of brain cancer was 1.9 times higher and for leukemia and lymphoma, the risk was 6.3 times higher when compared to unexposed workers. Finally, Dr. Ross Adey, funded by Motorola, conducted a research project at the Veteran's Administration Medical Center. His study was the first to show a biological effect from cellular phone radiation. However, the industry did not amend its public position that cell phone waves were biologically inactive and safe.

50.     During the summer of 1996 the relationship between the CTIA and SAG (now known as the WTR)[3] became strained. Dr. Carlo had begun to pursue leads and studies that were potentially detrimental to the CTIA and the cellular phone manufacturers and carriers. As a result, the CTIA began making budgetary cutbacks to the WTR.

---

[3] In 1995, the Scientific Advisory Group was transformed into Wireless Technology Research, L.L.C., (WTR), a nonprofit organization also financed by CTIA. However, the new structure set up by CTIA again resulted in too little accountability. WTR rarely solicited input from the FDA and did not always follow the input that was given. Dr. Carlo was the President and CEO of WTR.

51.    In early 1998, Dr. Kjell Hansson Mild, from the Swedish National Institute for Working Life, along with colleagues from Norway, reported that as people increased their usage of cellular (analog and digital) phones, they experienced a correspondingly profound increase in the prevalence of headaches, fatigue, and the sensation of warmth around the ear. In both the Swedish and Norwegian data, a statistically significant increase in the prevalence of symptoms was noted that corresponded to an increase in both the number of calls made per day and the total minutes on either type of phone. The authors cited leakage in the blood brain barrier as a possible mechanism causing the symptoms.[4]  However, the industry did not amend its public position that cell phone waves were biologically inactive and safe.

52.    By the end of December 1998, the industry was faced with the evidence of genetic damage in human blood that they could no longer ignore. Drs. Ray Tice and Graham Hook of the Integrated Laboratory Systems in Research Triangle Park, North Carolina had preliminary results from a series of DNA damage studies. Their study demonstrated that radiation from an analog signal yielded a nearly 300% increase in genetic damage (micronuclei development) in human blood cells. These results were replicated in January 1999.

53.    The correlation between the presence of micronuclei and cancer is so strong, that doctors from around the world are using tests for the presence of micronuclei to identify patients who are likely to develop cancer. In fact, after the 1986 nuclear disaster at Chernobyl, Ukraine, experts used the micronuclei testing as a tool for diagnosing cancer risks.[5]  However, despite the

---

[4] This finding corroborates a study presented to the U.S. Senate in 1977. Balzano, of Motorola, attended this hearing.

[5] Dr. Marianne Berwick of the Memorial Sloan-Kettering Cancer Center and Dr. Paolo Vineis of the Unit of Cancer Epidemiology, University of Toronto, noted that the presence of micronuclei in living cells indicates that

evidence that mobile phones cause genetic damage, the industry did not amend its public position that cell phone waves were biologically inactive and safe.

54.    Also in 1998, Dr. Joshua Muscat of the American Health Foundation completed a study, under WTR contract, of brain cancer patients.  The Muscat study reported two findings: (1) that in areas of the skull where radiation plumes from cell phones penetrate, a significant increase in the risk of tumors appeared evident; and (2) for areas of the brain where cell phone radiation is now known not to penetrate, cell phone usage does not seem to affect the risk of tumor development.

55.    In 1998, the WTR also contracted for a study to be conducted on acoustic neuroma, a rare noncancerous tumor affecting the nerve that controls the hearing.  This study also showed a statistically significant dose-response relationship.  Finally, in December 1998, the WTR received a summary from Drs. Ken Rothman and Nancy Dreyer of the Epidemiology Resources, Inc., that concluded that the rate of brain-cancer deaths was higher among handheld phone users, where the antenna was next to their heads, than among car phone users, where the antenna is far away from the user.

56.    Dr. Carlo, widely considered an industry insider, declared without prior approval from or notice to the industry, that his research established a correlation between cancer and WHHP use.  In fact, Dr. Carlo's research indicated that WHHP radiation could triple the number of chromosomal abnormalities in human blood.

---

the cells can no longer properly repair broken DNA, and that this deficiency will likely lead to the development of cancer.  Journal of the National Cancer Institute (Aug. 2000).

