## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

JERALD P. BUSSE, individually, and on
behalf of all others similarly situated,

        Plaintiff,

        v.

MOTOROLA, INC., a Delaware corporation;
AMERITECH MOBILE COMMUNICA-
TIONS, INC., a Delaware corporation, on
behalf of itself and all other entities similarly
situated; CELLULAR TELECOMMUNICA-
TIONS INDUSTRY ASSOCIATION, a
District of Columbia corporation; THOMAS
E. WHEELER; RONALD NESSEN; SCI-
ENCE ADVISORY GROUP ON CELLU-
LAR TELEPHONE RESEARCH n/k/a
WIRELESS TECHNOLOGY RESEARCH,
L.L.C., a Delaware corporation; EPIDEMI-
OLOGY RESOURCES, INC., a Massachu-
setts corporation; and GEORGE L. CARLO,

        Defendants.

No:

```
JURY DEMAND 1 10/26/95 16:03
REF ATTORNEY NO: 06814
  1 CLASS ACTION          190.00
REF CASE #  95CH010332
  1 AUTOMATION              5.00
  1 DOCUMENT STORAGE        5.00
  1 LIBRARY                 9.00
  1 DISPUTE RESOLUTION      1.00
  1 ARBITRATION FEE ·      10.00
CASE TOTAL                220.00 *
```

## COMPLAINT

    . NOW COMES Plaintiff, JERALD P. BUSSE, individually, and on behalf of all persons

similarly situated, by his attorneys, WILLIAM J. HARTE, LTD., and BARNOW AND HEFTY,

P.C., and for his complaint against Defendants, MOTOROLA, INC.; AMERITECH MOBILE

COMMUNICATIONS, INC., on behalf of itself and all other entities similarly situated;

CELLULAR TELECOMMUNICATIONS INDUSTRY ASSOCIATION; THOMAS E.

WHEELER; RONALD NESSEN; SCIENCE ADVISORY GROUP ON CELLULAR

TELEPHONE RESEARCH n/k/a WIRELESS TECHNOLOGY RESEARCH, L.L.C.;

EPIDEMIOLOGY RESOURCES, INC.; and GEORGE L. CARLO, states as follows:

1.    Plaintiff, JERALD P. BUSSE ("BUSSE"), and the Plaintiff Class members are consumers (*i.e.*, purchasers, owners or users) of cellular portable telephones manufactured, activated or promoted by Defendants.

2.    BUSSE, a resident of Cook County, Illinois, purchased a MOTOROLA, INC. ("MOTOROLA") cellular portable telephone on or about December, 1993, from AMERITECH MOBILE COMMUNICATIONS, INC. ("AMERITECH"), and used the transmission services of AMERITECH at all times relevant herein.  BUSSE and the Plaintiff Class members have been the target of a nationwide promotional and media campaign developed, instigated and effectuated by, on behalf of, or with the consent, adoption and participation by the Defendants, and part of the targeted group for the human testing study of the potential health risks of cellular portable telephones being conducted by and on behalf of the Defendants.

3.    Defendant MOTOROLA is a Delaware corporation with its principal place of business in Illinois.  MOTOROLA is a leading designer, manufacturer, supplier, seller and promoter of cellular portable telephones in Illinois and throughout the United States and the world.

4.    Defendant AMERITECH is a Delaware corporation, with its principal offices located in Cook County, Illinois.  AMERITECH is in the business of providing transmission services to cellular portable telephone owners and users in Illinois and in the Great Lakes region.

5.    Defendant AMERITECH is representative of and represents all other similarly situated companies providing transmission services to cellular portable telephone owners and users ("Defendant Class"), said companies having participated in and fostered the acts complained of herein regarding the unlawful human testing.

-2-

6.  Defendant CELLULAR TELECOMMUNICATIONS INDUSTRY ASSOCIATION ("CTIA"), a District of Columbia corporation, is an industry association with its headquarters located in Washington, D.C.; it does business nationally. CTIA engages in various activities to promote the sale and use of cellular portable telephones. Such activities include, *inter alia*: lobbying efforts to control or limit the regulation of the industry by government bodies; media activities, *e.g.*, responding to adverse press reports regarding the safety of cellular portable telephones, through its President, Defendant THOMAS E. WHEELER ("WHEELER"), or Vice-President, Defendant RONALD NESSEN ("NESSEN"), and other officers, employees, or agents; producing and distributing press releases and related materials for use by CTIA members; and conducting seminars to advise industry members on how to control government, public and press inquiries as to the safety or possible harmful effects of the use of cellular portable telephones. WHEELER and NESSEN effect the policies and programs of CTIA, and have functioned as spokespersons for CTIA.

7.  Defendant SCIENTIFIC ADVISORY GROUP ON CELLULAR TELEPHONE RESEARCH n/k/a WIRELESS TECHNOLOGY RESEARCH, L.L.C. ("SAG n/k/a WTR") is a nonprofit, limited liability corporation, organized and existing under the laws of Delaware, and engaged in the research development business. On information and belief, SAG n/k/a WTR was established by CTIA and other industry members to, *inter alia*, conduct research on the harmful effects of electromagnetic radiation such as that emitted by cellular portable telephones, ostensibly independent of the industry's objectives or perspectives, and in pursuit of same, SAG n/k/a WTR transacts business in Cook County and elsewhere in Illinois, as well as nationally and internationally.

-3-

8.     Defendant EPIDEMIOLOGY RESOURCES, INC. ("ERI") is a Massachusetts corporation, in the business of, *inter alia*, performing research and related services for its clients. As part of its business conducted on behalf of CTIA, MOTOROLA and other Defendant members of the industry, ERI, on information and belief, has engaged in certain research activities complained of herein, in Cook County, or having impact or contact in Cook County, Illinois, and nationwide.

9.     Defendant GEORGE CARLO ("CARLO"), Chairman of the SAG n/k/a WTR, has been a principal spokesperson for SAG n/k/a WTR and CTIA in conjunction with industry efforts to deal with public concerns regarding the unproven safety of cellular portable telephones or potential harmful effects of the electromagnetic radiation emitted therefrom.  On information and belief, CARLO came to this position as a result of successful presentations made to CTIA with a media firm to advance his proposal, which was, in effect, a program to divert public concerns regarding the safety of cellular portable telephones.

10.     MOTOROLA, AMERITECH, and the members of the Defendant Class are members of the cellular portable telephone industry, the business of which includes, *inter alia*, the research, design, manufacture, promotion, and sale of cellular portable telephone units and transmission services.

11.     Cellular portable telephones effect wireless telephone-like communication by the use of electromagnetic radiation transmitted and received through the unit's antenna.  In operation, the cellular portable telephone unit is virtually pressed against, and with its antenna located in close proximity to, the operator's head.

12.     MOTOROLA's researchers and other researchers on behalf of MOTOROLA and CTIA have conducted, or are aware of research which has shown, that electromagnetic radiation

of the kind emitted by cellular portable telephones is absorbed deeply into biological tissue such as the human head and brain. Cellular portable telephone industry researchers have acknowledged that they cannot say for certain that the electromagnetic radiation emitted from cellular portable telephones is not harmful to users. CARLO has stated at one or more industry seminars that if it is shown that brain tumors are occurring on the side of the head on which the user holds and operates the cellular portable telephone, that is strong evidence of causation of brain tumors by the electromagnetic radiation emitted from the cellular portable telephones. CARLO has also stated at one or more of said seminars that due to the large amount of blood vessels near the surface of one's head, and thus the proximity of blood to the electromagnetic radiation emitted by the cellular portable telephones, that there is a question of leukemia causation.

13.     Although marketed by MOTOROLA and other industry members as being proven safe by over 40 years of research and thousands of studies (see a copy of an article, "Cellular-phone doomsayer draws static," *Chicago Tribune*, January 26, 1993, attached hereto as Exhibit A), a significant number of persons within the scientific community have reported that cellular portable telephones have never been proven safe. This fact is well known to each of the Defendants and other members of their industry.

14.     MOTOROLA and the cellular industry, however, have sold and continue selling cellular portable telephones with the representations that they are safe and proven such by substantial scientific research.

15.     As a result of the actions of these Defendants, the Defendant Class, and other members of the industry, purchasers are not being informed that the earlier industry statements of proven safety, made by one or more of these Defendants, the Defendant Class, and other industry members, are not accurate. On information and belief, MOTOROLA has acknowledged

biological effects being caused by the electromagnetic radiation emitted from the cellular portable telephones, but has failed to advise Plaintiff and Plaintiff Class members of that fact.

16.    As a result of the actions of these Defendants, the Defendant Class, and other members of the industry, purchasers have not been informed and are not being informed at the time of purchase, that cellular portable telephones are, in fact, under research to determine whether they foster or contribute to the development of tumorous conditions, brain tumors or other health maladies, including, but not limited to, leukemia.

17.    As a result of Defendants', including the Defendant Class, conduct as aforesaid, BUSSE and members of the Plaintiff Class have used cellular portable telephones on a regular basis.

18.    One or more class actions have been filed against Defendants seeking the establishment of a medical monitoring fund.    The Defendants in those cases, including MOTOROLA, have opposed the establishment of said medical fund on the ground, *inter alia*, that they were not needed as cellular portable telephones have been shown to be safe and represent no health risk.

19.    Defendants, the Defendant Class, and other industry members have advanced purported findings of research regarding the safety of cellular portable telephones and failed to publicize research which puts in question the safety of cellular portable telephones and makes irrefutable their unproven safety.    These tactics have been rebuked by the government, and the industry has been advised to stop its upbeat press conferences which falsely imply that cellular portable telephones have been proven safe.    See a copy of the correspondence dated July 19, 1993, from Dr. Elizabeth D. Jacobson, Deputy Director for Science, Food and Drug Administration, to CTIA President WHEELER reprinted in *Microwave News*, July/August 1993, attached hereto as Exhibit B.    In December of 1993 the Defendants' industry caused to be publicized a

study which supposedly showed cellular portable telephones to be safe. The articles reporting the purported study were bannered with lines such as "**Study: Cellular phones safe.**" See a copy of said article appearing in *USA Today*, December 10, 1993, attached hereto as Exhibit C. In fact, said study was inherently flawed, utilized an old-style cellular portable telephone which placed the antenna farther from the head of the user than current models, and was falsely presented as being sponsored by the National Institutes of Health. The industry, including these Defendants, has never advised Plaintiff or other members of the Plaintiff Class, that the study was designed or influenced by the industry to falsely show safety of the cellular portable telephones and that it did not prove the cellular portable telephones to be safe as publicized by or on behalf of the these Defendants.

20. Even though committing to keep consumers advised, Defendants, and the Defendant Class, have failed or refused to advise and warn users of cellular portable telephones that recent studies have shown damage to DNA and brain tissue as a result of electromagnetic radiation of the kind emitted from cellular portable telephones. See Exhibits D and E, attached hereto, being letters which the Defendants, in consort and in combination, prepared and circulated. These Defendants, in consort and in combination, also caused to be prepared and circulated publicly a brochure entitled "Safe Cellular Phones." See Exhibit F, attached hereto, being a copy of said brochure. Research reports from independent scientists in the United States have shown DNA breaks in brain cells that have been exposed to electromagnetic radiation at levels currently stated by the cellular portable telephone industry to be safe. A copy of the Dr. Lai and Dr. Singh study, "Microwaves and DNA Damage," is attached hereto as Exhibit G. Also see Exhibit H, a copy of an article regarding same from *Microwave News*, November/December 1994. Plaintiff is informed and believes that DNA damage is related to the initiation of cancer.

After a request for additional research funding was made by these scientists to SAG n/k/a WTR, the group established by the industry purportedly to fund such research, the group not only denied the funding, but also withdrew invitations to these scientists to attend the organization's next workshop and meeting reviewing aspects of their research. Faced with the possibility of public dissemination of the DNA damage findings, and to frustrate further research regarding these findings by the very group the industry has set forth as an independent research body, MOTOROLA announced that it would be doing its own research in an effort to quell the public concern certain to be raised by disclosure of these facts. See a copy of an article, "Motorola to Study Cell Phone Safety," *Chicago Sun-Times*, January 4, 1995, attached hereto as Exhibit I.

21.    MOTOROLA, AMERITECH, members of the Defendant Class, CTIA, WHEELER, NESSEN, SAG n/k/a WTR, ERI and CARLO have not taken adequate action to advise consumers that cellular portable telephones and the usage thereof are the subject of both current medical hazard research and monitoring.

22.    On information and belief, Defendants MOTOROLA, AMERITECH, members of the Defendant Class, and CARLO have either supplied or participated in the supplying to Defendants CTIA, SAG n/k/a WTR and ERI the names and other identification of users and/or other personal information pertaining to their use of cellular portable telephones. AMERITECH, and members of the Defendant Class, in consort and in combination with the other Defendants, including, but not limited to, MOTOROLA and CTIA, facilitated the mollification of public apprehension by, *inter alia*, circulating to the public letters such as those attached hereto as Exhibits D and E.