57.      In February 1999, at the "Wireless '99" trade show, Dr. Carlo presented his findings to the industry. In response to the new information, William Collins, chairman of MetroCall, whose 120 stores sell pagers and wireless phones, put new procedures into effect in his stores. Any customer who walks into a store receives a single-page health and safety bulletin that explains the possible dangers of using cell phones. The sheet especially warns parents not to expose their children to health risks from cell phone radiation.

58.      In response to receiving Dr. Carlo's results in May 1999, the CTIA and the other Defendants complained about the study's procedures and methods. Further, the CTIA began a marketing campaign to discredit the work and abilities of Dr. Carlo, the man originally chosen by them to spearhead their much-touted studies.

59.      On October 8, 1999, Thomas Wheeler personally sent Dr. Carlo a letter outlining the CTIA position that all test results demonstrate the safety of WHHPs.

60.      In November 1999, Dr. Carlo released a book titled "Cell Phones, Invisible Hazards in the Wireless Age." In his book, Dr. Carlo describes in detail his time at WTR, the research and methodology used by him, and the impediments and hurdles placed by the WHHP industry to that research.

61.      In anticipation of Dr. Carlo's book, the CTIA and Wheeler continued the media campaign against Dr. Carlo. In October 1999, when it became evident that ABC News would air a story about cell phone health risks, the CTIA, through its lawyers, sent a letter to ABC News listing a number of the industry's concerns. The letter also took the opportunity to attack Dr. Carlo's credibility and question his motives for speaking out about the health risks he had discovered. The letter ended with a request that the program to be aired on *20/20* be delayed.

18

62.    When ABC News did not delay its *20/20* program, Wheeler had the opportunity to speak to the public:

> Our industry has gone out and aggressively asked the question, "Can we find a problem?" And the answer that has come back is that there is *nothing* that has come up in the research that *suggests* that there is a linkage between the use of a wireless phone and health effects. . . .

ABC News *20/20* October 20, 1999 (emphasis added). Later in the interview, when asked about the scientific evidence discussed above, Wheeler stated that "I have to look at what the responsible scientists say . . . and they say that there is not a public-health effect."

63.    These statements were false and misleading in that by October 20, 1999, the CTIA and the manufacturing Defendants were apprised of all the above studies demonstrating a correlation between cell phone use and adverse health effects.

64.    An epidemiological study released in 2000 and conducted by Dr. Lennart Hardell of the Department of Oncology at Orebro Medical Center in Orebro, Sweden, demonstrated that the risk of tumors developing on the same side of the head that cell phone users hold their telephones is significantly higher than it is for the other side.[6]  Despite such findings, the CTIA and the manufacturers still held on to their mantra that cell phone radiation was biologically inactive.

65.    On August 1 and 2, 2000, Dr. Joseph Roti Roti of the Washington University in St. Louis, Missouri presented his findings confirming the prior WTR studies.  Using different methods and systems, his research also showed that human blood cells exposed to radiation at wireless phone frequencies did indeed develop genetic mutations, in the form of micronuclei.

66.    In the Summer of 2000, as a direct consequence of the filing of lawsuits raising concerns about biological effects from RFR, Defendants again promised to adopt the then SAG recommendations to adopt measures that would serve the public interest.  Some, but not all, Manufacturing Defendants began to provide to purchasers of WHHPs a copy of the FDA's "Update on Mobile Phones" dated October 2000 (the "Update").  This document is included by some Defendants as an insert to the packaging for newly purchased WHHPs.

67.    The FDA's "Update" informs the consuming public as follows:

**The U.S. Food and Drug Administration's Center for Devices and Radiological Health Consumer Update on Mobile Phones.**

\*\*\*

**Why the concern?**

Mobile phones emit low levels of radio frequency energy (i.e., radio frequency radiation) in the microwave range while being used.  They also emit very low levels of radio frequency energy (RF), considered non-significant, when in the stand-by mode.  It is well known that high levels of RF can produce biological damage through heating effects (this is how your microwave oven is able to cook food).  However, it is not known whether, to what extent, or through what mechanism, lower levels of RF might cause adverse health effects as well.  Although some research has been done to address these questions, no clear picture of the biological effects of this type of radiation has emerged to date.  Thus, the available science does not allow us to conclude that mobile phones are absolutely safe, or that they are unsafe. . . .

**How much evidence is there that hand-held mobile phones might be harmful?**

Briefly, there is not enough evidence to know for sure, either way, however research efforts are on-going.  The existing scientific evidence is conflicting and many of the studies that have been done to date have suffered from flaws in their research methods.