23.    On information and belief, Defendants SAG n/k/a WTR and ERI, in cooperation with Defendants CTIA, WHEELER, NESSEN and CARLO, or at their direction, and without the

knowledge of the users, have entered or caused to be entered into a database, users' names and other personal information pertaining to them, with the purpose and design of conducting research to monitor health effects of cellular portable telephone use on said individuals. See a copy of an article, "Studies re-examine cellular phone safety," *Chicago Tribune*, September 19, 1994, attached hereto as Exhibit J. MOTOROLA, AMERITECH and other members of the Defendant Class, are aware of, and have knowingly participated in, directly or indirectly, the complained of conduct.

24.    Consumers, when purchasing and activating their cellular portable telephones, have not been and are not being informed by MOTOROLA, AMERITECH or other members of the Defendant Class, of the lack of proven safety of cellular portable telephones, the recognized risks of use, the ongoing research of cellular portable telephones, and that the consumers' names have been, are, or will be put into a database to monitor health effects on cellular portable telephone users, including whether or when they have or will come to have brain tumors or other health problems. On information and belief, MOTOROLA, AMERITECH and other members of the Defendant Class routinely advise consumers that cellular portable telephones are safe and that there are no health concerns with their use.

25.    In selling cellular portable telephones and providing related transmission services to consumers while failing to advise the consumers of the status of research regarding the safety of cellular portable telephones and that their names and other personal information have been or will be inserted into a database to monitor users' health for adverse effects, Defendants have subjected the Plaintiff and other Plaintiff Class members to human testing without permission or consent and have violated multiple rights of the Plaintiff and other Plaintiff Class members as more fully stated herein.

## CLASS ACTION ALLEGATIONS

1.      Plaintiff brings this action as a class action pursuant to the Illinois Code of Civil Procedure, 735 ILCS 5/2-801 *et seq.*, on behalf of himself and all other persons and entities who have sustained damage or will sustain damage as a result of Defendants' illegal actions.

2.      The members of the Plaintiff Class are numerous, and by Defendants' own statements number in the millions.  The identity of each such person, while not presently known to Plaintiff, can be ascertained.  Joinder of all Class members is impracticable.  The members of the Defendant Class are numerous and while their identity can be ascertained, joinder of all Defendant Class members is impracticable.

3.      The claims of the Class involve common questions of law or fact which predominate over any questions affecting only individual Class members, whether Plaintiff or Defendant.  Among such questions are:

   a.      whether Defendants have violated regulations regarding the use of human test subjects;

   b.      whether Defendants' conduct constitutes an invasion of Plaintiff's and Plaintiff Class members' privacy;

   c.      whether Plaintiff and the Plaintiff Class are entitled to injunctive relief on account of Defendants' unlawful activities;

   d.      whether Defendants have intentionally inflicted emotional distress upon Plaintiff and Plaintiff Class members;

   e.      whether Defendants' conduct constitutes negligence per se against Plaintiff and Plaintiff Class members;

   f.      whether Defendants have converted Plaintiff's and Plaintiff Class members' services or property; and

g.      whether Defendants have committed and/or continue to commit a civil battery on Plaintiff and Plaintiff Class members by subjecting them to the effect and impact of the electromagnetic radiation emitted from their cellular portable telephones.

4.      Plaintiff and his counsel will fairly and adequately protect the interests of the members of the Plaintiff Class. Plaintiff has retained counsel who are competent and experienced in class action litigation and who intend to prosecute this action vigorously. The Defendant Class will be fairly and adequately protected by the representative Defendants.

5.      A class action is an appropriate method for the fair and efficient adjudication of the controversy. The prosecution of separate actions by individual members of the Plaintiff Class or against individual members of the Defendant Class would create a risk of inconsistent or varying adjudications and rulings with respect to individual members of the Plaintiff Class and the Defendant Class, and would result in the unnecessary burdening of court dockets and unnecessary expense and inconvenience to the members of the Plaintiff Class and the Defendant Class.

## COUNT I

## VIOLATION OF REGULATIONS REGARDING HUMAN TESTING

1. - 30.      Plaintiff adopts and realleges paragraphs 1 through 25 of the Complaint and 1 through 5 of the Class Action Allegations as though fully set forth herein.

31.      The Secretary of Health and Human Services and the Food and Drug Administration are the principal entities of the federal government that establish and regulate safety standards for products that emit electromagnetic radiation in their operation or use. Under 21

U.S.C. § 360ii the Secretary is charged with the responsibility of establishing and carrying out

> (a) . . . an electronic product radiation control program designed to protect the public health and safety from electronic product radiation . . . [and] (a)s part of such plan, he shall—
>
> . . .
>
>> (2) plan, conduct, coordinate, and support research, development, training, and operational activities to minimize the emissions of and the exposure of people to, unnecessary electronic product radiation;
>
> . . .
>
>> (4) study and evaluation [*sic*] emissions of, and conditions of exposure to, electronic product radiation and intense magnetic fields; . . . .

In carrying out these responsibilities of 21 U.S.C. § 360ii, the Secretary is authorized under subsection (b)(2) "[to] make grants to public and private agencies, organizations, and institutions, and to individuals for the purposes stated in paragraphs (2) [and] (4). . . ;" and, with regard to studies to be conducted by the Secretary, under 21 U.S.C. 360jj(b) ". . . the Secretary. . . [s]hall invite the participation of . . . interested professional, labor, and industrial organizations." Such testing is not left to the whim of industry.

32.     The FDA imposes regulations on researchers conducting human testing for, on behalf of, or in conjunction with the FDA.  Said regulations are contained in 21 C.F.R. Part 50, and reflect the federal government's general policy with regard to human testing. (Similar provisions are found in over 40 different sections of the Code of Federal Regulations.) 21 C.F.R. Part 50.20 provides:

> . . . [N]o investigator may involve a human being as a subject in research covered by these regulations unless the investigator has obtained the legally effective informed consent of the subject or the subject's legally authorized representative. An investigator shall seek such consent only under circumstances that provide the prospective subject or the representative sufficient opportunity to consider whether or not to participate and that minimize the possibility of coercion or undue influence.

Elements of informed consent found in 21 C.F.R. Part 50.25 require, *inter alia*:

> (a) . . . [that] the following information shall be provided to each subject:

(1) A statement that the study involves research, an explanation of the purposes of the research and the expected duration of the subject's participation, a description of the procedures to be followed, and identification of any procedures which are experimental.

(2) A description of any reasonably foreseeable risks or discomforts to the subject.

. . .

(5) A statement describing the extent, if any, to which confidentiality of records identifying the subject will be maintained and that notes the possibility that the Food and Drug Administration may inspect the records.

(6) For research involving more than minimal risk, an explanation as to whether any compensation and an explanation as to whether any medical treatments are available if injury occurs and, if so, what they consist of, or where further information may be obtained.

(7) An explanation of whom to contact for answers to pertinent questions about the research and research subject's rights, and whom to contact in the event of a research-related injury to the subject.

33.    On information and belief, Defendants, in conjunction with the research efforts or concerns of the FDA and other governmental agencies, and under said agencies supervision or review, have engaged some three million (3,000,000) users and plan to engage some ten million (10,000,000) users in a research study to determine the detrimental effects of electromagnetic radiation from cellular portable telephones.

34.    Defendants have not notified the millions of users who are unwitting participants in Defendants' research of their inclusion in Defendants' pool of human test subjects, much less obtained their informed consent as required by the aforementioned regulations. In fact, these Defendants, along with other industry members, have put the means of the test, the cellular portable telephones and the resulting electromagnetic transmissions, into the consumers' hands without informing them of the lack of proven safety of the cellular portable telephones and have failed to advise the consumers that they would be part of a test to see if they get health maladies such as brain tumors.

35.    The circumstances of Defendants' research are not such that Defendants are exempt from the requirements of said regulations.

-13-

36.     Defendants by the aforementioned acts and omissions have engaged in conduct that is in contravention of the regulations provided in 21 C.F.R. Part 50, and in contravention of the federal government's general policy regarding human testing.

WHEREFORE, Plaintiff prays that this Court enter an order against Defendants and in favor of Plaintiff and all others similarly situated and, accordingly:

a.     Certify this action as a class action pursuant to Section 2-801 of the Illinois Code of Civil Procedure with the named Plaintiff as Plaintiff Class representative;

b.     Certify the Plaintiff's counsel as Plaintiff Class counsel;

c.     Certify a Defendant Class as aforementioned;

d.     Declare that Defendants' conduct is in contravention of the regulations provided in 21 C.F.R. Part 50, and in contravention of the federal government's general policy regarding human testing;

e.     Order Defendants to cease all research activities using human subjects which are being conducted in contravention of FDA regulations regarding human testing;

f.     Order Defendants to publicly notify present users and prospective consumers of cellular portable telephones and transmission services of the uncertainty regarding the safety of cellular portable telephone use;

g.     Order Defendants to individually notify by U.S. Mail all relevant parties of their unwitting participation in Defendants' illegal research activities;

h.     Award damages to Plaintiff and others similarly situated to compensate them for damages incurred as a result of Defendants' illegal actions;

i.     Award appropriate attorneys' fees and the reimbursement of expenses to Plaintiff Class counsel; and

j.     For any other relief this Court deems equitable and just.

## COUNT II

## INVASION OF PRIVACY

1. - 30.      Plaintiff adopts and realleges paragraphs 1 through 25 of the Complaint and 1 through 5 of the Class Action Allegations as though fully set forth herein.

31.      On information and belief, Defendants SAG n/k/a WTR, by and through CARLO and said organizations' other officers, members and agents, CTIA, by and through its officers, members and agents, and ERI, by and through its officers, employees and agents, have solicited from Defendants AMERITECH and other members of the Defendant Class, and Defendants AMERITECH and other members of the Defendant Class, have provided or will provide SAG n/k/a WTR, CTIA, and ERI with personal information from Plaintiff and Plaintiff Class members without their knowledge of and consent to said Defendants' intended use of such information, *i.e.*, medical research.  On information and belief, MOTOROLA was a participant in the establishment and furtherance of the complained of unlawful human testing.

32.      Plaintiff and Plaintiff Class members have provided this personal information to AMERITECH and other Defendant Class members in the belief that it was necessary for very limited and specific purposes (*e.g.*, account billing) and that it would not be transferred, sold to, or shared with any other individual or entity for the purpose of testing a product for its adverse health effect propensities, including the fostering or exacerbation of cancer or tumorous growths.

33.      On information and belief, Defendants SAG n/k/a WTR, CTIA, and ERI have placed or plan to place Plaintiff's and Plaintiff Class members' personal information into a research database to monitor Plaintiff's and Plaintiff Class members' lives and health.  See, "Studies re-examine cellular phone safety," *Chicago Tribune*, September 19, 1994, attached hereto as Exhibit J.

34.    Plaintiff believes that Defendants will use this process and information to fulfill their self-serving purposes, which include the downplaying of reports of research indicating possible health hazards associated with the use of cellular portable telephones, in reckless if not deliberate disregard of consumer safety in order to preserve the steady inflow of their profits.

35.    This unauthorized use and publication of users' highly personal individual and medical information is outrageous and violative of the rights of Plaintiff and other Plaintiff Class members.

WHEREFORE, Plaintiff prays that this Court enter an order against Defendants and in favor of Plaintiff and all others similarly situated and, accordingly:

a.    Certify this action as a class action pursuant to Section 2-801 of the Illinois Code of Civil Procedure with the named Plaintiff as Plaintiff Class representative;

b.    Certify the Plaintiff's counsel as Plaintiff Class counsel;

c.    Certify a Defendant Class as aforementioned;

d.    Order Defendants SAG n/k/a WTR, CTIA, and ERI to cease the gathering and using of personal and medical information of cellular portable telephone purchasers or users obtained from any industry participant without the knowledge and consent of such purchaser or user as to who will receive said information and the purpose(s) for seeking said information;

e.    Order Defendants to individually notify by U.S. Mail all relevant parties of their unwitting participation in Defendants' illegal research activities;

f.    Award damages to Plaintiff and others similarly situated to compensate them for damages incurred as a result of Defendants' illegal actions;

g.    Award appropriate attorneys' fees and the reimbursement of expenses to Plaintiff Class counsel; and

h.    For any other relief this Court deems equitable and just.

## COUNT III

## TORT OF OUTRAGE

1. - 30.    Plaintiff adopts and realleges paragraphs 1 through 25 of the Complaint and 1 through 5 of the Class Action Allegations as though fully set forth herein.

31. - 35.    Plaintiff adopts and realleges paragraphs 31 through 35 of the allegations of Count II as though fully set forth herein.

36.    Defendants engaged in the aforementioned acts deliberately and with reckless disregard of the possibility of causing emotional distress to Plaintiff and Plaintiff Class members.

37.    As a direct and proximate result of Defendants' aforesaid acts, Plaintiff and Plaintiff Class members have suffered and will continue to suffer emotional pain and torment.