---

[6] During the summer of 2001, Dr. Hardell released a new study that backed up these results.

* * *

**What is FDA's role concerning the safety of mobile phones?**

Under the law, FDA does not review the safety of radiation emitting consumer products such as mobile phones before marketing, as it does with new drugs or medical devices. . . . Although the existing scientific data do not justify FDA regulatory actions at this time, FDA has urge the mobile phone industry to take a number of steps to assure public safety.  The agency has recommended that the industry:

- support needed research into possible biological effects of RF of the type emitted by mobile phones;
- design mobile phones in a way that minimizes any RF exposure to the user that is not necessary for device function; and
- cooperate in providing mobile phone users with the best possible information on what is known about possible effects of mobile phone use on human health.

68.     In addition to furnishing this FDA Update as a package insert, some Defendants also included headsets as part of the package of newly purchased WHHPs.   Moreover, during the Summer of 2000, the CTIA announced its recommended policy for disclosing the SAR measurement on the packaging of each WHHP.  This voluntary disclosure program was to begin by August 2001.

69.     Also in the Summer of 2000, CNN's *Larry King Live* aired a story on cell phones and their health risks.  Motorola declined an invitation and instead sent a written statement: "Over the years, scientific expert panels, standard-setting organizations, and other authoritative bodies around the world have not wavered from the longstanding conclusions that the low-power radio signals from wireless phones pose no known health risk."  This statement was false and

21

misleading because Motorola was at all times privy to the scientific studies and results discussed

above.

70.    On or about May 7, 2001, the United States General Accounting Office issued

GAO-01-545 titled "Research and Regulatory Efforts on Mobile Phone Health Issues."  See

Exhibit A (hereinafter GAO Report).  The purpose of this report was to provide an update on the

general status of the scientific research on mobile phone health effects.  Based on review of the

Food & Drug Administration, the World Health Organization, the Federal Communications

Commission, and other health agencies, the report stated that although the current research did

not show radiofrequency energy emitted from mobile phones had adverse health effects, the

findings were not conclusive.  The GAO report discussed the entities designing and conducting

the tests, their lack of productivity and accountability, the types of projects selected, and the

inadequacies of the test designs:

> In 1993, CTIA created a nonprofit organization to fund research on
> the health effects of mobile phone emissions.  Although some
> useful research was conducted, many scientists and government
> and industry officials that we spoke with raised questions about the
> productivity and accountability of that organization.
>                                  * * *
> [T]he Scientific Advisory Group [established by the CTIA to
> conduct the research] was being directly funded by CTIA on a
> month-by-month basis, an arrangement that could have raised
> questions about the objectivity and credibility of the research
> effort.
>                                  * * *
> A relatively large body of research exists on the health effects of
> radiofrequency energy in general, but most of this research has
> focused on short-term exposure of the entire body, not on the
> longer-term exposure of the head that is characteristic of mobile
> phone use.  In addition, much of the research to date has
> investigated the health effects of emissions at frequencies different
> from those used by mobile phones; it is not clear how possible

22

> health effects found at one frequency on the radiofrequency
> spectrum apply to other frequencies on the spectrum.  Furthermore,
> much of the research focusing on mobile phones has tested the
> emissions of analog phones rather than digital phones, . . . .

71.    According to the CTIA website, "[t]he number of digital subscribers soared to

more than 38.5 million by mid-year 1999, amounting to 47.5 percent of all wireless subscribers

in the U.S."

72.    Despite these shortcomings, some studies indicate that questions still exist about

potential biological effects that will require further investigation.   As an example, the GAO

Report stated:

> when researchers performed a battery of tests to assess the effects
> of exposure to mobile phone radiofrequency energy on the genetic
> material of blood cells, one type of test, known as a micronucleus
> assay, detected changes in the genetic material, a common
> precursor to cancer.
>                     * * *
> Some of these studies have reported effects, including changes in
> brain activity, reactions times, and sleep patterns.

73.    The GAO Report also outlines the shortcomings of the testing protocols used by

the CTIA-funded researchers as well as independent researchers.