WHEREFORE, Plaintiff prays that this Court enter an order against Defendants and in favor of Plaintiff and all others similarly situated and, accordingly:

a.    Certify this action as a class action pursuant to Section 2-801 of the Illinois Code of Civil Procedure with the named Plaintiff as Plaintiff Class representative;

b.    Certify the Plaintiff's counsel as Plaintiff Class counsel;

c.    Certify a Defendant Class as aforementioned;

d.    Order Defendants SAG n/k/a WTR, CTIA, and ERI to cease the gathering and the use of personal and medical information of cellular portable telephone purchasers or users obtained from any industry participant without the knowledge and consent of such purchaser or user as to who will receive said information and the purpose(s) for seeking said information;

e.    Order Defendants to individually notify by U.S. Mail all relevant parties of their unwitting participation in Defendants' illegal research activities;

f.    Award damages to Plaintiff and all others similarly situated to compensate them for losses incurred as a result of Defendants' illegal actions;

g.   Award appropriate attorneys' fees and the reimbursement of expenses to Plaintiff Class counsel; and

h.   For any other relief this Court deems equitable and just.

## COUNT IV

## NEGLIGENCE PER SE

1. - 30.   Plaintiff adopts and realleges paragraphs 1 through 25 of the Complaint and 1 through 5 of the Class Action Allegations as though fully set forth herein.

31. - 36.   Plaintiff adopts and realleges paragraphs 31 through 36 of the allegations of Count I as though fully set forth herein.

37.   The statutes and regulations referenced above were created to protect the very same group of individuals that Plaintiff and the Plaintiff Class represent, from the type of actions in which the Defendants have engaged, and the types of harm and damages (*e.g.*, adverse health effects) that could result therefrom. Said statutes and regulations define a standard of conduct which creates a duty and which Defendants have violated by establishing, maintaining and effectuating the complained of human testing, including the failure to advise the Plaintiff and Plaintiff Class members of their unwitting participation therein.

38.   Plaintiff does not know the extent of the damage that may have been done or that is being done to him and Plaintiff Class members as a result of Defendants' aforementioned actions or omissions.

WHEREFORE, Plaintiff prays that this Court enter an order against Defendants and in favor of Plaintiff and all others similarly situated and, accordingly:

a.   Certify this action as a class action pursuant to Section 2-801 of the Illinois Code of Civil Procedure with the named Plaintiff as Plaintiff Class representative;

b.   Certify the Plaintiff's counsel as Plaintiff Class counsel;

-18-

c.    Certify a Defendant Class as aforementioned;

d.    Order Defendants SAG n/k/a WTR, CTIA, and ERI to cease the gathering and the use of personal and medical information of cellular portable telephone purchasers or users obtained from any industry participant without the knowledge and consent of such purchaser or user as to who will receive said information and the purpose(s) for seeking said information;

e.    Order Defendants to individually notify by U.S. Mail all relevant parties of their unwitting participation in Defendants' illegal research activities;

f.    Award damages to Plaintiff and all others similarly situated to compensate them for losses incurred as a result of Defendants' illegal actions;

g.    Award appropriate attorneys' fees and the reimbursement of expenses to Plaintiff Class counsel; and

h.    For any other relief this Court deems equitable and just.

## COUNT V

### CONVERSION OF PLAINTIFF'S AND PLAINTIFF CLASS MEMBERS' SERVICES AND PROPERTY

1. - 30.    Plaintiff adopts and realleges paragraphs 1 through 25 of the Complaint and 1 through 5 of the Class Action Allegations as though fully set forth herein.

31. - 32.    Plaintiff adopts and realleges paragraphs 33 and 35 of the allegations of Count I as though fully set forth herein.

33.    Plaintiff's and Plaintiff Class members' participation in Defendants' research experiments subjects them to potentially dangerous if not lethal risks.

34.    While Plaintiff or Plaintiff Class members may have been willing to weigh the cost and benefits of their participation in Defendants' research and thereafter decide to participate,

such participation is clearly a property right for which any unadvised or un-negotiated taking demands compensation.

35.    Defendants, in their actions taken and plans made to conscript users into their research experiments as human test subjects without the users' knowledge or consent, and moreover, without compensating users for the substantial risks involved, have converted Plaintiff's and Plaintiff Class members' property and, at the same time, subjected them to risks not knowingly taken.

WHEREFORE, Plaintiff prays that this Court enter an order against Defendants and in favor of Plaintiff and all others similarly situated and, accordingly:

a.    Certify this action as a class action pursuant to Section 2-801 of the Illinois Code of Civil Procedure with the named Plaintiff as Plaintiff Class representative;

b.    Certify Plaintiff's counsel as Plaintiff Class counsel;

c.    Certify a Defendant Class as aforementioned;

d.    Order Defendants to individually notify by U.S. Mail all relevant parties of their unwitting participation in Defendants' research activities;

e.    Award damages to Plaintiff and all others similarly situated to compensate them for losses incurred as a result of Defendants' illegal actions in an appropriate amount to be determined by the Court;

f.    Award appropriate attorneys' fees and the reimbursement of expenses to Plaintiff Class counsel; and

g.    For any other relief this Court deems equitable and just.

# COUNT VI

## CIVIL BATTERY

1. - 30.    Plaintiff adopts and realleges paragraphs 1 through 25 of the Complaint and 1 through 5 of the Class Action Allegations as though fully set forth herein.

31.    Defendants MOTOROLA, AMERITECH, and the Defendant Class have sold and continue to sell cellular portable telephones and transmissions services with the representation that they are safe.

32.    The electromagnetic radiation emitted from cellular portable telephones causes the vibration, oscillation and agitation of one or more components of the exposed cells of the user of a cellular portable telephone.

33.    Said Defendants have not informed Plaintiff and consumers of the above stated effect or that in the standard operation of their cellular portable telephones electromagnetic radiation is deposited in the biological tissue including brain tissue of the user, that this electromagnetic radiation produces biological effects, and that potential detrimental consequences thereof have been indicated by research.

34.    MOTOROLA, AMERITECH, and the Defendant Class, by their intentional acts of exposing Plaintiff and Plaintiff Class members to potentially damaging electromagnetic radiation, have brought about and continue to effect harmful or offensive contact to the person of the Plaintiff and to Plaintiff Class members.

35.    Plaintiff does not know the extent of the damage that may have been done or that is being done to him and to Plaintiff Class members by said offensive contact.

36.    MOTOROLA, AMERITECH, and the Defendant Class, by their actions, must be held to have intended to bring about such offensive and possibly devastating contact.

WHEREFORE, Plaintiff prays that this Court enter an order against MOTOROLA, AMERITECH, and the Defendant Class, and in favor of Plaintiff and all others similarly situated and, accordingly:

a.    Certify this action as a class action pursuant to Section 2-801 of the Illinois Code of Civil Procedure with the named Plaintiff as Plaintiff Class representatives;

b.    Certify Plaintiff's counsel as Plaintiff Class counsel;

c.    Order MOTOROLA, AMERITECH, and the Defendant Class to notify all current and prospective users of said cellular portable telephones and services, prior to their purchase, of the fact that electromagnetic radiation is deposited in the head and brain tissue of users during the ordinary use of their cellular portable telephones, and that the potential danger and/or extent of damage to the user as a result of such contact is not yet known;

d.    Establish a fund in an amount sufficient to adequately monitor and test for health effects for those consumers who choose to voluntarily participate in a study designed to determine what health effects users are subjected to because of their use of cellular portable telephones;

e.    Award damages to Plaintiff and all others similarly situated to compensate them for losses incurred as a result of the illegal actions of Defendants MOTOROLA, AMERITECH, and the Defendant Class;

f.    Award appropriate attorneys' fees and the reimbursement of expenses to Plaintiff Class counsel; and

g.    For any other relief this Court deems equitable and just.

JERALD P. BUSSE, individually, and on behalf of all others similarly situated

By: _____

One of the attorneys for Plaintiff

William J. Harte
WILLIAM J. HARTE, LTD.
111 W. Washington St.
Suite 1100
Chicago, IL 60602
(312) 726-5015
Firm I.D. 04410

Ben Barnow
Alan M. Goldberg
Robert J. Pouk
BARNOW AND HEFTY, P.C.
105 W. Madison St.
Suite 2200
Chicago, IL 60602
(312) 621-2000
Firm I.D. 06814

OF COUNSEL
Harold B. Gold
HAROLD B. GOLD, P.C.
9443 Hilldale Drive
Dallas, TX 75231
(214) 340-2520

# Cellular-phone doomsayer draws static

**By Ronald E. Yates**

There was a time, back when radio was the newfangled thing, when doomsayers brooded about the effects of radio waves. The invisible signals, they insisted, did everything from making their goldfish suicidal to destroying the appetites of their dogs and children.

Technology evolves, and so do technological villains. The latest to emerge: the cellular telephone, that symbol of executive status that permeates corporate America and occupies the best leather briefcases.

While few scientists and researchers in the medical community are taking them seriously, charges made Thursday on Cable News Network's "Larry King Live" about a link between cellular phones and brain cancer nevertheless sent shock waves through the cellular industry. And when some people stopped to factor in last week's announcements that two high-profile corporate chief executives had come down with brain cancer ... well, that was more than enough to send the stock prices of cellular manufacturers such as Motorola Inc. and McCaw

Cellular tumbling Friday.

So, on Monday, industry bigwigs rolled out the heavy artillery.

Motorola, the world's largest producer of cellular phones, led the way. The Schaumburg-based communications giant attempted

See **Phones**, pg. 6

---

## From Page 1

# Phones

Continued from page 1

to pulverize concerns about the safety of the high-frequency, low-voltage phones that are used by more than 10 million people, saying no scientific evidence exists linking them to cancer or any other health problem.

"Based on more than 40 years of our own research ... and more than 9,000 independent studies, we are convinced there are no health hazards associated with using cellular phones," said Edward Staiano, executive vice president and general manager of Motorola's General Systems Division, which makes the company's cellular products.

Monday's move by Motorola was seen by industry analysts as an attempt to defuse the controversy before it gets out of hand and threatens Motorola's vision of a wireless world, in which people would communicate with one another anytime, anyplace via cellular phones, computers using wireless modems and other hand-held devices.

David Reynard, a St. Petersburg, Fla., resident, Thursday told Larry King's national audience that

Reynard's wife's death from a brain tumor was the result of her persistent use of a cellular telephone, alleging that the tumor formed right next to where she held the handset. Reynard has filed suit against Japan's NEC Corp., maker of the cellular phone his wife used, as well as a GTE Corp. subsidiary that provided the service.

But few in the medical community agree with Reynard or believe he and his attorneys have a chance of winning in a courtroom.

"Electronic waves simply don't cause cancer ... period," said Dr. Victor Levin, chairman of the department of neuro-oncology at the prestigious M.D. Anderson Cancer Center in Houston.

Added Eleanor Adair of Yale Laboratories' John B. Pierce Foundation Laboratories: "The power output from a cellular phone is just too low. ... It can't do that kind of damage to tissues."

Staiano said that while Motorola takes cellular-telephone safety seriously, "to be perfectly honest, we aren't concerned."

He added that although some anxious customers have called Motorola seeking clarification, the number of queries hasn't been larger than is usual regarding product safety. He

said there has been no noticeable effect on sales.

Motorola's confidence in the safety of its cellular products and in cellular technology in general "is rooted in scientific fact," Staiano said. "These questions have been raised from time to time, and they are legitimate questions. But if Motorola had the least concern that these products would cause health problems, we would stop selling them immediately."

Much of the concern stems from decades-old worries about the effect of electromagnetic fields and low-frequency (15 hertz to 30 kilohertz) radiation produced by products such as video display terminals, electric motors and high-voltage power lines.

Unlike those devices, however, cellular phones use much higher frequency ranges (800 to 900 megahertz) and much lower voltage (1/2 watt to 3 watts).

Critics contend that electromagnetic waves emitted at hundreds or thousands of watts can cause cataracts or heat damage to the body, but there are no definitive research data to support those claims, Staiano said.

"We know of no level of RF [radio frequency] energy at which there is any causation of tumors or

any acceleration of the growth of tumors," he said. "And, we have tested these products over a wide variety of frequencies."

While most researchers agree with Motorola's conclusions about safety—including a panel brought together by the U.S. Labor Department—some scientists in Germany, Sweden and the U.S. insist enough research has been done on cellular phones to allay anxiety.

"Research into the cumulative effect of exposure in the cellular frequency band has been negligible," said W. Ross Adey, associate director of research at the J.L. Pettis Memorial VA Medical Center in Loma Linda, Calif., who is conducting research into cellular safety.

In research data shared with Motorola, however, Adey indicated that thus far, results indicate cellular transmissions in the 800- to 900-megahertz frequency range have no demonstrable impact on cell formation or growth, Staiano said.

And by day's end, the stock market seemed to be siding with the industry, not the doomsayers. Motorola regained $2 of the stock it lost Friday, to close at $56, and McCaw, which lost $2.50 that day, regained every penny.