> Small differences in the way different technicians set up the test,
> mist the tissue fluid, or calibrate the measurement instruments can
> introduce variation into the test results.  Variations can also occur
> because laboratories can use different testing procedures.
>                     * * *
> Other important sources of variability due to differences in testing
> procedures include the properties of the mixtures used to simulate
> human tissue, the type of head model used, the type and calibration
> of the probe used to measure the radiated electric field, and the
> methods for averaging SAR measurements.
>                     * * *

However, a major engineering organization has not yet completed a long-standing effort to develop uniform procedures for this testing, the lack of which significantly increases variability in test results.

74.    These shortcomings can cause a WHHP's actual maximum SAR level to fall within a range of plus/minus 50-60% of the test result.  Thus, the SAR levels voluntarily disclosed to the public are not meaningful or objective since these are not based on standardized tests, provide no assurances of accuracy, and cannot be a source of objective comparison for the consuming public.

75.    The CTIA maintains a website that has a separate "For the Consumer" area.  In the area discussing health issues, the CTIA states:

> After a substantial amount of research, scientists and governments around the world continue to reaffirm that there is no public health threat from the use of wireless phones." stated Tom Wheeler, President and CEO of the Cellular Telecommunications Industry Association (CTIA).

76.    The CTIA also claims that the industry is subject to strict guidelines regarding safety. "Wireless products are required to adhere to strict emissions guidelines, which are themselves developed under a thorough and rigorous review process.  The United States, the International Commission on Non-Ionizing Radiation Protection (ICNIRP) and Canada have recently reviewed their guidelines and declared that they continue to protect the public."  However, as discussed elsewhere, the only regulation is the FCC's maximum SAR levels that a WHHP can emit.  All other "guidelines" are voluntarily followed, if at all, by members of the CTIA.  Finally, compliance with these guidelines is based on non-standardized tests infused with a multitude of subjective variables.  No authoritative body has yet established standardized tests that must be followed by the industry.

24

77.    Finally, in response to frequently asked questions, the CTIA website states:

**What SAR level should I look for when buying a wireless phone?**

There are many features to consider when buying a wireless phone: style, size, functionality and price. The SAR is provided for consumers who may also be interested in RF exposure levels. It is important to remember, however, that all wireless phones marketed in the United States must meet the safety limit of 1.6 W/kg (watts per kilogram) set by the FCC <u>and do not pose a health risk to users</u>. The guidelines that set the safety limit incorporate a substantial margin of safety to give additional protection to wireless phone users.

                                            * * *

**What is CTIA's requirement that will tell me about the radio wave levels of my phone?**

 Beginning in early 2001, consumers will receive information about a phone's radio wave levels or Specific Absorption Rates (SAR) in the informational materials or user manual included with phones certified by CTIA after August 1, 2000. This information will provide the SAR level for the phone, let consumer know that their phone model has been tested <u>and meets strict, science-based federal guidelines</u> and describe and put SAR into context for the consumer. Because CTIA's certification program is voluntary not all phones will include this information. . . . On the outside of the box will be information stating that the phone meets FCC RF emissions guidelines, the phone's FCC ID number (used for searching on the FCC website) and the FCC website where more information on the phone's SAR can be found.

                                            * * *

**What is the CTIA certification program?**

The CTIA certification program is a separate, voluntary testing program unrelated to the FCC's product certification process. The CTIA certification program is designed to make sure that mobile phones perform according to industry standards. CTIA certified phones have passed CTIA's stringent evaluation program by meeting or exceeding the industry's expectation for performance.

(Emphasis added).

                                            25

78.     Again, the CTIA failed to note that the SAR levels are a result of non-standardized testing that could be off by as much at 60%.  Moreover, as discussed in the GAO Report, the FCC has stressed that they are not a public health agency and do not have any expertise in the area of WHHP safety.  The SAR limit, thus, is not a safety limit as claimed by the CTIA.[7]

79.     Finally, the CTIA leads the consumer to believe that its certification of WHHPs is somehow linked to a test of safety.  However, meeting or beating stringent industry *performance* standards is not the same as meeting and beating stringent safety standards – in fact, there are NO objective safety standards.

80.     On February 4 and 5, 2002, ABC News (WJLA) aired a story on its I-Team segment regarding its investigation of the safety of WHHPs.  Robert Kane, formerly a senior research scientist and a member of the technical staff at Motorola, was interviewed for this news story.  Mr. Kane stated that, "[t]here are individuals who are employed in the cell phone industry who are lying to us."