EXHIBIT

Λ

# FDA to CTIA: There Isn't Enough Data To Gauge Cellular Phone Risks

*The following is the full text of a letter, dated July 19, 1993, sent by FDA's Dr. Elizabeth Jacobson to CTIA President Thomas Wheeler.*

Dear Mr. Wheeler:

I am writing to let you know that we were concerned about two important aspects of your press conference on July 16 concerning the safety of cellular phones, and to ask that you carefully consider the following comments when you make future statements to the press.

First, both the written press statements and your verbal comments during the conference seemed to display an unwarranted confidence that these products will be found to be absolutely safe. In fact, the unremittingly upbeat tone of the press packet strongly implies that there can be no hazard, leading the reader to wonder why any further research would be needed at all. (Some readers might also wonder how impartial the research can be when its stated goal is "a determination to reassure consumers," and when the research sponsors predict in advance that "we expect the new research to reach the same conclusion, that cellular phones are safe.")

More specifically, your press packet selectively quotes from our Talk Paper of February 4, in order to imply that FDA believes that cellular phones are "safe." ("There is no proof at this point that cellular phones can be harmful.") In fact, the same Talk Paper also states, "There is not enough evidence to know for sure, either way." Our position, as we have stated it before, is this: Although there is no direct evidence linking cellular phones with harmful effects in

humans, a few animal studies suggest that such effects could exist. It is simply too soon to assume that cellular phones are perfectly safe, or that they are hazardous—either assumption would be premature. This is precisely why additional research is needed.

We are even more concerned that your press statements did not accurately characterize the relationship between CTIA and the FDA. ("CTIA has asked the Food and Drug Administration to review and validate this new research to ensure its credibility.") It goes without saying that we would review your data and provide comment on it—we view that as part of our job as a regulatory agency. But since it is not yet clear whether we will help to direct the research program, it is premature to state that we will credential the research.

To sum up, Mr. Wheeler, our role as a public health agency is not to "reassure consumers." I think it is very important that the public understand where we stand in evaluating the possibility that cellular phones might pose a health risk. I am concerned that your July 16 press conference did not serve that end as well as it should have.

Sincerely yours,

Elizabeth D. Jacobson, PhD
Deputy Director for Science
Center for Devices and Radiological Health
Food and Drug Administration
Rockville, MD

EXHIBIT

B

USA Today, December 10, 1993, 2B, p.8

# Study: Cellular phones safe

Cellular-phone users can relax. The radiation spewed by these phones pose no safety risk, a new study finds.

Om Gandhi, professor of electrical engineering at the University of Utah, will present the study today at a conference in Europe. His conclusion: The amount of radiation from cellular phones that is absorbed by the body is four to five times lower than levels generally accepted by scientists as safe.

Gandhi's study was sponsored by the National Institutes of Health. Partial funding was provided by McCaw Cellular, the USA's largest cellular phone service company.

The study looked at 10 different phones from four manufacturers, and measured how much radiation a user's shoulder, head, neck and upper torso absorbed. He used a special head-shaped model that simulated the human skull's ability to absorb outside particles.

The safety of cellular phones has been questioned this year. In January, David Reynard of St. Petersburg, Fla., appeared on CNN's Larry King show, saying his wife died of a brain tumor caused by cellular phones. He sued cellular service provider GTE, though that lawsuit was dismissed, and Japanese company NEC, which made the cellular phone.

Later, a class-action lawsuit was filed in Chicago against Motorola and other cellular-phone makers, charging them of selling an unsafe product. That lawsuit was dismissed in July.

Ron Nessen, of the Cellular Telecommunications Industry Association, says the study is good news. "The more research, the better," he adds. Indeed, a host of similar studies is under way.

The controversy hasn't harmed the growth of cellular phone users, which now total 14.7 million, up 34% from last year. "Our feeling is that the public responded in a common-sense way," Nessen says.
— *James Kim*

EXHIBIT

C



**MOBILE
COMMUNICATIONS**

JOHN E. ROONEY
President

Ameritech Center Building
2000 West Ameritech Center Drive
Hoffman Estates. Illinois 60195-5000
708/765-5701
Fax: 708/765-3700

February 1, 1993

Dear Valued Customer:

If you've seen recent television or newspaper coverage concerning the safety of portable cellular phones, you're probably wondering whether your phone is safe. A lawsuit in Florida alleges that portable cellular phones cause brain cancer, however, no substantiated proof has been presented to support this claim. I want to assure you that there has been a great deal of scientific research on this topic, and there is no evidence that your cellular phone can cause any health problems.

While we are convinced that cellular phones do not pose health hazards, we recognize that you, our customer, may feel more comfortable if the issue is once again addressed and resolved by an authoritative assessment of the complex medical and scientific issues. Work has already begun. Ameritech Mobile has joined with other cellular companies, represented by the Cellular Telecommunications Industry Association, in announcing that we are funding new research to re-examine the findings contained in the thousands of studies which have found that radio waves from cellular phones are safe.

The cellular industry has asked the government agencies responsible for ensuring the health and safety of the public in this area, the Department of Health and Human Services, the Federal Communications Commission, and the Environmental Protection Agency, to appoint a blue-ribbon commission to review and approve the methodology and findings of this research. We expect some of the new tests to be completed in a relatively short time. Other research will take longer.

I want to assure you that you can be confident that your cellular service is safe and that Ameritech Mobile is serious about ensuring the health and safety of each and every customer.

Sincerely,

*[signature]*

**EXHIBIT**

D

Robert J. Nelson
*President/General Manager*

# CELLULAR**ONE**

840 East State Parkway
Schaumburg, IL 60173
1-800-CELL ONE

February 1993

To Our Valued Customers,

If you've seen the TV coverage or read the recent newspaper stories, you're probably wondering about the safety of cellular phones. We want to assure you that significant scientific evidence exists to verify that cellular phones are safe. Indeed, the Food and Drug Administration, while recommending further studies, stated several days ago that it sees no reason for people to stop using their cellular phones.

The current flurry of news stories was apparently sparked by a single Florida lawsuit. Nevertheless, the wide-spread publicity about this case has caused concern and confusion.

This concern cannot be alleviated by videotapes or TV talk shows. Any real issues that might exist need to be resolved by an authoritative, scientific investigation. That's why Cellular One has joined with other cellular companies, represented by the Cellular Telecommunications Industry Association, to fund new research we believe will confirm previous studies which have found that radio waves associated with cellular phones are safe.

To be sure that this new research is credible to you, the cellular industry has asked the government agencies responsible for ensuring the health and safety of the public in this area — the Department of Health and Human Services, the Federal Communications Commission, and the Environmental Protection Agency — to appoint a blue-ribbon commission to review and approve the methodology and findings of this research. We expect some of the new tests to be completed in a relatively short time; other research may take longer. But the cellular industry is committed to a thorough scientific investigation to assure that the proper use of cellular phones poses no significant health risk.

In the meantime, we believe you can continue to use your cellular phone with confidence that it is safe. We care about your well-being. And we'll continue to keep you updated on this important issue as more information becomes available.

Sincerely,

Enclosure

**EXHIBIT**

# SAFE CELLULAR PHONES

CTIA®

CTIA®

CELLULAR TELECOMMUNICATIONS
INDUSTRY ASSOCIATION
1133 21st Street, NW, Third Floor

EXHIBIT

F

THOUSANDS OF RESEARCH STUDIES,
PAPERS AND ARTICLES ON THE HEALTH
EFFECTS OF ELECTROMAGNETIC FIELDS
HAVE APPEARED IN PUBLICATIONS
SUCH AS THE FOLLOWING:

American Medical Association Archives of
Industrial Health
Annals of The New York Academy of Sciences
Bioelectromagnetics
Health Physics
International Journal of Radiation Biology
Journal of Applied Physiology: Respiratory,
Environmental, and Exercise Physiology
Journal of Microwave Power
Journal of Occupational Medicine
Radiation Research
Radio Science
Science
Transactions of American Institute
of Electrical Engineers

"...hand-held cellular telephones usually have their antennas
mounted in such a way that the feed-point is several inches
from the head, thus reducing exposure further. Studies
using cellular telephones reported by Balzano [Dr. Quirino
Balzano, Electrophysicist, V.P., Motorola, Radio Products
Group] have indicated that SAR [Specific Absorption Rate]
values in human head models are below the exclusion
threshold."
    *Federal Communications Commission,*
    *Office of Engineering & Technology,*
    *Spectrum Engineering Division, January 1993*

"...Recommended exposure limits and guidelines have been
published by the American National Standards Institute, the
Institute of Electrical and Electronics Engineers, the National
Council on Radiation Protection and Measurements, and the
International Radiation Protection Association...Based on
present knowledge, prolonged exposure at or below the levels
recommended in these guidelines is considered safe for
human health by us.

    ...Therefore, based on present knowledge, the exposures
from low-power transceivers and cellular telephones are con-
sidered to be without risk for the users and for the public."
    *Institute of Electrical and Electronics Engineers*
    *(IEEE), December 1992*

"...The cellular portable unit emits 0.6 W, a power level well
below the 2.0 W commonly used for CB [CITIZENS'
BAND] hand-held portable transceivers, and the 5.0 W com-
monly used for hand-held marine transceivers.
    The exposure of the head and body of the user of a cellular
hand-held unit has also been measured. The measurements
show that the exposure of the user is negligible, i.e., the head
(the organ closest to the antenna) is exposed to levels far
below current and foreseeable U.S. exposure guidelines."
    *Electromagnetic Energy Policy Alliance, 1991*

"...the [safety] standard is set at levels well above those that
are emitted by such devices as cellular phones...the power
output from a cellular phone is just too low. It can't do that
kind of damage to issues."
    Eleanor Adair, Ph.D.,
    John B. Pierce Foundation Laboratories, Yale Laboratories;
    *New York Live, January 21, 1991*

## ARE CELLULAR TELEPHONES SAFE?

Yes. That position is supported by research, experience and testing.

## DON'T CELLULAR TELEPHONES EMIT ENERGY?

Like all electrical devices, cellular telephones produce electromagnetic fields (EMF). EMF are the lines of force that surround any electric current. They are found throughout nature, and we are constantly being exposed to a variety of such fields from natural and man-made sources. The EMF produced by cellular telephones is a type known as "non-ionizing," ordinary light and television signals are also non-ionizing. This should not be confused with "ionizing" radiation, such as x-rays. Again, there is no scientific evidence of adverse health effects from low-power transmissions from cellular phones.

## JUST HOW POWERFUL IS THE ENERGY LEVEL FROM A CELLULAR TELEPHONE?

A conversation over a cellular telephone is carried by radio waves similar to those that carry television broadcasts into your home, though thousands of times less powerful. A cellular telephone operates at a power level lower than that of a small flashlight.

## HAVE THE GOVERNMENT SET STANDARDS FOR THIS EXPOSURE?

There are government guidelines on exposure to electromagnetic energy. More specifically, there are industry and government-approved standards to prevent excessive exposure to radio waves. These standards were set as a matter of prudence, rather than demonstrated risk. Cellular telephones fall safely within these standards.

## WHAT GOVERNMENT AGENCIES HAVE LOOKED INTO THIS ISSUE?

The Environmental Protection Agency, the Food and Drug Administration and Federal Communications Commission. The FCC conducted a series of inquiries into radio-frequency transmissions over a period of eight years and concluded that a portable cellular phones operate well within safety standards. The question of RF exposure also has been addressed by the National Institute of Occupational Safety and Health, the American National Standards Institute, the National Council on Radiation Protection and Measurements and the International Radiation Protection Association. At the professional scientific level, the Institute of Electrical and Electronics Engineers (IEEE) has stated that "under conditions of normal use, the cellular telephones are considered safe for the users and the public."

## WHAT IS THE CELLULAR INDUSTRY DOING ABOUT THESE HEALTH AND SAFETY ISSUES?

Cellular manufacturers are constantly testing their products and conducting research to ensure their telephones continue to meet or exceed all health and safety standards.

## ARE CELLULAR TELEPHONES SAFE?

Thousands of studies, papers and articles have been conducted and published over the past forty years by researchers at universities, government agencies and private laboratories throughout the world on the biological effects of exposure to ultra-high frequency (UHF) radio waves, such as those used in cellular communications. The research has shown overwhelmingly that the radio transmissions from cellular telephones pose no health risk.

## HOW CELLULAR WORKS

Cellular technology uses low-power radio waves to transmit and receive phone calls. Cellular radio waves transmit voice communications in the ultra-high frequency (UHF) band, similar to the radio waves used for television channels 13 and higher. Cellular works by dividing a city into small geographic areas called cells, each served by its own low-power radio transmitter and receiver. Call sites are connected to a Mobile Telephone Switching Office, which is linked to the phone network serving your home or office. As a caller drives across town, the phone call is automatically passed from cell to cell and transmitter to transmitter, without interruption.