81.     Also during this I-Team segment, it was disclosed that numerous patents for WHHP safety devices have been obtained by Defendants yet never placed into the market place.  These safety devices are designed to shield radiation from the head or redirect radiation away from the head.  A non-industry patent holder, who has been frozen out of the market, believes that these devices are not implemented due to a fear that a stigma would be attached to the

---

[7] The CTIA repeatedly references the FCC guidelines as establishing either an RF exposure or SAR exposure *safety* limit.  See, e.g., http://www.wow-com.com/consumer/faq/articles.cfm?ID=129; http://www.wow-com.com/consumer/faq/articles.cfm?ID=128.  As discussed above, the FCC is not a public health agency and does not purport to regulate the safety of WHHPs.

WHHPs and that consumers would believe that there is in fact a safety concern with the radiation emitted from them. Thus, the safety devices have remained a patented secret.

82.    Finally, as recently as August 2002, a report was issued from Stockholm, Sweden regarding a recent study that showed the risk of developing brain tumors from first-generation WHHPs (Nordic Mobile Telephone, "NMT") was as much as 80% greater than those who did not use WHHPs. Defendant Nokia still produces two models of its WHHP that operates on the NMT standard.

## DEFENDANTS' MISCONDUCT

83.    At all relevant times, Plaintiff and other members of the Class were and continue to be uninformed, misled and deceived by Defendants as to the debate regarding the safety risks associated with the use of WHHPs as well as the existence and potential importance of accurate and objective SAR information.

84.    At all relevant times, Defendants controlled the marketing, lease and/or sale of their WHHPs.

85.    The disclosures by Defendants to the consuming public during the period relevant to this Complaint were wholly inadequate to alert Plaintiff and the Class as to the conflicting scientific studies and industry debate concerning the safety risks associated with the use of WHHPs, the SAR levels associated with each WHHP, and the consumer's ability to compare the RFR exposure associated with each WHHP before making any purchase.

86.    As a result of Defendants' actions in concealing information relevant to their WHHPs from the public, Plaintiff was unaware of Defendants' unlawful conduct, and could not through due diligence have discovered the extent of such unlawful conduct until recently.

## COUNT I
### (Violation of Maryland Consumer Protection Act)

87.    Plaintiff incorporates by reference all the paragraphs in this complaint as if fully restated herein.

88.    This cause of action is brought pursuant to the Maryland Consumer Protection Act, MD. Comm. Law Code Ann. §13-101 et seq. ("Maryland CPA").

89.    Section 13-301 defines an unfair or deceptive trade practice to include any:

(1)    False . . . or misleading oral or written statement . . . or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;

(2)    Representation that: (i) Consumer goods . . . have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have; (iv) Consumer goods . . . are of a particular standard, quality, grade, style, or model which they are not;

(3)    Failure to state a material fact if the failure deceives or tends to deceive; . . . and

(9)    Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with:  (i) The promotion or sale of any consumer goods . . .

90.    Section 13-303 prohibits unfair or deceptive practices in both the sale and offer for sale of any consumer goods.

91.    Defendants' conduct as alleged above violates Sections 13-301 and 13-303 of the Maryland CPA in that Defendants, among other things, made representations and/or omissions regarding the potential risks associated with their WHHPs which had the capacity tendency, or effect of deceiving Plaintiff and the Class; and failed to state material facts regarding these risks, which failure deceived or tended to deceive Plaintiff and the Class.

28

92.    Defendants, through the practices set forth above, engaged in deception and misrepresentation of its products intending that Plaintiff and the members of the Class would rely on such misrepresentations and omissions of material fact.

93.    By its concealment, suppression and/or omission of material facts, with the intent that others rely upon such acts, Defendants deceptively engaged in making false and misleading statements and omissions.

94.    Defendants' deceptive representations and omissions to Plaintiff and the Class are, and were, unfair and deceptive acts and practices, the direct and proximate result of which has caused Plaintiff and members of the Class significant damage.

95.    Plaintiff and the Class seek damages and attorney's fees pursuant to Section 13-408 of the Maryland CPA, which authorizes a civil action to be brought by any person damaged under the Act.  Plaintiff and putative Class members are consumers entitled to the statutory remedies made available by the Maryland CPA.

## COUNT II
### (Violation of D.C. Consumer Protection Procedures Act)

96.    Plaintiff incorporates by reference all the paragraphs in this complaint as if fully restated herein.

97.    This cause of action is brought pursuant to the District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3901 et seq ("DC CPPA").