## CELLULAR STANDARDS

The American National Standards Institute (ANSI) has recently approved the Institute of Electrical and Electronics Engineers (IEEE) standard for exposure to electromagnetic fields (EMF). In addition, the National Council on Radiation Protection and Measurements (NCRP), an independent organization chartered by Congress, has reviewed the scientific literature concerning the biological effects of EMF and set guidelines for the exposure to electromagnetic energy.

## CELLULAR TELEPHONES ARE WELL BELOW EACH STANDARD

The ANSI/IEEE public exposure standard recommends that the specific absorption rate (SAR) be less than 1.6 Watts/kilogram for a localized exposure of 30 or more minutes. Studies indicate that the highest energy exposure to the head from a portable cellular phone is approximately 0.45 Watts/kilogram, 3 1/2 times below the standard.



**SPECIFIC ABSORPTION RATES (SAR) FOR COMMON PORTABLE COMMUNICATIONS EQUIPMENT**
National Council on Radiation Protection and Measurements: Maximum SAR for Localized Occupational Exposure: 8 W/kg for 6 minutes or more

Cellular Portable: .45 W/kg
CB Radio: 1.6 W/kg
Police Radio: 3.6 W/kg

BIOELECTROMAGNETICS
(IN PRESS)

Acute Low-Intensity Microwave Exposure Increases
DNA Single-Strand Breaks in Rat Brain Cells

Henry Lai[1] and Narendra P. Singh[2]

Department of Pharmacology[1],
Center for Bioengineering[1],
and Department of Psychiatry and Behavioral Sciences[2],
University of Washington,
Seattle, WA 98195
USA

Running title: Microwaves and DNA Damage

Please send correspondence to:

Henry Lai, Ph.D.
Department of Pharmacology, SJ-30
University of Washington,
Seattle, WA 98195

EXHIBIT

G

**Lai**
**Page 2**

## Abstract

Levels of DNA single-strand break were assayed in brain cells from rats acutely exposed to low-intensity 2450-MHz microwaves using an alkaline microgel electrophoresis method. Immediately after 2 hours of exposure to pulsed (2 μsec in width and 500 pulses per second) microwaves, no significant effect was observed, whereas a dose rate-dependent (0.6 and 1.2 W/kg whole body specific absorption rate [SAR]) increase in DNA single-strand breaks was found in brain cells of rats at 4 hours postexposure. Furthermore, in rats exposed for 2 hours to continuous-wave 2450-MHz microwaves (SAR 1.2 W/kg), increases in brain cell DNA single-strand breaks were observed immediately as well as at 4 hour postexposure.

Key words: microwaves, brain cells, DNA damage

Lai
Page 3

In this paper, we report the results from an experiment to study the effect of acute exposure to low-intensity microwaves on DNA damage in brain cells of the rat. Well characterized damages to DNA include DNA single and double strand breaks, alkali labile sites (apurinic, apyrimidinic, alkylation, and phosphotriester formation), base damage, base modification, DNA-DNA and DNA-protein cross links, pymidine dimers, and DNA adducts, etc. Out of all of these, the most commonly used marker for DNA damage is single-strand break. DNA single-strand breaks can lead to carcinogenecity [Tice, 1978; Certutti, 1985; Ames, 1989a,b], cell death [Prigent et al., 1993; Walker et al., 1991; Onishi et al., 1993], and aging [Hart and Setlow, 1974; Tice, 1978]. We used the alkaline microgel electrophoresis method [Singh et al., 1988, 1991, 1994] to assay for DNA single-strand breaks in individual brain cells. This is the most sensitive method available for assaying DNA single-strand breaks and can detect 1 break per $2 \times 10^{10}$ daltons of DNA in lymphocytes.

Male Sprague-Dawley rats (250-300 g) purchased from B & K Laboratory, Bellevue, WA were used in this research. They were housed 3 in a cage in a vivarium on a 12-hr light cycle (light on 7 AM- 7 PM) at an ambient temperature of $22^{\circ}C$ and relative humidity of 65%. They were given food and water ad libitum. The cylindrical waveguide system developed by Guy et al. [1979] was used for microwave exposure. Our waveguide system consists of eight individual cylindrical exposure tubes connected though a power divider network to a single microwave power source. Each tube consists of a section of circular waveguide constructed of galvanized wire screen in which a circularly polarized $TE_{11}$ mode field configuration is excited. The tube also contains a plastic chamber to house a rat. This waveguide system using circularly polarized radiation enables efficient coupling of microwave energy to the animal exposed. For example, a spatially averaged power density of 1 mW/cm$^2$ in the waveguide produces a whole body specific absorption rate (SAR) of 0.6 W/kg in the rat. The range of power

Lai
Page 4

densities for a linearly polarized plane wave associated with an SAR of 0.6 W/kg would

approximate 3-6 mW/cm$^2$.  Local SAR in eight brain regions measured in rats exposed

in this waveguide system varies from 0.5-2.0 W/kg per mW/cm$^2$ [Chou et al, 1985].

Using this system, rats can be irradiated with either continuous-wave (CW) or pulsed (2

μsec pulses, 500 pps) 2450-MHz microwaves at different spatially averaged power

densities.  In our experiments, animals were subjected either to microwave or sham

exposure in the waveguide system for 2 hrs.  Immediately and at 4 hrs after exposure,

rats were placed in a closed box containing dry-ice for 60 sec and then decapitated.  All

procedures from this time onward were done in minimum light.  Brains were removed

immediately and dissected on ice for assay of DNA single-strand breaks.  Removal of the

brain from the skull took approximately 30 sec and dissection of the hippocampus took

an additional 40-45 sec.  All experiments were run blind. Two experimenters were

involved: one did the animal exposure and brain dissection and the other DNA single-

strand break assay.  Neither experimenters knew the treatment condition (microwave or

sham exposed) of the rats.  The method of Singh et al [1994] was used to assay for DNA

single-strand breaks in brain cells with minor modifications.  All chemicals used in the

assay were purchased from Sigma Chemical Co. (St. Louis, MO) unless otherwise noted.

Immediately after dissection, brain tissues were immersed in ice-cold phosphate-buffered

saline (PBS) (NaCl, 8.01 g; KCl, 0.20 g; Na$_2$HPO$_4$, 1.15 g; KH$_2$PO$_4$, 0.20 g, per liter) at

pH 7.4.  Tissue was washed four times with the same buffer to remove most of the red

blood cells.  A pair of sharp scissors was used to mince (approximately 200 times) the

tissue in a 50-ml polypropylene centrifuge tube containing 5 ml of ice-cold PBS to obtain

pieces of approximately 1 mm$^3$.  Four more washings with the cold buffer removed most

of the remaining red blood cells.  Finally, in 5 ml of PBS, these tissue pieces were

dispersed into single-cell suspension using a 5,000λ pipetman.  Therefore, this cell

suspension consisted of different types of cells in the brain.  A small volume (10 μl) of

Lai
Page 5

this cell suspension was mixed with 0.2 ml of 0.5% agarose maintained at 37°C, and 75 μl of this mixture was pipetted onto a fully frosted slide (Eric Scientific Co., Portsmouth, NH) and immediately covered with a 24 x 50 mm square #1 coverglass (Corning Glass Works, Corning, NY) to make a microgel on the slide. Slides were put in an ice-cold steel tray on ice for 1 min to allow the agarose to gel. The coverglass was removed and 75 μl of agarose solution was layered as before. This layering was done very quickly as agarose solidifies rapidly on top of a cold agarose layer. Slides were then immersed in an ice-cold lysing solution (2.5 M NaCl, 1% sodium N-lauroyl sacosinate, 100 mM disodium EDTA, 10 mM Tris base, and 1% Triton-X 100, at pH 10). After an hour of lysing at 0°C, slides were treated with DNAase-free proteinase K (Boehringer Mannheim Corp., Indianapolis, IN) in lysing solution for 2 hr at 37°C. The proteinase K solution was preincubated for 1 hr at 37°C to ensure DNAase inactivation. Slides were then put on the horizontal slab of an electrophoretic assembly (Hoefer Scientific, San Francisco, CA) modified so that both ends of each electrode are connected to the power supply. Nine hundred milliliters of an electrophoretic buffer (300 mM NaOH, 0.1% of 8-hydroxyquinoline, 2% dimethyl sulfoxide, and 10 mM tetra-sodium EDTA) were gently poured into the assembly to cover the slides to a height of 6 mm above their surface. After 20 min to allow for DNA unwinding, electrophoresis was started (18 volts, approximately 300 mA, for 60 min) and the buffer was recirculated at a rate of 100 ml/min. At the end of the electrophoresis, extra electrophoretic buffer was removed from the top of the slides. The slides were gently removed from the electrophoretic apparatus and immersed for neutralization in 35 ml of 0.4 M Tris (pH 7.4) in a Coplin jar (two slides per jar) for 30 min. After two more similar steps of neutralization, the slides were dehydrated in absolute ethanol in a Coplin jar for 30 min and blow dried. One slide at a time was taken out and stained with 50 μl of 1 μM solution of YOYO-1 (stock, 1 mM in DMSO from Molecular Probes, Eugene, OR) and then covered with a 24 x 50-mm

Lai
Page 6

coverglass.  Slides were examined and analyzed with a Reichert vertical fluorescent

microscope (model 2071) equipped with a filter combination for fluorescence

isothyocynate (excitation at 490 nm, emission filter at 515 nm, and dichromic filter at 500

nm).  We measured the length (in microns) from the beginning of the nuclear area to the

last pixel of DNA at the leading edge.  The migration length is used as the index of DNA

single-strand breaks. (As a reference,  lymphocytes exposed to 25 rads of x-rays show 50-

60 microns of DNA migration when assayed with this method.)  Data were analyzed by

ANOVA and difference between groups was compared by the Newman- Keuls test.  A

difference at $p < .05$ was considered statistically significant.

In the first experiment, we exposed rats for 2 hrs to 2450-MHz pulsed (2 μsec

pulses, 500 pps) microwaves at spatially averaged power density of either 1 or 2 mW/cm$^2$

inside the waveguide.  These power densities give an average whole body SAR of 0.6 and

1.2 W/kg,  respectively,  in the exposed animals [Chou et al., 1984].  Amount of DNA

single-strand breaks in cells from the hippocampus and the rest of the brain were assayed

immediately and at 4 hr postexposure.   Figures 1 and 2 show an increase in DNA single-

strand breaks (expressed as microns of migration)  in cells of the hippocampus and the

rest of the brain, respectively, of the microwave-exposed rats at 4 hr after exposure (right

panel), whereas no significant effect was seen immediately after 2 hrs of microwave

exposure (left panel).

In a second experiment, the effect of CW microwave radiation was investigated.

Rats were exposed to CW 2450-MHz microwaves for 2 hrs in the circular waveguide at a

power density of 2 mW/cm$^2$ (average whole body SAR of 1.2 W/kg).  DNA single-strand

breaks were assayed in cells obtained from the whole brain of the animals immediately

and at 4 hr postexposure.  Data in Fig. 3 show a significant increase in DNA single-strand

breaks in brain cells of the microwave-exposed rats compared to those of sham-

Lai
Page 7

exposed animals. Increase in breaks was observed immediately after microwave exposure and at 4 hrs postexposure. It should be noted that the base line of DNA single-strand breaks in the sham-exposed samples in this experiment is lower than that in the previous experiment. This difference could be due to whole brain was used in this study, whereas in the previous study, the hippocampus was dissected out and assayed separately from the rest of the brain. The dissection process took 40-45 sec more before the tissues could be put into ice-cold buffer for processing. Such a delay and the additional disturbance to the tissue during dissection could increase the base line level of DNA breaks.

Thus, our data indicate that acute microwave exposure increases DNA single-strand breaks in brain cells of the rat. Other previous studies have also suggested effects of microwave exposure on chromosome and DNA. Garaj-Vrhorac et al. [1991] showed that acute (15-60 min) exposure to 7.7 GHz microwaves at 0.5 mW/cm$^2$ caused higher incidence of chromosome aberrations in Chinese hamster fibroblasts. Maes et al. [1993] reported that acute exposure to 2450 MHz microwaves at SAR of 75 W/kg and constant temperature increased dicentric chromosome and acentric chromosomal fragments in human lymphocytes. Both studies suggest damage of chromosomal DNA in cells after microwave exposure. In an in vitro study, Sagripanti and Swicord [1986] reported an increase in single- and double-strand breaks in isolated DNA after acute microwave exposure. Recently, Sarkar et al. [1994] reported a change in the sizes of DNA fragments isolated from the brain and testis of mice given repeated exposure to 2450-MHz microwaves at 1 mW/cm$^2$ (SAR 1.18 W/kg). The mechanism of interaction between microwaves and DNA is unknown. An increase in DNA single-strand breaks could be due to an increase in the rate of breaking or a reduction in the DNA-damage repair processes in the cell. It is also puzzling that brain cell DNA responded differently to CW

Lai
Page 8

and pulsed microwaves. A significant increase in DNA single-strand breaks was observed immediately after exposure to CW but not to pulsed microwaves. This further supports our previous conclusion that biological responses to microwaves depend on the parameters of the radiation [Lai, 1992].