98.    Section 28-3904 of the DC CPPA indicates that it is a violation, whether or not any consumer is in fact misled, deceived or damaged thereby, to:

(a)    represent that goods or services have a source, sponsorship, approval, certification, accessories, characteristics, ingredients, uses, benefits, or

quantities that they do not have; . . .

(d)     represent that goods or services are of particular standard, quality, grade, style, or model, if in fact they are of another;

(e)     misrepresent as to a material fact which has a tendency to mislead;  or

(f)     fail to state a material fact if such failure tends to mislead;

99.     Defendants' conduct as described herein was a false and deceptive trade practice within the meaning of the DC CPPA in that Defendants, among other things, made representations and/or omissions regarding the potential risks associated with their WHHPs which had the capacity tendency, or effect of deceiving Plaintiff and the Class; and failed to state material facts regarding these risks, the failure of which deceived or tended to deceive Plaintiff and the Class.

100.     As a direct and foreseeable result of Defendants' conduct, Plaintiff and the Class have been injured by paying for WHHPs that did not comport to the description of the product as offered by Defendants.

101.     Defendants continue to market the WHHPs in the fashion described herein, and their conduct, if allowed to continue, would cause damages to purchasers like Plaintiff and the Class members.

102.     This action is brought pursuant to Section 28-3905(k)(1) of the DC CPPA, and seeks treble damages or $1,500 per violation, whichever is greater, reasonable attorney's fees, punitive damages, an injunction against Defendants' use of their unlawful trade practices.

## COUNT III
### (Unjust Enrichment)

103.    Plaintiff incorporates by reference all the paragraphs in this complaint as if fully restated herein.

104.    Defendants have benefited by their receipt of profits from Plaintiffs and other class members resulting from the unlawful conduct alleged herein.

105.    It would be inequitable for Defendants to be permitted to retain these benefits, which were conferred by Plaintiff and the Class, and which stemmed from Defendants' unlawful conduct.

106.    Plaintiffs and members of the Class are entitled to the establishment of a constructive trust consisting of the ill-gotten profits paid to Defendants as a result of their unlawful conduct, and from which Plaintiffs and the other Class members may make claims on a pro-rata basis.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment against Defendants as follows:

(a)    That the Court determine that this action may be maintained as a Class action and direct that reasonable notice of this action be given to the members of the Class;

(b)    That judgment be entered against Defendants and in favor of Plaintiff and the Class on all counts;

(c)    That Defendants be permanently enjoined from continuing in any manner the violations alleged in this Complaint;

(d)    That actual or treble damages be granted;

31

(e)    That rescissory damages be granted in that Plaintiff and the Class be permitted to return their WHHPs for a full refund;

(f)    That monetary damages be granted according to proof, and that Plaintiff and the Class be awarded, where appropriate, treble damages or statutory damages, punitive damages, attorneys' fees, costs and/or disbursements.

(g)    That equitable relief be awarded in a declaration that Defendants' conduct described herein constitutes violations of applicable statutory and common law in Maryland and the District of Columbia.

(h)    That equitable relief be awarded in the form of a fund created by Defendants for the purpose of testing safety associated with WHHPs and for the purpose of establishing standardized protocols for testings SAR levels.

(i)    That equitable relief be awarded in revised public warning and statements regarding the scientific debate regarding the potential risks of using WHHPs.

(j)    That the Court establish a constructive trust comprised of Defendants' ill-gotten profits from which Plaintiff and the Class may make claims.

(k)    That Plaintiff and the Class be awarded pre- and post-judgment interest; and

(l)    That Plaintiff and the Class have such other and further relief as the Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiff demands a jury trial as to all issues triable by a jury.

Dated:  September _6_, 2002          By:    FINKELSTEIN, THOMPSON & LOUGHRAN

_Burton H. Finkelstein_

Burton H. Finkelstein (#11558)
Richard M. Volin  (#13554)
Tracy D. Rezvani  (#MD13281)
The Duvall Foundry
1050 30th Street, N.W.
Washington, DC   20007
(202) 337-8000
(202) 337-8090 fax

Of Counsel:

Stephen A. Sheller
SHELLER, LUDWIG & BADEY
1528 Walnut Street, 3rd Floor
Philadelphia, PA 19102
(215) 790-7300
(215) 546-0942 fax