Acknowledgments. We thank Mrs. Monserrat Carino for her technical assistance in these experiments and Dr. C.K. Chou of the City of Hope National Medical Center, Duarte, CA for his comments on the manuscript. Research described in this paper was supported by a grant from the National Institute of Environmental Health Sciences (ES-03712).

Lai
Page 9

## References

Ames BN (1989a): Endogenous DNA damage as related to cancer and aging. Mutat Res 214: 41-46.

Ames BN (1989b): Endogenous oxidative DNA damage, aging, and cancer. Free Rad Res Comm 7:121-128.

Cerutti PA (1985): Peroxidant states and tumor promotion. Science 227:375-381.

Chou CK, Guy AW, Johnson RB (1984): SAR in rats exposed in 2450-MHz circularly polarized waveguide. Bioelectromagnetics 5:389-398.

Chou CK, Guy AW, McDougall JA, Lai H (1985): Specific absorption rate in rats exposed to 2450-MHz microwaves under seven exposure conditions. Bioelectromagnetics 6:73-88.

Garaj-Vrhovac V, Horvat D, Koren Z (1991): The relationship between colony-forming ability, chromosome aberrations and incidence of micronuclei in V79 Chinese hamster cells exposed to microwave radiation. Mutat Res 263:143-149.

Guy AW, Wallace J, McDougall JA (1979): Circular polarized 2450-MHz waveguide system for chronic exposure of small animals to microwaves. Radio Sci 14(6s):63-74.

Hart RW, Setlow RB (1974): Correlation between deoxyribonucleic acid excision repair and life span in a number of mammalian species. Proc Natl Acad Sci 71:2169-2173.

Lai H (1992): Research on the neurological effects of nonionizing radiation at the University of Washington. Bioelectromagnetics 13:513-526.

Maes A, Verschaeve L, Arroyo A, DeWagter C, Vercruyssen L (1993): In vitro cytogenetic effects of 2450 MHz waves on human peripheral blood lymphocytes. Bioelectromagnetics 14:495-501.

Onishi Y, Azuma Y, Sato Y, Mizuno Y, Tadakuma T, Kizaki H (1993): Topoisomerase inhibitors induce apoptosis in thymocytes. Biochim Biophys Acta 1175:147-154.

Lai
Page 10

Prigent P, Blanpied C, Aten J, Hirsch F (1993): A safe and rapid method for analyzing apoptosis-induced fragmentation of DNA extracted from tissues or cultured cells. J Immunol Mthods 160:139-140.

Sagripanti JL, Swicord ML (1986): DNA structural changes caused by microwave radiation. Int J Radiat Biol 50:47-50.

Sarkar S, Ali S, Behari J (1994): Effect of low power microwave on the mouse genome: a direct DNA analysis. Mutat Res 320:141-147.

Singh NP, McCoy MT, Tice RR, Schneider EL (1988): A simple technique for quantitation of low levels of DNA damage in individual cells. Expt Cell Res 175:123-130.

Singh NP, Tice RR, Stephens RE, Schnieder EL (1991): A microgel electrophoresis technique for the direct quantitation of DNA damage and repair in individual fibroblasts cultured on microscope slide. Mutat Res 252:289-296.

Singh NP, Stephens RE, Schneider EL (1994): Modification of alkaline microgel electrophoresis for sensitive detection of DNA damage. Int J Radiat Biol 66:23-28.

Tice RR (1978): Aging and DNA repair capability. In Schneider EL (ed): "The Genetics of Aging," New York: Plenum Press, pp 53-89.

Walker PR, Smith C, Youdale T, Leblanc J, Whitfield JF, Sikorska M (1991): Topoisomerase II-reactive chemotherapeutic drugs induce apoptosis in thymocytes. Cancer Res 51:1078-1085.

Lai
Page 11

## Figure Legends

Fig. 1. DNA single-strand breaks (shown as microns of migration during electrophoresis) in hippocampal cells of rats subjected to 2 hr of exposure to pulsed microwaves at an average whole body SAR of 0.6 or 1.2 W/kg, or sham-exposure. Assay was done immediately after exposure (left panel) or at 4 hr postexposure (right panel). N is the number of rats studied. One-way ANOVA showed no significant treatment (microwave) effect on DNA migration immediately after exposure (F[2, 24] = 1.239; nonsignificant), whereas a significant treatment effect was observed at 4 hr postexposure (F[2, 25] = 12.22, p< .001). Values of 0.6 and 1.2 W/kg are significantly different from sham-exposure at p< .01 (Newman-Keuls test). No significant difference was found between exposure at 0.6 and 1.2 W/kg.

Fig. 2. DNA single-strand breaks (shown as microns of migration during electrophoresis) in cells from the rest of the brain (i.e., whole brain minus hippocampus) of rats subjected to 2 hr of exposure to pulsed microwaves at an average whole body SAR of 0.6 or 1.2 W/kg, or sham-exposure. N is the number of rats studied. Assay was done immediately after exposure (left panel) or at 4 hr postexposure (right panel). One-way ANOVA showed no significant treatment (microwave) effect on DNA migration immediately after exposure (F[2, 24] = 1.288; nonsignificant), whereas a significant treatment effect was observed at 4 hr postexposure (F[2, 24] = 14.04, p< .001). Values of 0.6 and 1.2 W/kg are significantly different from sham-exposure at p< .05 and .01 (Newman-Keuls test), respectively. A significant difference at p< .01 was found between exposures at 0.6 and 1.2 W/kg.

Lai
Page 12

Figure 3. Effect of acute exposure (2 hrs) to continuous-wave 2450-MHz microwaves
(SAR 1.2 W/kg) on DNA single-strand breaks in cells of the rat brain. Brain cells
from microwave- and sham-exposed rats were assayed immediately and at 4 hr
postexposure. Two-way ANOVA showed a significant effect of microwaves (F[1,27]
= 25.18, p< .005). Differences between microwave- and sham-exposed rats were
significant at p< .01 both immediately and at 4 hrs after exposure, when compared
using the Newman-Keuls test. There is no significant effect due to time of assay
(F[1,27] = 1.79, non-significant) nor time-of-assay x microwave interaction effect
(F[1,27] = 0.582, non-significant).

Lai
Page 13

## Fig. 1



## Fig. 2



Lal
Page 14

# FIGURE 3





# MICRO WAVE NEWS

**Vol. XIV No. 6**    *A Report on Non-Ionizing Radiation*    *November/December 1994*

## INSIDE...

### EMF NEWS pp.2-9

*Power Line Talk:*
White House Silent on Childhood Cancer Link • Savitz Paper Due January 15 • DOE's Troubles • EPA Hot Line in Hot Water • Measurement Protocol • EPRI and EEI Teleconference • U.K. Update

*McGill Study:*
Strong Association Between Lung Cancer and Transients • Abstract • Table of HFT Exposure–Lung Cancer Response • Transients or RF from Mobile Radios?

*Epidemiology Roundup:*
Appliances and Leukemia • No Link to Brain Tumors • USC Breast Cancer Study

EPRI Seeks Fabrics To Shield Magnetic Fields

EMF Program Begins In California

Florida 500 kV Power Line on Hold

Utility Seeks Dismissal of Property Value Case

### HIGHLIGHTS pp.9-13

*Cellular Phone Notes:*
New Brain Tumor Lawsuits • U.K.'s NRPB Dosimetry • German Studies Find No Cancer Risks • GAO Report Urges Biological Research • Danish Health Review for the EC • CTIA/SAG Meetings

German Telekom Cellular Phone Studies

Fetal Loss In Rats Exposed to DC Fields

The Lai–Singh Experiment

### FROM THE FIELD p.13

Clippings from All Over

### CONFERENCES pp.14-15

1995 Conference Calendar

### UPDATES pp.15-18

European Notes on Electromagnetic Hypersensitivity • Use of Job Titles in Assessing Exposure Can Spell Trouble • EEA Plans Standards for EM Products • Microwave Light Bulbs • People in the News

### CLASSIFIEDS pp.15-20

## Microwaves Break DNA in Brain; Cellular Phone Industry Skeptical

Low-level microwave radiation can cause DNA breaks in the brains of experimental animals, according to studies carried out in the U.S. and in India. The new results, which have attracted a lot of interest within the cellular phone industry, suggest that microwaves could act as a cancer-causing agent.

Drs. Henry Lai and Narendra Singh of the University of Washington, Seattle, have found that a single two-hour exposure to 2.45 GHz radiation at levels currently believed to be safe can increase the number of single-strand breaks in the DNA of the brain cells of rats. "DNA damage is related to the initiation of cancer—if there is an error in the repair process, it could lead to a problem." Lai told *Microwave News.*

"We have a long way to go before we can reach any definitive conclusions," Lai added, pointing out that, "DNA breaks may stimulate DNA repair mechanisms, which could in fact have a beneficial effect." The Lai-Singh paper has been accepted for publication in *Bioelectromagnetics.* It should appear by the spring, according to Dr. Ben Greenebaum, the editor of the journal. (See p.12 for details of the study.)

A second animal study, by a group led by Dr. Soma Sarkar of the Institute of Nuclear Medicine and Allied Sciences in New Delhi, India, found that the DNA in the brains and testes of mice had undergone "rearrangement" following microwave exposure at the same frequency and approximately the same intensity as in the Lai-Singh study. Sarkar and coworkers concluded that a reevaluation of the mutagenic potential of microwave radiation "seems imperative." Sarkar's results were published in *Mutation*

(continued on p.11)

## Hydro-Québec Bars Further Work on Transient Data by McGill University

Hydro-Québec (HQ), a Canadian electric utility, is refusing to allow researchers at McGill University the opportunity to analyze further the data collected in the $3 million Canadian–French epidemiological study released earlier this year (see *MWN, M/A94*). "I can't use the data anymore," said Dr. Gilles Thériault, who led the research project and is the chair of the Department of Occupational Health at McGill University's medical school in Montreal. "It's in the contract that the data belong to the utility and so I can't use them."

Dr. Claude Cardinal, HQ's electromagnetic field (EMF) program manager, confirmed that the utility is barring further access to the data. "All the data belong to the utilities and there is no mandate to start a new analysis," Cardinal told *Microwave News.* Dr. Michel Plante, an HQ medical adviser in Montreal who has been a utility liaison to the McGill team, said: "We

(continued on p.5)

EXHIBIT

H

*Microwaves B.   ⟨ DNA in Brain (continued from p.1)*

growing use of wireless devices for voice and data communications. Both thermal and athermal (low-level) effects will be reviewed, Andersen told *Microwave News*. The study was requested by the telecommunications directorate of the European Commission. A report should be available next spring, Andersen said.

«« »»

CTIA's SAG sponsored an *RF Exposure and Dosimetry Workshop on Small Animal and In vitro Exposure Systems* in Los Angeles, December 2-3. Among the agenda items was a discussion of head-only versus whole-body exposure systems. "We are trying to simulate exposures from the phones," SAG's Dr. Mays Swicord said. "We must be able to define what the exposure is." The Los Angeles meeting follows SAG's October 28 *National Symposium on Wireless Transmission Base Station Facilities*, held in Philadelphia. .

## Fetal Loss Found Among Rats Exposed to DC Magnetic Fields

Pregnant rats exposed to 30 mT (300 G) static magnetic fields had significantly fewer live fetuses than unexposed rats, according to a new study by Drs. Meike Mevissen, Siegfried Buntenkötter and Wolfgang Löscher. The researchers cautioned, however, that more work is needed before the relevance of this finding for humans is known.

Writing in the September 1994 *Teratology* (50, pp.229-237), the researchers, from the School of Veterinary Medicine in Hannover, Germany, reported that fetal resorptions—similar to miscarriages in humans—were 13.9% among exposed rats as compared to 3.9% among controls. They did not observe any serious malformations in the live fetuses.

In an interview with *Microwave News*, Löscher said that his interest in static fields grew out of concern in Germany that magnetic resonance imaging (MRI) technicians have higher-than-average rates of spontaneous abortions. He said this was the first study to use an exposure comparable to field levels to which technicians are exposed.

There were no significant effects on the number of live fetuses in rats exposed to 30 mT 50 Hz magnetic fields. Exposed fetuses had significantly more minor skeletal anomalies than unexposed fetuses, however.

Both groups (DC and AC) of exposed fetuses showed increased skeletal ossification, which the German team said might indicate accelerated prenatal development. In another experiment, the birth weight of rats born to mothers exposed to DC fields was significantly higher than that of the offspring of unexposed rats.

The researchers concluded that exposing pregnant rats to magnetic fields like those in which MRI technicians work "does not induce any major teratogenic effect but seems to slightly increase fetal loss."

*Research* earlier this year.

The cellular phone industry is concerned about the new results. Representatives from Motorola and from the Cellular Telephone Industry Association's (CTIA) Scientific Advisory Group (SAG) on Cellular Telephone Research have visited Lai and Singh's lab a number of times over the last few months.

Despite all the attention, however, the industry is taking a skeptical and dismissive view of the experiments and their implications—and the SAG has angered Lai and Singh. "The validity of the Lai–Singh experiment has yet to be established and, even if it is validated, the effects it purports to show may be inconsequential," Dr. Quirino Balzano, a Motorola corporate vice president, told *Microwave News*. In August, Balzano, accompanied by Dr. Asher Sheppard, an independent consultant to Motorola based in Redlands, CA, went to Seattle to meet with Lai and Singh.

Dr. Ian Munro of CanTox Inc. in Mississauga, Canada, one of the three SAG members, commented that the results of the assay are of "unknown and unclear public health significance." And Dr. George Carlo, the chairman of the SAG, who is setting up a research program on cellular phone health risks for the CTIA (see *MWN*, S/O94), has written that, "It is unclear what relevance [the Lai–Singh data] has to our program."

The third member of the SAG is Dr. Bill Guy, a professor emeritus at the University of Washington and a longtime collaborator of Lai's at the university's Bioelectromagnetics Research Laboratory. Guy designed the microwave exposure system used by Lai and Singh. In an interview, Guy said that he had a "strong conflict of interest" and that, "For the present, I'm reserving my judgment."

One of the industry's key concerns is whether the assay used by Lai and Singh is a reliable and reproducible indicator of DNA damage. The assay—formally called alkaline microgel electrophoresis, but better known as the "comet" assay because it causes the broken-down DNA to spread out like the tail of a comet—was originally developed by Singh and others in the 1980s. Singh stands by the new microwave results: "The data are very impressive and are very interesting," he told *Microwave News*.

The SAG convened an expert panel in Bedminster, NJ, on October 19 to assess the comet assay and the Lai–Singh work. The panel, which was chaired by Dr. Richard Setlow, the associate director for life sciences at Brookhaven National Lab in Upton, NY, "found a number of uncertainties and inconsistencies in the Lai–Singh data," according to Carlo. Setlow refused to comment on the meeting.

In a November 16 memo to Carlo, Munro reported that the expert panel "recommended that the experiment be repeated" as long as "numerous limitations" are corrected. But in the same memo, Munro concluded that, "It is our position that from both a scientific and a priority perspective it may be premature to repeat and extend the Lai–Singh work." Munro said that he would prefer to wait on an international group of researchers that is planning to examine the validity of the assay. "It is probably inappropriate to spend a lot of money to repeat the experiment when we are not sure it is producing a valid result," Munro said.

Last spring, approximately 50-60 scientists held a work-

shop in England to review re....rch on the comet assay, including its use in genetic toxicology, according to Dr. Ray Tice of Integrated Laboratory Systems in Research Triangle Park, NC, who attended both the comet workshop and the October 19 SAG meeting. On March 12, many of the same scientists will resume these discussions at the *Annual Meeting of the Environmental Mutagen Society* in St. Louis. On the agenda is a plan to set up a validation study for the assay, which, once under way, would take about a year to complete, Tice said.

The question of when the SAG will replicate the Lai–Singh study will now be presented to the Harvard Center for Risk Analysis peer-review group on cellular phones (see *MWN, J/A94*). In a November 17 letter to Dr. John Graham, the director of the Harvard center in Boston, Carlo asked: "Should a repeat of the *in vivo* comet assay be deferred until the international validation is completed and we have a more thorough understanding of this assay technique?"

On December 1, Dr. Susan Putnam, a research associate at the Harvard center, said that as soon as she receives complete background information from the SAG, she will forward it to a subset of her peer-review group. She declined to predict when she would have a response for Carlo.

Many of those who know about the Lai–Singh data believe that replication studies should move forward now. "Results like these deserve a follow-up," Dr. Elizabeth Jacobson told *Microwave News*. Jacobson is the deputy director for science at the Food and Drug Administration's (FDA) Center for Devices and Radiological Health (CDRH) in Rockville, MD.

"My opinion as a scientist is that it should be pursued and should be replicated in other labs," Tice said in an interview, adding that, "The data from the validation study will be useful in interpreting these results." And Sheppard, Motorola's consultant, commented, "I think that the work needs to be replicated and explored further."

Early this year, Lai and Singh asked the SAG for $240,000 (of which $50,000 would have been for lab equipment) from the $15-25 million research fund set up by the cellular phone industry (see *MWN, J/F93* and *J/A93*). But in early November, they became so frustrated that they withdrew their proposal. "They are moving too slowly," Lai said. He added that he could not understand the delays over validation since many labs are using the comet assay and at least three other labs have used it to examine DNA breaks in brain tissue. A group led by Dr. Luc Verschaeve at VITO, the Flemish Technological Research Institute, in Brussels, Belgium, reported effects of mobile telephone radiation on blood lymphocytes as determined by the comet assay, at last June's *Annual Meeting of the Bioelectromagnetics Society* in Copenhagen, Denmark.

The relationship between Lai and Singh and the SAG has been tense since Lai and Singh were not allowed to attend the October 19 panel workshop. "They invited us twice, but then they forgot about us," Lai said. Singh remains bitter about this episode: "When you are executing a person, you should have a fair trial," he said.

Carlo responded that a decision was made that attending the workshop "would not be the best use of Lai and Singh's time." Munro said that it was common practice not to invite researchers to a peer review of their own work. Both Carlo

## The Lai–Singh Experiment

Rats were exposed for two hours to either continuous wave (CW) or pulsed (500 2 μsec pulses per second) 2450 MHz radiation at a power density of 2 mW/cm², corresponding to a specific absorption rate (SAR) of 1.2 W/Kg. The researchers used the comet assay to measure DNA breaks.

Four hours after exposure to the pulsed signals, Lai and Singh found a significant increase in single-strand DNA breaks in the hippocampus, as well as in the rest of the brain of the rats. But no significant effect was observed immediately after a two-hour exposure. A similar effect was also seen for 1 mW/cm² (SAR =0.6 W/Kg) and there appeared to be a dose–response relationship.

For CW exposures, a significant increase in DNA breaks in the rats' brains was found both immediately after exposure and four hours later.

Lai told *Microwave News* that there were approximately 20% and 30% more DNA breaks after exposure to CW and pulsed microwaves, respectively, as compared to controls.

and Munro noted that Lai and Singh continue to serve as consultants to the SAG, attending workshops and other meetings.

Guy, a colleague of both Lai's and Carlo's, said that Lai should expect some controversy. "I told Henry that 'You've got dynamite in your hands—if it turns out to be a real effect, the implications are tremendous,'" Guy told *Microwave News*. If Lai and Singh are correct, their results will have implications far beyond the cellular phone industry because of the low exposure levels implicated. "These are levels that could stimulate a reevaluation of the ANSI/IEEE standard," Sheppard said.

Lai wants to continue his studies: "We did not ask for a lot of money—we should be doing science instead of all this politics," he said.

On September 30, the SAG signed a letter of intent with Dr. Martin Meltz for *in vitro* studies of DNA damage using the comet assay. The proposal from Meltz, who is the director of the Center for Environmental Radiation Toxicology at the University of Texas Health Sciences Center in San Antonio, TX, has not yet been considered by the Harvard peer-review panel. Carlo said that no "definitive experiment" would begin until it wins Harvard approval, which he anticipates getting by the beginning of 1995. Meltz requested $95,000, which includes $13,000 for lab equipment.

While a decision on when to replicate the Lai–Singh experiment is pending, Dr. Jerry Phillips in Dr. Ross Adey's lab at the VA Hospital in Loma Linda, CA, is gearing up to repeat the Indian study but at cellular phone frequencies. "We are going to look at DNA damage in brain tissue exposed *in vivo* and in brain tumor cells exposed *in vitro* using the Sarkar method," Phillips said. He pointed out that the comet assay requires sophisticated and expensive equipment to which he does not have access.

Lai and Singh are not the first to report that microwaves can cause breaks in DNA. In the mid-1980s, FDA's Drs. Jose-Luis Sagripanti and Mays Swicord, working with Dr. Christopher Davis of the University of Maryland, College Park,

12

# FROM THE FIELD

## Clippings from All Over

Early research did raise legitimate concerns about the health effects of [EMFs]. Since then, most studies have found no association, but there are occasional chance findings—blips—that keep the issue on the table. No study, of course, can ever prove that EMFs (or anything else) are safe. But none of the 30 to 40 studies done in the last 10 years has provided any convincing evidence that EMFs cause birth defects, childhood cancers, breast cancer in women, or other problems.
—Dr. Patricia Buffler, University of California, Berkeley, quoted in "A Clear Point of View: Patricia Buffler on EMFs," *University of California at Berkeley Wellness Letter*, p.2, November 1994

To those physicists and biologists who understand the fundamental science, Janie Robins, a Harvard epidemiologist, observes, EMF-induced cancer seems almost as implausible as, for instance, ESP-induced cancer. Because epidemiologists don't understand physics as well as physicists do, or biology as well as biologists do, they are not constrained by a strong prejudice toward the "null hypothesis"—the assumption that the phenomenon in question is nonexistent. As a result, Robins says, epidemiologists will gladly give credence to dubious studies of EMF in a way they never would to similar studies of ESP, the implausibility of which they understand.
—Gary Taubes, "Fields of Fear," *Atlantic Monthly*, pp.102, 108, November 1994. The article ran with the following subhead: "People want to believe that [EMFs] are bad for them, and so they do. A study in how the selective reporting of scientific evidence—by researchers as well as journalists—can generate anxiety at the expense of reality."

"If you're sick, do you go to a physicist?" [Professor Dan Wartenberg of Rutgers University] said that he is very careful not to speak about physics questions outside his field—like how to minimize EMF fields. Physicists should do the same, he said. The debate is one of argument and counter-argument—with the public's health riding on the final score. The Edison Electric Institute, an industry group, argues that there has been "no established biological mechanism" to explain the EMF–cancer link, and so cancer in the studies must have other causes. Wartenberg responds that the National Cancer Institute officially recommends eating fresh fruits and vegetables to reduce cancer risk, although they admit ignorance of exactly why those foods

help. EMF studies are no different, he said—the results are still persuasive, even if the exact mechanism[s] are not well understood.
—David Newhouse, "Sparks Continue To Fly In Debate Over EMFs," *The Times* (Trenton, NJ), p.8, November 21, 1994

Craig McCaw [is] the kind of man who...once suggested in all apparent seriousness—as color drained from the face of a PR man in attendance—that the Federal Communications Commission should reserve spectrum for telepathic communications to be made possible by brain implants he thinks will exist some day.
—Andrew Kupfer, "AT&T's $12 Billion Cellular Dream," *Fortune*, p.102, December 12, 1994

The worst thing that utility systems could do would be to dismiss EMF health risk findings. But I also believe that there is danger in according to the EMF riddle the status of a probable health risk requiring enormous amounts of study. If the utility industry in its zeal to be responsive creates too large an issue over EMF, it runs the risk of reaching a kind of problematic critical mass which will continue to generate a long series of relatively expensive studies. These will never prove what is going on or definitively disprove it either....The time is coming to take a harder line against the small industry of people who are attempting to use litigation to extract payoffs from utility companies by convincing a jury that the utilities have known of EMF dangers but have done nothing about them.
—Cyrus Noë, "EMF Health Effects Update: It's Time To Take a Harder Line," *Clearing Up: Northwest Energy Markets*, a newsletter based in Seattle, pp.1-6, November 21, 1994

The presence of high-power transmission lines is like a double-edged sword of Damocles affecting perhaps the physical health, but surely the economic health, of landowners. It hangs over the heads of the utilities as well. In their own economic self-interest, if not concern for the public, utilities should press the appropriate state and federal authorities to study the problem and come up with definitive answers to the EMF puzzle before utilities and customers suffer severe, dire consequences.
—Dr. Sharlene McEvoy, "Double-Edged Sword of Damocles: Utility Companies' Liability for Diminution of Property Values Due to Electromagnetic Fields," *Real Estate Law Journal*, 23, p.122, 1994

---

found that microwave radiation acts synergistically with copper to cause single- and double-strand breaks (see *MWN, M/J87*). In a recent interview, Swicord, the chief of the molecular biology branch at FDA's CDRH, commented that, "The speculation is that this is a possible mechanism for causing DNA damage that could have significant health effects."

SAG's Munro pointed out that he does not put as much emphasis on single-strand breaks as on mutations. "Stable mutations are a much more serious matter," he said.

Dr. Kenneth Tindall, the head of the molecular mutagenesis group at the National Institute of Environmental Health Sciences (NIEHS) in Research Triangle Park, NC, said that, "The jury is still out on the biological significance of single-strand breaks," explaining that, "The classic view is that they are not important, but more recent research suggests certain types of breaks may not be easily repaired and could lead to a biological effect." The NIEHS is a sponsor of Lai's work on the search for a possible mechanism to explain microwave interactions with neurological function.

Indeed, Lai argues that the microwave radiation does not cause direct damage to the DNA. "I would bet that an enzyme repair mechanism is being affected," he said.

Nor are Lai and Singh the first to show that microwaves

can transform DNA. Drs. Elizabeth Balcer-Kubiczek and George Harrison of the University of Maryland School of Medicine in Baltimore found that 2.45 GHz radiation, modulated at 120 Hz, causes cells to become cancerous if they are later treated with a tumor promoter (see *MWN, J/A89*). "We unequivocally showed neoplastic transformation after microwave irradiation followed by the application of the tumor promoter TPA," Harrison told *Microwave News*. And in a series of studies, a group of Croatian researchers found that radar radiation can lead to chromosomal aberrations (see *MWN, M/J92*).

Elizabeth Balcer-Kubiczek and George Harrison, "Neoplastic Transformation of C3HI 10T½ Cells Following Exposure to 120Hz Modulated 2.45 GHz Microwaves and Phorbol Ester Tumor Promoter," *Radiation Research*, 126, pp.65-72, 1991.

Vera Garaj-Vrhovac, Dorda Horvat and Zlatko Koren, "The Effect of Microwave Radiation on the Cell Genome," *Mutation Research*, 243, pp.87-93, 1990 (for references to related Croatian studies, see *MWN, M/J92*).

Henry Lai and Narendra Singh, "Acute Low-Intensity Microwave Exposure Increases DNA Single-Strand Breaks in Rat Brain Cells," *Bioelectromagnetics*, 16, 1995 (in press).

Jose-Luis Sagripanti, Maya Swicord and Christopher Davis, "Microwave Effects on Plasmid DNA," *Radiation Research*, 110, pp.219-231, 1987.

Sohva Sarkar, Sher Ali and J. Behari, "Effect of Low-Power Microwave on the Mouse Genome: A Direct DNA Analysis," *Mutation Research*, 320, pp.141-147, 1994.

N.P. Singh, R.E. Stephens and B.L. Schneider, "Modifications of Alkaline Microgel Electrophoresis for Sensitive Detection of DNA Damage," *International Journal of Radiation Biology*, 66, pp.23-28, 1994.

Chicago Sun-Times, Wednesday, January 4, 1995, p. 3

# Motorola to Study Cell Phone Safety

**By Frederick H. Lowe**
Staff Writer

Motorola Inc. will conduct its own research into the safety of cellular telephones after a recent study again raised questions about their potential health hazards.

The study, by University of Washington scientists Henry Lai and Narendra P. Singh, found that rats experienced breakages in several strains of DNA tissue after being exposed to microwave radiation equivalent to levels transmitted from cell phones for two hours.

"DNA damage is related to the initiation of cancer—if there is an error in the repair process, it could lead to a problem," Lai told Microwave News, a scientific newsletter that published the study in its November/December issue.

The Lai/Singh study also will be published in the spring issue of Bioelectromagnetics.

"This really is the first serious piece of biological data to come along since [the safety issue] hit the front pages two years ago, and it is not at all reassuring," said Louis Slesin, publisher of Microwave News.

But one cellular telephone industry official dismissed the study.

"It's not very relevant because they didn't use the cellular frequency or cellular power," said Ron Nessen, a vice president at the Cellular Telecommunications Industry Association, a Washington-based trade group to which Motorola belongs.

The study's initial results, however, have prompted Schaumburg-based Motorola to conduct its own research.

"The results are contradictory to previous research and we want to address the conclusions they



NANCY STUENKEL/SUN-TIMES

**Cellular telephone industry officials predict 100 million cellular phone users by the year 2000.**

[Lai and Singh] reached," Motorola spokesman Norman Sandler said.

After safety issues were raised in 1992, Motorola helped the Scientific Advisory Group on Cellular Telephone Research raise $25 million to conduct studies on cellular telephones, which have not begun. The Motorola study will be separate from SAG's research, Sandler said.

Motorola has hired an independent lab employing an international group of scientists to conduct its study, which will be ready for peer review this spring.

Sandler said consumer safety is uppermost in the minds of company officials.

Motorola's decision prompted applause from Slesin.

"I don't think Motorola believes the results of Lai/Singh, but the company is doing the right thing. This is the only way you are going to find out," he said.

The design of hand-held cellular telephones put the user's brain only fractions of an inch from an antenna that acts as a mini-transmitter. The antenna sends radio signals up to 10 miles away to receiving stations that transfer the signal. Some of the signal is absorbed in the user's head.

The safety issue concerning hand-held cellular telephones gained widespread attention in 1992, when a man appearing on national television said his wife died from brain cancer caused by the use of the telephones, and he filed a lawsuit against two companies.

Just last month, the General Accounting Office reported that cellular telephones may pose a health hazard, but no federal agency or private group has done the research to find out.

Neither Lai, an associate professor of pharmacology, nor Singh, an assistant professor of psychiatry and behavioral sciences, would comment beyond a news release issued by the University of Washington.

The cellular phone industry, which began service in Chicago 12 years ago, is growing by leaps and bounds. About 20 million people own cellular telephones, and consumers are buying 17,000 telephones a day, CTIA spokesman Michael Houghton said. Industry officials predict 100 million cellular phone users by the year 2000.

Last June, cellular industry revenues reached $12.6 billion, up 40 percent compared with the same period last year. To boost the surging industry, capital investment also has boomed. Last June, companies invested $16.1 billion in new infrastructure, up 27 percent from the previous year.

Motorola is one of several companies building plants to meet the growing demand for cellular. Last April, company officials announced plans to spend $100 million on a new cellular telephone manufacturing plant in Harvard, Ill., that will employ 2,000 to 3,000 workers.

**EXHIBIT**

I

# Studies re-examine cellular phone safety

FT. LAUDERDALE SUN SENTINEL

Cellular-phone users, take heed:

Headlines in December declaring cellular telephones safe were based on a study that has since been declared invalid by the researcher who performed it and other scientists who reviewed it.

The cellular phone industry says it will be several years before there will be a definitive answer on whether the devices cause brain tumors or other health problems.

"This is a scientific process, and, yes, you find some errors," said Dr. George Carlo, chairman of the Scientific Advisory Group on Cellular Telephone Research, which was established by the industry to oversee new research. "But as a scientist, I think that's good. It shows the peer review process is working."

Carlo just released a two-volume "blueprint" for future research.

"It has become clear that it is probably going to take more money than was originally thought, but the CTIA [Cellular Telecommunications Industry Association] has made pledges to me that the money will be there," Carlo said. In January 1993, the industry promised up to $25 million for research, after news-media coverage of possible health risks.

The industry association at the time said thousands of studies during the last 40 years showed the phones posed no health hazard, but Carlo's group has spent the last 18 months reviewing those studies and says they are not enough.

"We have found data gaps, arenas where there is insufficient evidence" to establish whether the radio-frequency radiation emitted by the phones is harmful, Carlo said.

"Although a large body of literature exists on the biological effects of radio-frequency radiation, few studies directly consider exposure from cellular telephones and other wireless instruments," he said.

Carlo's group plans to establish a database including as many as 10 million cellular-phone users—3 million have already been identified—for what he described as "post-market surveillance."

That means the health of phone users will be monitored in various studies.

The study declared invalid was done by Dr. Om Gandhi, chairman of the Department of Electrical Engineering at the University of Utah.

Using models of the human head, Gandhi took measurements of the radiation being absorbed at various points, but he found lower exposures than other scientists who performed similar tests.

Gandhi said he redid the studies, putting the phone closer to the head than he had the first time.

"We revised our numbers up by anywhere from 10 percent for some of the telephones tested to about 2.3 times as much power absorbed for other telephones," Gandhi said.

Gandhi said all the phones he tested were within safety guidelines, but he is studying the next generation of phones and says those may pose a hazard.

"With the ever-decreasing dimensions of cellular phones and their antennas, we find in the future for some of these under certain circumstances the absorbed power will be above the limit," Gandhi said.

Questions about the phones' safety were raised in January 1993, when it was reported that none of the three federal agencies with jurisdiction over the devices could say they were safe.

The articles were prompted by a lawsuit filed by David Reynard of Madeira Beach, Fla., alleging that his wife's death was caused by a brain tumor triggered by radiation from her cellular phone.

The case is before the U.S. District Court in Tampa, but no trial date has been set.

A U.S. General Accounting Office investigation into safety issues is expected to be completed in late October.

**EXHIBIT**

J

Nov 28 '95  12:36AM MOTOROLA LITIGATION SEC 000

| SUMMONS | | ALIAS - SUMMONS | | (Rev. 5/1/92) CCG-1 |
|---|---|---|---|---|

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

JERALD P. BUSSE, individually, and on
behalf of all others similarly situ-
ated,

        Plaintiff,

      v.

MOTOROLA, INC., a Delaware corpora-
tion; AMERITECH MOBILE COMMUNICATIONS,
INC., a Delaware corporation, on be-
half of itself and all other entities
similarly situated; CELLULAR TELECOM-
MUNICATIONS INDUSTRY ASSOCIATION, a
District of Columbia corporation;
THOMAS E. WHEELER; RONALD NESSEN;
SCIENCE ADVISORY GROUP ON CELLULAR
TELEPHONE RESEARCH n/k/a WIRELESS
TECHNOLOGY RESEARCH, L.L.C., a Dela-
ware corporation; EPIDEMIOLOGY RE-
SOURCES, INC., a Massachusetts corpo-
ration; and GEORGE L. CARLO,

        Defendants.

No:

95CH 10332

JURY DEMAND

**PLEASE SERVE:** See Reverse

## SUMMONS

To each defendant:

    YOU ARE SUMMONED and required to file an answer to the complaint in this
case, a copy of which is hereto attached, or otherwise file appearance, in
the office of the Clerk of this Court (located in the Richard J. Daley Cen-
ter, Room 802, Chicago, Illinois 60602) within 30 days after service of
this summons, not counting the day of service. IF YOU FAIL TO DO SO, A JUDG-
MENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF ASKED IN THE COM-
PLAINT.

To the officer:

    This summons must be returned by the officer or other person to whom it
was given for service, with endorsement of service and fees, if any, immedi-
ately after service. If service cannot be made, this summons shall be re-
turned so endorsed. This summons may not be served later than 30 days after
its date.

      WILLIAM J. HARTE, LTD.
Name BARNOW AND HEFTY, P.C.
Attorneys for Plaintiff
Address 105 W. Madison St., Ste 2200
City   Chicago, IL 60602
Telephone 312-621-2000
Firm I.D.  06814

ADDRESS,

CLERK C.
AURELIA PUCINSKI

        Clerk of court

Date of service, 10 31 , 19
(To be inserted by officer on copy left
with defendant or other person)

AURELIA PUCINSKI, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Received Time   Oct. 31. 10:37AM        Print Time    Oct. 31. 10:38AM

NOV-06 '95 12:34PM MOTOROLA LITIGATION SECTION    No. 3833    P. P. 4/4

CTSystem

**Service of Process Transmittal Form**

Chicago, Illinois

**10/31/1995**

Via Federal Express (Overnight)



TO: Richard H Whited
Motorola, Inc.
1303 E. Algonquin Rd.
Schaumburg, IL 60196

RE:    **PROCESS SERVED IN ILLINOIS**

FOR    MOTOROLA, INC. Domestic State: De

ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:

1. TITLE OF ACTION:    Jerald P. Busse, Individually, and on behalf of all others similarly situated, Plaintiff vs Motorola, Inc., et al Defendants

2. DOCUMENT(S) SERVED:    Summons, Complaint, Exhibits

3. COURT:    Circuit Court of Cook County, Illinois, County Department, Chancery Division
Case Number 95CH10332

4. NATURE OF ACTION:    Plaintiff prays that Court enter an order against Defendant, et al regarding cellular portable telephone and services, prior to their purchase, of the fact that electromagnetic radiation is deposited in the head and brain tissue of users during the ordinary use of their cellular portable telephones, etc. establish a fund in an amount sufficient to adequately monitor and test for health effects for those consumer who choose to voluntarily participate in a study, etc.

5. ON WHOM PROCESS WAS SERVED:    CT Corporation System, Chicago, Illinois

6. DATE AND HOUR OF SERVICE:    By Process server on 10/31/1995 at 08:00

7. APPEARANCE OR ANSWER DUE:    within 30 days

8. ATTORNEY(S):    Bernow and Hefty, P.C.
William J. Harte, Ltd.
105 W. Madison St., Ste. 2200
Chicago, IL 60602

9. REMARKS:    This confirms our telephone call with Cheryl Bradberry and sent as instructed.

SIGNED    CT Corporation System

PER    Debra L. Meyers /WS
ADDRESS    208 South LaSalle Street
Chicago, IL 60604
SOP WS 0000577129

Information contained on this transmittal form is recorded for CT Corporation System's record keeping purposes only and to permit quick reference for the recipient. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information that can be obtained from the documents themselves. The recipient is responsible for interpreting the documents and for taking the appropriate action.

Received Time    Oct. 31. 10:37AM    Print Time    Oct. 31. 10:36AM